IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

HENRY ALVAREZ, MARIANO     CIVIL DIVISION
CUESTA, MACH 21 INVESTMENTS,     CASE NO.: 2018-013762 CA 01
LLC and HMD INVESTMENT GROUP,
LLC,
        Plaintiffs

versus

BRANDTASTIC DESIGN LLC., a dissolved
Florida Limited Liability Company,
DESIGNATED HOLDINGS LLC., a
Florida Limited Liability Company, PAUL
KETTLEWELL, VIRTUE VAPE LLC,
VVIG INC. FLAVOR SUITE, LLC, a dissolved
Foreign company, DAVID O'BRIEN,
JOHN ABBEY, CATALINA JIMENEZ and ALAN
SMURFIT

        Defendants
_____/

## **AMENDED COMPLAINT**

NOW COME, the Plaintiffs, Henry Alvarez ("Alvarez"), Mariano Cuesta ("Cuesta"),

Mach 21 Investments, LLC ("Mach 21") and HMD Investment Group, LLC "HMD"), by and

through the undersigned counsel and sue the Defendants, Brandtastic Design

LLC.("Brandtastic"), Designated Holdings LLC ("Designated"), Paul Kellewell ("Kettlewell"),

Virtue Vape LLC ("Virtue"), VVIG Inc. ("VVIG"), Flavor Suite LLC ("Flavor"), David O'Brien

("O'Brien"), John Abbey ("Abbey"), Catalina Jimenez ("Jimenez") and Alan Smurfit

("Smurfit") and as grounds therefore would show as follows:

## JURISDICTION, VENUE, AND DEFINITIONAL ALLEGATIONS

1. This is an action for damages in excess of $15,000.00 and injunctive relief which is within the jurisdiction of this Court.

2. The Plaintiffs are subject to the jurisdiction of this court as follows:

   a. Alvarez and Cuesta, are residents of Miami-Dade County, Florida and are otherwise sui juris;

   b. The Plaintiffs, Mach 21 and HMD, are limited liability companies with their principal place of business in Miami-Dade County, Florida and are suit juris.

3. The Defendants are subject to the jurisdiction of this court as follows:

   a. Brandtastic, Designated and Virtue are Florida Limited Liability Companies which do business, and which reflect their principal place of business as Miami-Dade County, Florida and are sui juris.

   b. VVIG is a Florida corporation which does business in Miami-Dade county, Florida and is sui juris.

   c. Flavor was a Delaware company which also was registered in North Carolina and thereafter dissolved. Said company did business within the State of Florida and is sui juris.

   d. The Defendant, Kellewell is a resident of Miami-Dade county, Florida and is sui juris.

   e. The Defendants, Abbey, Jimenez, and Smurfit, were residents of Miami-Dade County, Florida but did business within and committed the tortious conduct complained of in this Amended Complaint within Miami-Dade County, Florida and are sui juris.

   f. The Defendant, O'Brien, did business within and committed the tortious conduct complained of in this Amended Complaint within Miami-Dade County, Florida and is sui juris.

   g. The following terms shall have the stated definitions:

    i.  *Itemized Trademarks* shall be defined to include Crack Pie; Food Fighters

       Juice; Dirty Danish; Krispee; Monster Krisp; Pound It; Raging Donut; Too

       Puft; 2 Puft; and Vape Breakfast Classics

    ii.  *Detailed Trademarks* shall be defined to include Crack Pie; Pound It;

       Raging Donut

## ALLEGATIONS IN COMMON TO ITEMIZED TRADEMARKS

4. The allegations of this complaint which were set forth under Jurisdiction, Venue, and

   Definitional Allegations are hereby re-alleged

5. The Plaintiffs held trade secrets pertaining to distribution as well as the creation,

   development, formulae and details of the Itemized Trademarks.

6. Such information was information, including a formula, pattern, compilation, Program,

   device, method, technique as defined in the Florida Statues as trade secrets.

7. The Defendants have fraudulently applied for and obtained trademark registrations for

   each of the Itemized Trademarks.

8. Specifically, Catalina Jimenez for VVIG verified to the United States Patent Office that

   for each of the Identified Trademarks that VVIG (1) was the owner of the Trademark, (2)

   had used the Mark in commerce, and (3) to the best of Jimenez's knowledge and belief,

   no other persons, had the right to use the mark in commerce, either in the identical form

   or in such near resemblance as to be likely, when used on or in connection with the

   goods/services of such other persons, to cause confusion or mistake, or to deceive.

   (documents are attached)

9.  Such statements were false and known to be false at the time such representation were made to the Patent Office as reflected below:

    a.  VVIG was solely a distribution company and was not to be the owner of trademarks for any brands distributed by VVIG;

    b.  VVIG had confirmed that Alvarez and Cuesta had controlled and were the owners of such trademarks;

    c.  VVIG had paid royalties for VVIG's sale of such trademarked items again confirming that Alvarez and Cuesta, not VVIG were the owners;

    d.  The trademarks was created and developed by Alvarez and Cuesta which was known by VVIG;

10. The statements made by Jimenez for VVIG were false and known to be false at the time such representation made to the Patent Office improperly for the purposes of damaging the Plaintiff.

11. The Defendants' manufacture, distribution and sale of the reproductions of Plaintiffs' marks were for the willful and calculated purpose of trading on plaintiffs' good will and business reputation.

12.  Furthermore, the Defendants have willfully promoted and sold the products and items using the Itemized Trademarks in such a manner so as inevitably to suggest association, affiliation or sponsorship with, or approval by, Plaintiffs and so as to cause or be likely to cause, confusion or mistake among purchases as to origin of the defendants' products, all to the defendants' gain and plaintiffs' damage.

## COUNT I: COMMON-LAW TRADEMARK INFRINGEMENT, COMMON-LAW AND STATUTORY UNFAIR COMPETITION
### (VVIG)

13. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Itemized Trademarks are hereby re-alleged

14. The conduct of the Defendants' (VVIG), violate and infringe upon the Plaintiffs' common law rights in the Itemized Trademarks, as well as constitute improper and unfair competition with the Plaintiffs under the laws of the State of Florida.

15. The conduct of the Defendants has damaged and will continue to damage plaintiffs' good will and reputation to the irreparable injury unless restrained by this Court.

16. The Plaintiffs have no adequate remedy at law.

WHEREFORE, the Plaintiffs request this court enter a Judgment Against VVIG Inc., for Damages, Injunction (Enjoining VVIG from using the Itemized Trademarks), Attorney Fees, costs and such other relief as this court deems just and proper.

## COUNT II: UNFAIR COMPETITION
### (Virtue Vape, VVIG Inc., Flavor Suite)

17. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Itemized Trademarks are hereby re-alleged

18. The Defendants (Virtue Vape, VVIG Inc., Flavor Suite) have caused reproductions of products with the Plaintiffs' Itemized Trademarks to enter into interstate commerce.

19. The Defendants' use of the Itemized Trademarks is a false description and representation that the Defendants' goods are made by, sponsored by or affiliated with the Plaintiffs.

20.  The Defendants have adopted and used reproductions of Plaintiffs' Itemized Trademarks as the dominant indication of source in connection with the distribution and sale in commerce of its product(s), with full knowledge of the prior use and continued ownership by the Plaintiffs.

21. The Defendants have willfully promoted the sale in commerce of its product(s) using reproductions of Plaintiffs' Itemized Trademarks in such a manner so as to falsely designate origin or association with Plaintiffs' Itemized Trademarks and with Plaintiffs' products, and so as inevitably to cause confusion or mistake among purchasers as to the true origin, source, sponsorship, or affiliation of defendants' products, all the defendants' gain and plaintiffs' great damage.

WHEREFORE, the Plaintiffs request this court enter a Judgment Against Virtue Vape, VVIG Inc., Flavor Suite, for Damages, Injunction (Enjoining Virtue Vape, VVIG Inc., Flavor Suite from using the Itemized Trademarks), Attorney Fees, costs and such other relief as this court deems just and proper.

## COUNT III: TRADE SECRET INJUNCTION
(Brandtastic, Designated, Kettlewell, Virtue, VVIG, Flavor, O'Brien, Abbey, Jimenenz Smurfit)

22. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Itemized Trademarks are hereby re-alleged

23. Abbey and Virtue Vape entered into an agreement with Alvarez and Cuesta for manufacturing purposes. (Agreement is attached)

24. Pursuant to paragraph 14 of the Virtue Agreement, the Defendants agreed that that all confidential or proprietary information would be held in confidence without disclosure to

third parties unless permitted by the express written consent of Alvarez and Cuesta of Lee & Quids Vapor LLC.

25. Furthermore, the confidential obligations survived the termination/expiration of the agreement (Paragraph 8)

26. Notwithstanding the requirement that such trade secrets of Alvarez and Cuesta be maintained, such items were provided by Abbey and Virtue unto the other Defendants (Brandtastic, Designated, Kettlewell, VVIG, Flavor, O'Brien, Jimenenz Smurfit) in violating and misappropriating the disclosed such trade secrets to the Defendants in this cause.

27. At the time of the disclosure, the Defendants knew or had reason to know this such knowledge of the trade secrets was;

    a. Derived from or through a person (Brandtastic, Designated, Kettlewell, Virtue, VVIG, Flavor, O'Brien, Abbey, Jimenenz, Smurfit) who had utilized improper means to acquire same;

    b. Acquired under circumstances giving rise to a duty to maintain its secrecy of limits its use; and/or

    c. Derived from or through a person who owed a duty to the Plaintiffs to maintain such secrecy or limits its use

28. The Plaintiffs have no adequate remedy at law.

WHEREFORE, it is appropriate that the court enter its order of injunctive relief precluding the Defendants, Brandtastic, Designated, Kettlewell, Virtue, VVIG, Flavor, O'Brien, Abbey, Jimenenz, Smurfit, from continued use of the Itemized Trademark Information as well as consequential damages and attorney fees.

### COUNT IV TRADE SECRET DAMAGES
(Brandtastic, Designated, Kettlewell, Virtue, VVIG, Flavor, O'Brien, Abbey, Jimenenz Smurfit)

29. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Itemized Trademarks, and all allegations under Count III: Trade Secret Injunction are hereby re-alleged

30. Plaintiffs have suffered damages including loss of revenue and profits attributable to the Itemized Trademarks, interest and loss of reputation and good will.

31.  It is appropriate that the court enter its judgment for damages against all Defendants for damages and attorney fees.

32. The conduct of the Defendants was done purposely and willfully to cause grievous damages against the Plaintiffs.

WHEREFORE, it is appropriate that the court enter its Judgment of Injunctive relief precluding the Defendants, Brandtastic, Designated, Kettlewell, Virtue, VVIG, Flavor, O'Brien, Abbey, Jimenenz Smurfit, from continued use of the Itemized Trademark Information as well as consequential damages and attorney fees and such other relief as this court deems just and proper.

## COUNT V: LANHAM ACT
(VVIG)

33. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Itemized Trademarks are hereby re-alleged

34. By reason of the foregoing, the Plaintiffs make claim against the Defendants (VVIG) for injunctive and monetary relief under the Lanham Act with regard to the false designation of origin and false descriptions and representations in commerce of the Plaintiffs' product which carry the Itemized Trademarks.

35.  The Defendants, whether personally or through one or more entities they controlled have violated the Lanham Act as set forth above including copying the Itemized Trademarks, manufacturing the improper products associated with the Itemized Trademarks and distributing/passing off such items as genuine

36.  The Defendants have actively and knowingly engaged both directly and indirectly in the infringing acts described herein and thus such Defendants are liable both personally and through their controlled entities for the violations of the Lanham Act.

WHEREFORE, it is appropriate that the court enter its Judgment for Injunctive Relief and Damages against the Defendants, VVIG as well as damages, attorney fees, and such other relief as deemed just and proper.

## COUNT VI: CANCELLATION OF TRADEMARKS
### (VVIG)

37. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Itemized Trademarks, as well as under the Lanham ACt are hereby re-alleged

38. The Defendants' fraudulently obtained trademarks should be forthwith deemed cancelled and the court should order the Defendants to promptly cancel and cease use thereof in the of  injunctive and such damages as are just and proper

WHEREFORE, it is appropriate that the court enter its Judgment for Injunctive Relief Canceling the Trademarks held by VVIG as well as damages, attorney fees, and such other relief as deemed just and proper.

## COUNT VII: FRAUD BY CATALINA JIMENEZ
### (Jiminez)

39. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Itemized Trademarks, as well as under the Lanham Act are hereby re-alleged

40. The statements by Jimenez made to the USPTO were false, known to be false at the time such representations were made, and made with the intentions of damaging the Plaintiffs.

41. The Plaintiffs have been damaged by such representations.

WHEREFORE, it is appropriate that the court enter its Judgment of Damages against Jimenez as well as consequential damages and attorney fees and such other relief as this court deems just and proper.

## ALLEGATIONS IN COMMON TO DETAILED TRADEMARKS

42. The Plaintiffs own the Florida Trademarks of all marks defined under Detailed Trademarks.

43. The Defendants use reproductions of said marks in the stream of commerce.

44. The Defendants' use in Florida of reproductions of the Detailed Trademarks infringes the Plaintiffs' rights in the Florida registered trademarks and is thus in violation of the Florida Trademark Statute.

45. The Plaintiffs have requested and demanded that the Defendants cease and desist from their acts of trademark infringement and have given Defendants' actual notice of the Plaintiffs' registrations; however, the defendants have refused to cease this conduct.

## COUNT VIII: VIOLATION OF FLORIDA TRADEMARK
### (VVIG, FLAVOR)

46. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Detailed Trademarks are hereby re-alleged

47. The conduct of the Defendants (VVIG and Flavor) has caused and will continue to cause damages in excess of $15,000.00, unless restrained by the Court.

48. Plaintiffs have no adequate remedy at law.

WHEREFORE, it is appropriate that the court enter its Judgment of Injunctive relief precluding the Defendants, VVIG and Flavor from continued use of the Detailed Trademark Information as well as consequential damages and attorney fees and such other relief as this court deems just and proper

## COUNT IX: FLORIDA DECEPTIVE TRADE PRACTICES
(VVIG, Flavor)

153. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Detailed Trademarks are hereby re-alleged

154. The Defendants' (VVIG and Flavor) use of the reproductions are a deceptive trade practice.

155. By engaging in such conduct, the Defendants have derived substantial profits from such wrongful manufacture, use, and sale to which such Defendants are not in equity or in good conscience entitled

156. The Plaintiff has been damaged by said practice.

WHEREFORE, it is appropriate that the court enter its Judgment of Damages against the Defendants, VVIG and Flavor as well as award attorney fees and such other relief as this court deems just and proper

### COUNT X: TRADEMARK DILUTION AND INJURY TO BUSINESS REPUTATION
(VVIG, Flavor)

153. The allegations of this complaint which were set forth under Jurisdiction, Venue,
    and Definitional Allegations, and Allegations in Common to Detailed Trademarks
    are hereby re-alleged

154. The conduct of the Defendants (VVIG and Flavor) will cause a likelihood of dilution
    of the distinctive and valuable quality of Plaintiffs trademarks and a likelihood of
    injury to Plaintiffs' business reputation in violation of the Florida unless enjoined by
    the court.

   WHEREFORE, it is appropriate that the court enter its Judgment of Damages against the
Defendants, VVIG and Flavor as well as award attorney fees and such other relief as this court
deems just and proper

### ALLEGATIONS IN COMMON TO BREACH OF CONTRACT, INDEMNITY AND NEGLIGENCE

49. The Plaintiffs entered into an agreement with the Defendants, (Virtue and Abbey)
   hereinafter referred to as the Virtue Agreement on December 16, 2014. (attached as
   Exhibit 1)

50. In accordance with the terms of the agreement, Virtue was to:
   a. "supply the bottles, PG, VG, nicotine and labels necessary for e-liquid
      manufacturing, mix flavors, bottle, label and ship product, and supply reports on
      usage and sales.";
   b. "follow the highest professional standards in performing all services to be
      provided under this agreement".

    c.   indemnify and held harmless Alvarez and Cuesta of Lee & Quids Vapor LLC from any breach of the said agreement or the gross negligence or willful misconduct of Virtue's employees or agents.  (See paragraph 16).

51.  Pursuant to paragraph 14 of the Virtue Agreement, the Defendants agreed that that all confidential or proprietary information would be held in confidence without disclosure to third parties unless permitted by the express written consent of Alvarez and Cuesta of Lee & Quids Vapor LLC.

52. Furthermore, the confidential obligations survived the termination/expiration of the agreement (Paragraph 8).

53.  Alvarez and Cuesta of Lee & Quids Vapor LLC complied with all terms and provisions of the Virtue Agreement.

54.  Notwithstanding the foregoing full compliance by Alvarez and Cuesta of Lee & Quids Vapor LLC, the Defendants, Abbey/Virtue breached the aforedescribed agreement as follows:

    a.   Virtue/Abbey diverted the formulae, manufacture, and nature of each Itemized Trademarks directly to other parties (VVIG and the Defendants) so that when the relationship under the Virtue Agreement ceased, all such confidential information, were fully disclosed unto the other Defendants.

    b.   Virtue supplied such information to VVIG, Jimenez and Kettlewell who used such information provided to them to file for trademarks and object to the trademarks sought by the Plaintiffs in their filings;

    c.   Virtue and Abbey continued to create and provide the same services to produce the same products for the other Defendants which had been done previously for Alvarez and Cuesta, thus failing to keep in confidence such information and failing to act in accordance with the highest professional standards;

## COUNT XI: BREACH OF CONTRACT
### (Abbey/Virtue)

55. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Breach of Contract, Indemnity and Negligence are hereby re-alleged

56. As a consequence of the actions and conduct of Virtue and Abbey, the Plaintiffs intellectual property, trademark rights, sales and loss of business were inflicted by the said breach caused directly by said misconduct.

WHEREFORE, the Plaintiff this Court enter its Judgment for Damages against Abbey and Virtue as well as attorney fees, costs, and such other relief is just and proper.

## COUNT XII: INDEMNITY
### (Abbey/Virtue)

57. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Breach of Contract, Indemnity and Negligence are hereby re-alleged

58. Pursuant to Paragraph 16 of the Virtue Agreement, Virtue and Abbey agreed to Indemnify Alvarez and Cuesta from such damages.

59. As a consequence of the action of Virtue and its agents and employees (i.e. Abbey, Jimenez, O'Brien and Smurfit as well as their companies of Flavor, VVIG, and Awesome), the Plaintiffs are now facing trademark claims and suits for the very products which the Plaintiffs created  and developed but which were provided over in breach of the Virtue Agreement unto Abbey, Jimenez, O'Brien and Smurfit as well as their companies of Flavor, VVIG, and Awesome, including expenditure of attorney fees and costs.

WHEREFORE, the Plaintiff requests this Court enter a Judgment against Abbey and Virtue for Damages as well as for Attorney Fees, Costs, and such other relief is just and proper.

## COUNT XIII: NEGLIGENCE
(Abbey/Virtue)

60. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Breach of Contract, Indemnity and Negligence are hereby re-alleged

61. Virtue/Abbey failed to exercise the duty of care imposed as follows;

    a. Failing to keep all matters under the Itemized Trademark and brands thereunder confidential.

    b. Virtue and Abbey failed to act in accordance with the highest professional standards;

        i. delays occurred in the manufacture an shipment as required by the proper standard of care;

        ii. insects were discovered as being placed inside the bottles of manufactured liquid thereby causing damage to the name and quality of the vapor products in violation of the duty of care;

        iii. a hypodermic syringe and other foreign matter was placed by Virtue in the bottles of vape liquid in violation of the proper duty of care;

62. As a consequence of these breaches in duty of Virtue and Abbey, the Plaintiffs intellectual property, trademark rights, sales and loss of business were caused by the failure of care done by Abbey/Virtue.

63. Further, loss of clients, goodwill and market share was harmed with attendant loss of revenue from the failure of Virtue/Abbey to exercise due care.

WHEREFORE, the Plaintiff this Court enter its Judgment for Damages against Abbey and Virtue as well as attorney fees, costs, and such other relief is just and proper

## COUNT XIV: TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

64. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Breach of Contract, Indemnity and Negligence are hereby re-alleged

65. Paul Kettlewell is a graphic designer who had become acquainted with Abbey, Jimenez, O'Brien, Alvarez and Cuesta prior to May 1, 2015.

66. On April 26, 2015, Kettlewell formed a company called Brandtastic Design LLC ("Brandtastic") to perform the graphic design and other services which he provided.

   a.   Said company ceased and was involuntarily dissolved on September 23, 2016.

67. On May 20, 2015, Brandtastic and Designated Holdings LLC (another Kettlewell created company hereinafter called "Designated") entered into a Standard Services Agreement which is attached as Exhibit 2 with Jimenez on behalf of VVIG. ("Brandtastic Agreement")

68. Said Brandtastic Agreement provided that Brandtastic and Designated would:

   a.   Provide Design Website Development and Maintenance;

   b.   Label Designs and Printing; and

   c.   Marketing Services.

69. Furthermore, said Brandtastic Agreement forbade the use and appropriate of intellectual property of others including third parties (See paragraph 2.1 and 2.2).

   a.   Said provision was present to protect the trade secrets and intellectual property of Alvarez and Cuesta.

70. Prior to the agreement to form VVIG for non-exclusive distribution, Virtue was manufacturing the following flavors and brands for Alvarez, Cuesta and/or their companies (Lee & Quids Vapor LLC, 212 Associates LLC, Mach 21 Investments LLC , Midnight Vapes Co. and Mach Investment Group LLC):

   a.   Gush;

   b.   Rolly;

   c.   Dragons and Kreme;

   d.   King's Custard;

  e. Queen's Fruit;

  f. Blackbird's Tobacco;

  g. Quid's POC;

  h. Apfel Spice; and

  i. Burst.

71. As had been agreed, VVIG was formed and the non-exclusive distribution of the above products proceeded (as well as the continued sale and distribution of such products by Alvarez and Cuesta and their companies).

72. The Plaintiffs, Henry Alvarez and Mariano Cuesta are the creators and owners of the intellectual property and common law rights to the trademarks, brand, flavor and images of Crack Pie, Dirty Danish.

73. As each of the above brands, flavors and images described in paragraphs 33-39 were developed, same were in turn forwarded for final graphic design and labels by John Abbey/Virtue Vape to   Brandtastic, Designated and Kettlewell pursuant to the Brandtastic Agreement.

74. Finalization of the images and products occurred and were transmitted back to Alvarez and Cuesta either individually or through their companies.   These items were then provided in turn by Alvarez and Cuesta for use by VVIG for distribution of the applicable products.

75. The Plaintiffs, Henry Alvarez and Mariano Cuesta are the creators and owners of the intellectual property and common law rights to the trademarks, brand, flavor and images of Crack Pie, Dirty Danish, Foodfighter Juice, Monster Krisp and Krispee, Pound It, Raging Donut, Too Puft and 2 Puft.

76. The Defendant, Kettlewell, for himself as well as his companies (Brandtastic and Designated) and on behalf of VVIG confirmed by e-mail in writing on July  25, 2017 that Alvarez and Cuesta were the owners of the following trademarks (Exhibit 3):

  a. Blackbird Tobacco;

  b. Crack Pie;

  c. Dragons and Kreme;

  d. Dunks;

  e. Gush;

  f. Lee & Quids POC;

  g. Parfait;

  h. Pound It;

  i. Raging Donut;

  j. Rolly;

  k. Too Puft;

77. Meanwhile, Paul Kettlewell, Brandtastic and Designated proceeded to use and appropriate the intellectual property provided over to Virtue Vape and John Abbey, notwithstanding the express terms of the Brandtastic Agreement.

  a. Indeed, Paul Kettlewell, Brandtastic and Designated appropriated such items for not only themselves but then licensed and provided same over to VVIG.

78. As a result of the foregoing, Virtue Vape and John Abbey breached the Virtue Vape agreement and the confidential or proprietary information to be held in confidence without disclosure to third parties, was caused to be breached by the actions of Kettlewell, Brandtastic and Designated.

79. Thus, Kettlewell, Brandtastic and Designated were aware of the existence of the Virtue Vape Agreement with Alvarez and Cuesta.

80. No justification nor privilege was present to permit the improper actions of Kettlewell, Brandtastic and Designated causing the breach of the Virtue Vape Agreement by Abbey and Virtue Vape.

81. As a result of the foregoing, Alvarez and Cuesta have suffered damages including loss of profits and earnings attributable to such intellectual property, loss of said intellectual property, attorney fees for such wrongful acts.

82. Such conduct was done maliciously and intentionally for the purposes of causing the improper taking of such intellectual property from Alvarez and Cuesta.

Wherefore, Alvarez and Cuesta pray for judgment for damages against Kettlewell, Brandtastic and Designated including loss of profits and earnings, loss of such property, attorney fees and such further relief as the court may deem to be just and proper.

## COUNT XV: ASSAULT
### Abbey

83. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations are hereby re-alleged

84. On February 9, 2016, the Defendant, John Abbey did assault and batter Henry Alvarez at the facility of Virtue and VVIG wherein the operations of Alvarez and Cuesta had been maintained in Miami, Florida.

85. In particular, the Defendant, John Abbey, yelled and then picked up an office chair and hurled same at Alvarez, wherein Alvarez was struck with said chair in front of the other workers and persons at said location.

86. As a result, Alvarez suffered bodily injury and resulting pain and suffering, Mental anguish and attendant damages.

87. Said conduct by Abbey was done willfully and maliciously with the intent of causing grievous injury to Alvarez

WHEREFORE, the Plaintiff this Court enter its Judgment for Damages against Abbey and as well as attorney fees, costs, and such other relief is just and proper

## ALLEGATIONS IN COMMON TO PRE-VVIG AGREEMENT

88. Abbey, Catalina and O'Brien and Kettlewell (along with the later participation of Smurfit) met with the Plaintiffs and agreed to commence a separate distribution company (VVIG) wherein the following was to occur ("Pre-VVIG Agreement");

   a. First, Abbey (via Jimenez), Jimenez, O'Brien, Alvarez and Cuesta would each become owners of 20% of VVIG;

   b. Second, VVIG would then solely act to distribute flavors and brands on a non-exclusive basis for the owners of said company, with the ownership and rights to all such flavors/brands to remain with the owner and/or his company;

   c.  Third, Virtue would provide manufacturing services of the flavors/brands; however, the sanctity and confidentiality of the Virtue Agreement would remain in force and effect;

   d.  Fourth, VVIG would pay from the VVIG revenues, the following:

       i.  First, payment for manufacturing would be paid to Virtue;

      ii.  Second, payment for payroll as employees would be paid to Jimenez, Smurfit, Alvarez and Cuesta;

     iii.  Third, payment for bonuses keyed to performance of the VVIG company would be paid as deemed fit by the owners of VVIG;

     iv.  Fourth, payment for royalties would be made to the owners of the flavor/brand being distributed to honor the ownership of said flavors/brands;

      v.  Fifth, commissions would be paid to those persons/companies enhancing the sales of products for distribution;

     vi.  Sixth, distributions of all remaining funds would be made on a monthly basis to the owners of VVIG.

**COUNT XVI: BREACH OF PRE-VVIG AGREEMENT**
(Abbey, Jimenez, Kettlewell, O'Brien)

89. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, and Allegations in Common to Pre-VVIG Agreement are hereby re-alleged

90. VVIG commenced operations pursuant to said agreement; however, it was then discovered that individual defendants breached the agreement as follows:

    e.   Diverting funds from VVIG to their individual products, companies, or personal use.

        vii.   No disbursement nor diversion of funds from VVIG was permitted without the written consent of Alvarez, Cuesta, Jimenz, O'Brien and subsequently Smurfit.

    f.   Payments from VVIG ceased and were not made to Plaintiffs as required;

    g.   Ownership of VVIG to Alvarez and Cuesta was then claimed to not be present;

    h.   The ownership and trade secrets pertaining to the Itemized Trademarks were not maintained as herein described; and

    i.   Ownership of the Itemized Trademarks and trade secrets of the Plaintiffs was disavowed.

91. The Defendants, despite the breach, assured the Plaintiffs that the Itemized Trademarks would remain under the sole control of the Plaintiffs (Exhibit 3).  Said representation was made by Kettlewell and further confirmed by all Defendants orally.

92. Meanwhile, the Defendants retained the trade secret information and began generating duplicates of the Itemized Trademarks for Awesome Flavors, VVIG and all Defendants' use.

93. The Defendants have fraudulently applied for and obtained trademark registrations for each of the Itemized Trademarks, (As described in the itemized trademark counts).

157.  The Defendants have thus fraudulently failed to pay the amounts described herein and fraudulently failed to provide the ownership of VVIG and fraudulently taken the Itemized Trademarks and trade secrets, causing damages of loss of profits from operations, loss of goodwill, reputation and diminution of same.

94.  Such actions reflect a breach of the agreement of the parties resulting in damages to the Plaintiff.

WHEREFORE, the Plaintiff requests this Court enter a Judgment for Damages against Abbey, Jimenez, Kettlewell, O'Brien as well as attorney fees, costs, and such other relief this court deems just and proper.

### COUNT XVI: FRAUD AND CONSPIRACY TO DEFRAUD (in the Alternative to Count XVII)
(Abbey, Jimenez, Kettlewell, O'Brien)

95. The allegations of this complaint which were set forth under Jurisdiction, Venue, and Definitional Allegations, Allegations in Common to Pre-VVIG Agreement, and Allegations under Count XV are hereby re-alleged.

96. Abbey, Jimenez and O'Brien (members and managers, and thereafter joined by Smurfit as owner and Kettlewell as authorized agent of Virtue) conspired and created a scheme to defraud and steal the trade secrets of the Plaintiffs for themselves and their companies.

97. In furtherance of the foregoing scheme and artifice, Abbey, Jimenez and O'Brien (members and managers, and thereafter joined by Smurfit as owner and Kettlewell as authorized agent of Virtue) falsely represented unto the Plaintiffs that:

   a.  Ownership of all brands/flavors would remain solely with the creator/developer of same and not with VVIG.

    b.  Such intellectual property represented by said brand and flavors developed by Cuesta and Alvarez would remain confidential and not released or provided to any other persons, just as was set forth in both the Virtue Agreement and Brandtastic Agreement;

    c.  In the event of termination for any reason, all of the foregoing representations would remain in full force and effect.

    d.  These representations were made with the specific intent that such representations would not be performed.

98. The Plaintiffs relied on such representation and acted in reliance thereon by providing the non-exclusive distribution rights to VVIG.

99. The Defendants represented to the Plaintiffs that the Itemized Trademarks would remain under the sole control of the Plaintiffs (Exhibit 3).  Said representation was made by Kettlewell and further confirmed by all defendants orally.

100.    the confirmation of Kettlewell as to the continued ownership and control of trade secrets remaining with the Plaintiffs was false, and known to be false at the time it was made by Kettlewell and confirmed by the other Defendants.

101.    Said false representation was made for the purposes of inducing the Plaintiffs to rely thereon which the Plaintiffs did to their detriment.

102.    Said representations were false and known to be false by the Defendants at the time said representations were made in order to induce the Plaintiff to rely thereon.

103.    The said representations were made with the specific intent that such representations would not be performed.

104.      The Plaintiffs relied on such representation and acted in reliance thereon by providing the non-exclusive distribution rights to VVIG.

105.      The Plaintiffs were damaged by the conspiracy by Abbey, Jimenez, Kettlewell, O'Brien

WHEREFORE, the Plaintiff requests this Court enter a Judgment for Damages against Abbey, Jimenez, Kettlewell, O'Brien as well as attorney fees, costs, and such other relief this court deems just and proper

WHEREFORE, the Plaintiffs, Henry Alvarez and Mariano Cuesta, pray for entry of injunctive relief prohibiting said defendants and their affiliates and agents from acting to license, sell use or distribute the e-vapor Liquid Products based on the trade secrets and Itemized/Designated Trademarks in any form or manner and cancel or cause to be cancelled the fraudulently obtained trademarks as outlined herein.

Furthermore, it is prayed that in order to provide full relief, this court enters judgment for all damages as outlined herein including loss of profits, revenues and damages, diminution of the value of the said e-vapor Liquid Products. Attorney Fees and Costs and such other relief as this Court may deem to be just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by email/ U.S. mail to Guy Giberson at gfg@mathewsllp.com, this 27th day of November, 2018.

Law Offices of Victor K. Rones, P.A.
16105 NE 18 Ave,
North Miami Beach Fl, 33162
Tel: (305) 945-6522
Fax: (305) 940-2277
Primary Email: law@victorkronespa.com
By:___s/Victor K. Rones___
Victor K. Rones, Esquire
Fla Bar # 245178

Alvarez v Brandtastic
Amended Complaint
Case No: 2018-013762 CA 01
Page 25

EXHIBITS

| Exhibit # | Description |
|---|---|
| 1. | Manufacturing Agreement |
| 2. | Standard Services Agreement |
| 3. | Trademark Applications |
| 4. | Florida Trademarks |
| 5. | Kettlewell Confirmation |
| 6. | Proposed Agreement |
| 7. | Shareholder Agreement |
| 8. | Handwritten Agreement |

EXHIBIT 1

MANUFACTURING AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into this _16_ day of _December_ 20_14_, by and between _Virtue Vape John Abbey_ of _____ V.P._____. (the "Manufacturer") and _Henry Alvarez & Marian Cuesta_ of _Lee & Quids Vapor_, LLC (the "Client").

RECITALS

A. WHEREAS, Client desires to obtain certain Services described hereunder from the Manufacturer;

B. AND WHEREAS Client agrees to engage the Manufacturer as an independent contractor to perform such Services and the Manufacturer hereby agrees to provide such services to the Client

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Services

Client hereby appoints Manufacturer to act as its Manufacturer and the Manufacturer hereby agrees to provide the following manufacturing services to Client (the "Services"):

Supply the bottles, PG, VG, nicotine and labels necessary for e-liquid manufacturing, mix flavors, bottle, label and ship product, and supply reports on usage and sales.

2. Standard of Performance

Manufacturer hereby agrees that it shall follow the highest professional standards in performing all Services to be provided under this Agreement.

3. Disclosure of Know-How

After the execution of this agreement, the Client shall provide all necessary know-how, standards and specifications to the Manufacturer. The Client shall promptly inform the Manufacturer of any knowhow hereafter acquired by the Client. The Manufacturer shall be entitled to make and or retain any notes, records and memoranda relating to the Client's know-how and specifications necessary to provide the Services hereunder.

4. Term

This Agreement is effective on the date written above and shall expire on ___T/B/D___. The parties may extend this Agreement for an additional ___(1) year period by giving __30__ day's written notice.

5. Independent Contractor

Manufacturer shall provide the Services as an independent contractor and Manufacturer shall not act as an employee, agent or broker of the Client. As an independent contractor, Manufacturer will be solely responsible for

Scanned by CamScanner

paying any and all taxes levied by applicable laws on its compensation. Manufacturer understands that Client will not withhold any amounts for payment of any taxes from Manufacturer's compensation.

6. Payment

During the term of this Agreement, Client shall pay the Manufacturer for its Services under this Agreement on a per milliliter basis plus the cost of shipping. The price tiers are as follows:

1-99: .20

100-300: .19

301-600: .18

601-999: .17

1000-3000: .16

3001-4999: .15

5000+: .14

7. Expenses

The Client agrees to reimburse any pre-approved out of pocked expenses incurred by the Manufacturer in connection with the Services, including, but not limited to, travel expenses, audit fees, tax fees, payroll service fees, etc.

8. Confidentiality

Manufacturer in the course of performing the Services hereunder may gain access to certain confidential or proprietary information of the Client. Such "Confidential Information" shall include all information concerning the business, affairs, products, marketing, systems, technology, customers, end-users, financial affairs, accounting, statistical data belonging to the Client and any data, documents, discussion, or other information developed by Manufacturer hereunder and any other proprietary and trade secret information of Client whether in oral, graphic, written, electronic or machine-readable form. The Manufacturer agrees to hold all such Confidential Information of the Client in strict confidence and shall not, without the express prior written permission of Client, (a) disclose such Confidential Information to third parties; or (b) use such Confidential Information for any purposes whatsoever, other than the performance of its obligations hereunder. The obligations under this Section shall survive termination or expiration of this Agreement.

9. Termination

(a) Either party may terminate this Agreement for convenience by providing thirty (30) days written notice ("Termination Notice") to the other party.

(b) If a party violates its obligations to be performed under this Agreement, the other party may terminate the Agreement by sending a thirty (30) days notice in writing. Upon receiving such notice, the defaulting party shall have thirty (30) days from the date of such notice to cure any such default. If the default is not cured within the required thirty (30) day period, the party providing notice shall have the right to terminate this Agreement.

## 10. Assignment

Manufacturer shall not assign any of their rights under this Agreement, or delegate the performance of any of the obligations or duties hereunder, without the prior written consent of the Client and any attempt by Manufacturer to so assign, transfer, or subcontract any rights, duties, or obligations arising hereunder shall be void and of no effect.

## 11. Notices

Any notices, bills, invoices, or reports required by this Agreement shall be deemed received on (a) the day of delivery if delivered by hand during receiving party's regular business hours or by facsimile before or during receiving party's regular business hours; or (b) on the second business day following deposit in the United States mail, postage prepaid, to the addresses heretofore below, or to such other addresses as the parties may, from time to time, designate in writing pursuant to the provisions of this section.

Client:

Lee & Quids Vapor, LLC

Manufacturer:

VIRTUE VAPE.

## 12. Governing Law

This Agreement is to be construed in accordance with and governed by the internal laws of the State of
Florida , USA.

## 13. Dispute Resolution

All disputes under this Agreement shall be settled by arbitration in Florida before a single arbitrator pursuant to the commercial law rules of the American Arbitration Association. Arbitration may be commenced at any time by any party hereto giving written notice to the other party to a dispute that such dispute has been referred to arbitration. Any award rendered by the arbitrator shall be conclusive and binding upon the parties hereto. This provision for arbitration shall be specifically enforceable by the parties and the decision of the arbitrator in accordance herewith shall be final and binding without right of appeal.

## 14. Severability

If any provision of this Agreement shall be held to be illegal, invalid or unenforceable under present or future laws, such provisions shall be fully severable, this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect.

Scanned by CamScanner

15. Limitation of Liability

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION, BUSINESS INTERRUPTION, LOSS OF OR UNAUTHORIZED ACCESS TO INFORMATION, DAMAGES FOR LOSS OF PROFITS, INCURRED BY THE OTHER PARTY ARISING OUT OF THE SERVICES PROVIDED UNDER THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL NEITHER PARTY'S LIABILITY ON ANY CLAIM, LOSS OR LIABILITY ARISING OUT OF OR CONNECTED WITH THIS AGREEMENT SHALL EXCEED THE AMOUNTS PAID TO MANUFACTURER DURING THE _____ MONTHS PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM OR ACTION BY CLIENT.

16. Indemnification

Each party shall at its own expense indemnify and hold harmless, and at the other party's request defend such party its affiliates, subsidiaries, successors and assigns officers, directors, employees, sublicensees, and agents from and against any and all claims, losses, liabilities, damages, demand, settlements, loss, expenses and costs (including attorneys' fees and court costs) which arise directly or indirectly out of or relate to (a) any breach of this Agreement, or (b) the gross negligence or willful misconduct of a party's employees or agents;

17. Entire Agreement; Amendment:

This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior or contemporaneous representations, discussions, proposals, negotiations, conditions, communications and agreements, whether written or oral, between the parties relating to the subject matter hereof and all past courses of dealing or industry custom. No modification of or amendment to this Agreement shall be effective unless in writing and signed by each of the parties.

18. Waiver

The waiver by either party of a breach of or a default under any provision of this Agreement shall not be effective unless in writing and shall not be construed as a waiver of any subsequent breach of or default under the same or any other provision of this Agreement, nor shall any delay or omission on the part of either party to exercise or avail itself of any right or remedy that it has or may have hereunder operate as a waiver of any right or remedy.

19. Captions

The headings used in this Agreement are for convenience only and shall not be used to limit or construe the contents of any of the sections of this Agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first set forth above.

CLIENT MANUFACTURER
By: _____     By: _____ 12/16/2014
Name: Marciano Costa     Name: _____

Henry Alvarez

Scanned by CamScanner

paying any and all taxes levied by applicable laws on its compensation. Manufacturer understands that Client will not withhold any amounts for payment of any taxes from Manufacturer's compensation.

6. Payment

During the term of this Agreement, Client shall pay the Manufacturer for its Services under this Agreement on a per milliliter basis plus the cost of shipping. The price tiers are as follows:

1-99: .20

100-300: .19

301-600: .18

601-999: .17

1000-3000: .16

3001-4999: .15

5000+: .14

7. Expenses

The Client agrees to reimburse any pre-approved out of pocked expenses incurred by the Manufacturer in connection with the Services, including, but not limited to, travel expenses, audit fees, tax fees, payroll service fees, etc.

8. Confidentiality

Manufacturer in the course of performing the Services hereunder may gain access to certain confidential or proprietary information of the Client. Such "Confidential Information" shall include all information concerning the business, affairs, products, marketing, systems, technology, customers, end-users, financial affairs, accounting, statistical data belonging to the Client and any data, documents, discussion, or other information developed by Manufacturer hereunder and any other proprietary and trade secret information of Client whether in oral, graphic, written, electronic or machine-readable form. The Manufacturer agrees to hold all such Confidential Information of the Client in strict confidence and shall not, without the express prior written permission of Client, (a) disclose such Confidential Information to third parties; or (b) use such Confidential Information for any purposes whatsoever, other than the performance of its obligations hereunder. The obligations under this Section shall survive termination or expiration of this Agreement.

9. Termination

(a) Either party may terminate this Agreement for convenience by providing thirty (30) days written notice ("Termination Notice") to the other party.

(b) If a party violates its obligations to be performed under this Agreement, the other party may terminate the Agreement by sending a thirty (30) days notice in writing. Upon receiving such notice, the defaulting party shall have thirty (30) days from the date of such notice to cure any such default. If the default is not cured within the required thirty (30) day period, the party providing notice shall have the right to terminate this Agreement.

10. Assignment

Manufacturer shall not assign any of their rights under this Agreement, or delegate the performance of any of the obligations or duties hereunder, without the prior written consent of the Client and any attempt by Manufacturer to so assign, transfer, or subcontract any rights, duties, or obligations arising hereunder shall be void and of no effect.

11. Notices

Any notices, bills, invoices, or reports required by this Agreement shall be deemed received on (a) the day of delivery if delivered by hand during receiving party's regular business hours or by facsimile before or during receiving party's regular business hours; or (b) on the second business day following deposit in the United States mail, postage prepaid, to the addresses heretofore below, or to such other addresses as the parties may, from time to time, designate in writing pursuant to the provisions of this section.

Client:

_Lee & Quids Vapor, LLC_

_____

Manufacturer:

_VIRTUE VAPE._

_____

12. Governing Law

This Agreement is to be construed in accordance with and governed by the internal laws of the State of
___Florida___, USA.

13. Dispute Resolution

All disputes under this Agreement shall be settled by arbitration in ___Florida___ before a single arbitrator pursuant to the commercial law rules of the American Arbitration Association. Arbitration may be commenced at any time by any party hereto giving written notice to the other party to a dispute that such dispute has been referred to arbitration. Any award rendered by the arbitrator shall be conclusive and binding upon the parties hereto. This provision for arbitration shall be specifically enforceable by the parties and the decision of the arbitrator in accordance herewith shall be final and binding without right of appeal.

14. Severability

If any provision of this Agreement shall be held to be illegal, invalid or unenforceable under present or future laws, such provisions shall be fully severable, this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect.

15. Limitation of Liability

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT,
INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, INCLUDING WITHOUT
LIMITATION, BUSINESS INTERRUPTION, LOSS OF OR UNAUTHORIZED ACCESS TO INFORMATION,
DAMAGES FOR LOSS OF PROFITS, INCURRED BY THE OTHER PARTY ARISING OUT OF THE
SERVICES PROVIDED UNDER THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF
THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL NEITHER PARTY'S LIABILITY ON ANY
CLAIM, LOSS OR LIABILITY ARISING OUT OF OR CONNECTED WITH THIS AGREEMENT SHALL
EXCEED THE AMOUNTS PAID TO MANUFACTURER DURING THE _____ MONTHS PERIOD
IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM OR ACTION BY CLIENT.

16. Indemnification

Each party shall at its own expense indemnify and hold harmless, and at the other party's request defend such party
its affiliates, subsidiaries, successors and assigns officers, directors, employees, sublicensees, and agents from and
against any and all claims, losses, liabilities, damages, demand, settlements, loss, expenses and costs (including
attorneys' fees and court costs) which arise directly or indirectly out of or relate to (a) any breach of this Agreement,
or (b) the gross negligence or willful misconduct of a party's employees or agents:

17. Entire Agreement; Amendment:

This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter
hereof and supersedes and merges all prior or contemporaneous representations, discussions, proposals,
negotiations, conditions, communications and agreements, whether written or oral, between the parties relating to
the subject matter hereof and all past courses of dealing or industry custom. No modification of or amendment to
this Agreement shall be effective unless in writing and signed by each of the parties.

18. Waiver

The waiver by either party of a breach of or a default under any provision of this Agreement shall not be effective
unless in writing and shall not be construed as a waiver of any subsequent breach of or default under the same or any
other provision of this Agreement, nor shall any delay or omission on the part of either party to exercise or avail
itself of any right or remedy that it has or may have hereunder operate as a waiver of any right or remedy.

19. Captions

The headings used in this Agreement are for convenience only and shall not be used to limit or construe the contents
of any of the sections of this Agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first set forth above.

CLIENT   MANUFACTURER
By: _____   By: _____   12/16/2014
Name: Mariano Cresta   Name: _____

Henry Alvarez

Scanned by CamScanner

EXHIBIT 2

# Standard Services Agreement

## STANDARD SERVICES AGREEMENT

**THIS AGREEMENT** is made on May 20th, 2015.

**BETWEEN**

1. **VVIG Inc** of (the "Buyer"); and
2. **Brandtastic Design LLC** of (the "Service Provider").

collectively referred to as the "Parties". **RECITALS**

The Buyer wishes to be provided with the Services (defined below) by the Service Provider and the Service Provider agrees to provide the Services to the Buyer on the terms and conditions of this Agreement.

1. **Key Terms**

   1.1 **Services**

   The Service Provider shall provide the following services ("Services") to the Buyer in accordance with the terms and conditions of this Agreement:

   1. *Branding design*
   2. *Websites development and Maintenance*
   3. *Label designs and printing*
   4. *Marketing Services*

   1.2 **Delivery of the Services**

   **Start date:** The Service Provider shall commence provide ongoing provision of the Services since this date  May 20th, 2015.

   1.3 **Site**

   The Service Provider shall provide the Services at the following site(s): Theejuiceexchange.com, ejuicedepo.com, virtuevape.com, vapeproper.com, among others that the buyer will need.

   1.4 **Price**

   a. As consideration for the provision of the Services by the Service Provider, the price for the provision of the Services is to be agreed based on the work specified.
   b. Any charges payable under this Agreement are exclusive of any applicable taxes, tariff surcharges or other like amounts assessed by any governmental entity arising as a result of the provision of the Services by the Service Provider to the Buyer under this Agreement and such shall be payable by the Buyer to the Service Provider in addition to all other charges payable hereunder.

2. **General terms**

## 2.1 Intellectual Property Rights

The Service Provider agrees to grant to the Buyer for any material specifically created as part of the Services, the Service Provider assigns the full title guarantee to the Buyer and any all of the copyright, other intellectual property rights and any other data or material used or subsisting in the Material whether finished or unfinished. If any third party intellectual property rights are used in the Material the Service Provider shall ensure that it has secured all necessary consents and approvals to use such third party intellectual property rights for the Service Provider and the Buyer. For the purposes of this Clause 2.1, "Material" shall mean the materials, in whatever form, used by the Service Provider to provide the Services and the products, systems, programs or processes, in whatever form, produced by the Service Provider pursuant to this Agreement.

## 2.2 Warranty

   a.  The Service Provider represents and warrants that:
       i.  it will perform the Services with reasonable care and skill; and
       ii. the Services and the Materials provided by the Service Provider to the Buyer under this Agreement will not infringe or violate any intellectual property rights or other right of any third party.

## 2.3 Limitation of liability

   b.  Subject to the Buyer's obligation to pay the Price to the Service Provider, either party's liability in contract, tort or otherwise (including negligence) arising directly out of or in connection with this Agreement or the performance or observance of its obligations under this Agreement and every applicable part of it shall be limited in aggregate to the Price.
   c.  To the extent it is lawful to exclude the following heads of loss and subject to the Buyer's obligation to pay the Price, in no event shall either party be liable for any loss of profits, goodwill, loss of business, loss of data or any other indirect or consequential loss or damage whatsoever.
   d.  Nothing in this Clause 2.3 will serve to limit or exclude either Party's liability for death or personal injury arising from its own negligence.

## 2.4 Term and Termination

   e.  This Agreement shall be effective on the date hereof and shall continue, unless terminated sooner, until the Completion Date.
   f.  Either Party may terminate this Agreement upon notice in writing if:
       i.  the other is in breach of any material obligation contained in this Agreement, which is not remedied (if the same is capable of being remedied) within 30 days of written notice from the other Party so to do; or
       ii. a voluntary arrangement is approved, a bankruptcy or an administration order is made or a receiver or administrative receiver is appointed over any of the other Party's assets or an undertaking or a resolution or petition to wind up the other Party is passed or presented (other than for the purposes of amalgamation or reconstruction) or any analogous procedure in the country of incorporation of either party or if any circumstances arise which entitle the Court or a creditor to appoint a receiver, administrative receiver or administrator or to present a winding-up petition or make a winding-up order in respect of the other Party.
   g.  [For European Buyers and Service Providers only] If the Buyer is a consumer and the Distance Selling Directive (97/7/EC) (the "Directive") applies to this Agreement, the Buyer may terminate this Agreement within the relevant timescales prescribed by the regulations or laws in the relevant Member State which implement the requirements of the Directive in respect of a right for the Buyer to withdraw from a contract. In the event of termination in accordance with this Clause 2.4(c), the liability of the Buyer to the Service Provider shall be as prescribed in the Directive or in any regulations or laws implementing its requirements in the relevant Member States.
   h.  Any termination of this Agreement (howsoever occasioned) shall not affect any accrued rights or liabilities of either Party nor shall it affect the coming into force or the continuance in force of any provision hereof which is expressly or by implication intended to come into or continue in force on or after such termination.

## 2.5 Relationship of the Parties

The Parties acknowledge and agree that the Services performed by the Service Provider, its employees, agents or sub-contractors shall be as an independent contractor and that nothing in this Agreement shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the parties.

### 2.6 Confidentiality

Neither Party will use, copy, adapt, alter or part with possession of any information of the other which is disclosed or otherwise comes into its possession under or in relation to this Agreement and which is of a confidential nature. This obligation will not apply to information which the recipient can prove was in its possession at the date it was received or obtained or which the recipient obtains from some other person with good legal title to it or which is in or comes into the public domain otherwise than through the default or negligence of the recipient or which is independently developed by or for the recipient.

### 2.7 Notices

Any notice which may be given by a Party under this Agreement shall be deemed to have been duly delivered if delivered by hand, first class post, facsimile transmission or electronic mail to the address of the other Party as specified in this Agreement or any other address notified in writing to the other Party. Subject to any applicable local law provisions to the contrary, any such communication shall be deemed to have been made to the other Party, if delivered by:

    ix.    first class post, 2 days from the date of posting;
    x.    hand or by facsimile transmission, on the date of such delivery or transmission; and
    xi.    electronic mail, when the Party sending such communication receives confirmation of such delivery by electronic mail.

### 2.8 Miscellaneous

    l.    The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights.
    m.    If any part, term or provision of this Agreement is held to be illegal or unenforceable neither the validity or enforceability of the remainder of this Agreement shall be affected.
    n.    Neither Party shall assign or transfer all or any part of its rights under this Agreement without the consent of the other Party.
    o.    This Agreement may not be amended for any other reason without the prior written agreement of both Parties.
    p.    This Agreement constitutes the entire understanding between the Parties relating to the subject matter hereof unless any representation or warranty made about this Agreement was made fraudulently and, save as may be expressly referred to or referenced herein, supersedes all prior representations, writings, negotiations or understandings with respect hereto.
    q.    Neither Party shall be liable for failure to perform or delay in performing any obligation under this Agreement if the failure or delay is caused by any circumstances beyond its reasonable control, including but not limited to acts of god, war, civil commotion or industrial dispute. If such delay or failure continues for at least 7 days, the Party not affected by such delay or failure shall be entitled to terminate this Agreement by notice in writing to the other.
    r.    This Clause 2.8(g) and Clauses 2.3, 2.6, 2.6, 2.7 and 2.8 of this Agreement shall survive any termination or expiration.
    s.    This Agreement shall be governed by the laws of the jurisdiction in which the Buyer is located (or if the Buyer is based in more than one country, the country in which its headquarters are located) (the "Territory") and the parties agree to submit disputes arising out of or in connection with this Agreement to the non-exclusive of the courts in the Territory.

3.    Amendments to existing clauses

Clause(s) [insert amended clause reference(s) here] shall be amended to read as follows:

4.    Additional clauses

AS WITNESS the hands of the Parties hereto or their duly authorized representatives the day and year first above written.

VVIG(ALVAREZ)-001520

SIGNED by Catalina Jimenez
for and on behalf of
**VVIG Inc**

)
)
)

May 20/2015

SIGNED by Paul Kettlewell
for and on behalf of
**Brandtastic Design LLC**
**Designated Holdings LLC**

)
)
)

05/20/2015

**VVIG(ALVAREZ)-001521**

EXHIBIT 3

# United States of America

## United States Patent and Trademark Office

# The Raging Donut

**Reg. No. 5,222,667**

**Registered Jun. 13, 2017**

**Int. Cl.: 34**

**Trademark**

**Principal Register**

VVIG Inc (FLORIDA CORPORATION)
572 NW 23rd St
Miami, FL 33127

CLASS 34: Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin

FIRST USE 4-6-2015; IN COMMERCE 5-21-2015

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

No claim is made to the exclusive right to use the following apart from the mark as shown: "DONUT"

SER. NO. 87-227,098, FILED 11-04-2016
HEATHER ALISON SALES, EXAMINING ATTORNEY



*Joseph Matal*

Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

**VVIG(ALVAREZ)-001193**

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse)  and  an  Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO.  Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO.  To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

**VVIG(ALVAREZ)-001194**

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Tuesday, March 28, 2017 00:54 AM |
| **To:** | trademark@virtuevape.com |
| **Cc:** | paul@virtuevape.com |
| **Subject:** | Official USPTO Notice of Publication Confirmation: U.S. Trademark SN 87227098: THE RAGING DONUT |

## *TRADEMARK OFFICIAL GAZETTE* PUBLICATION CONFIRMATION

**U.S. Serial Number:**  87227098
**Mark:**  THE RAGING DONUT
**International Class(es):**  034
**Owner:**  VVIG Inc
**Docket/Reference Number:**

The mark identified above has been published in the Trademark Official Gazette (TMOG) on Mar 28, 2017.

**To Review the Mark in the TMOG:**

   Click on the following link or paste the URL into an internet browser: https://tmog.uspto.gov/#issueDate=2017-03-28&serialNumber=87227098

On the publication date or shortly thereafter, the applicant should carefully review the information that appears in the TMOG for accuracy.  If any information is incorrect due to USPTO error, the applicant should immediately email the requested correction to TMPostPubQuery@uspto.gov.  For applicant corrections or amendments after publication, please file a post publication amendment using the form available at http://teasroa.uspto.gov/ppa/.  For general information about this notice, please contact the Trademark Assistance Center at 1-800-786-9199.

**Significance of Publication for Opposition:**

*   Any party who believes it will be damaged by the registration of the mark may file a notice of opposition (or extension of time therefor) with the Trademark Trial and Appeal Board.  If no party files an opposition or extension request within thirty (30) days after the publication date, then eleven (11) weeks after the publication date a certificate of registration should issue.

To check the status of the application, go to http://tsdr.uspto.gov/#caseNumber=87227098&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.  Please check the status of the application at least every three (3) months after the application filing date.

To view this notice and other documents for this application on-line, go to http://tsdr.uspto.gov/#caseNumber=87227098&caseType=SERIAL_NO&searchType=documentSearch.  NOTE: This notice will only become available on-line the next business day after receipt of this e-mail.

**VVIG(ALVAREZ)-001195**

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA  22313-1451
www.uspto.gov

Mar 8, 2017

## NOTICE OF PUBLICATION

1.  Serial No.:
    87-227,098

2.  Mark:
    THE RAGING DONUT
    (STANDARD CHARACTER MARK)

3.  International Class(es):
    34

4.  Publication Date:
    Mar 28, 2017

5.  Applicant:
    VVIG Inc

The mark of the application identified appears to be entitled to registration. The mark will, in accordance with Section 12(a) of the Trademark Act of 1946, as amended, be published in the *Official Gazette* on the date indicated above for the purpose of opposition by any person who believes he will be damaged by the registration of the mark. If no opposition is filed within the time specified by Section 13(a) of the Statute or by rules 2.101 or 2.102 of the Trademark Rules, the Commissioner of Patents and Trademarks may issue a certificate of registration.

Copies of the trademark portion of the *Official Gazette* containing the publication of the mark may be obtained from:

    The Superintendent of Documents
    U.S. Government Printing Office
    PO Box 371954
    Pittsburgh, PA 15250-7954
    Phone: 202-512-1800

By direction of the Commissioner.

**Email Address(es):**

trademark@virtuevape.com
paul@virtuevape.com

VVIG(ALVAREZ)-001196

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Wednesday, March 8, 2017 04:18 AM |
| **To:** | trademark@virtuevape.com |
| **Cc:** | paul@virtuevape.com |
| **Subject:** | Official USPTO Notification of Notice of Publication: U.S. Trademark SN 87227098: THE RAGING DONUT |

<u>NOTIFICATION OF "NOTICE OF PUBLICATION"</u>

Your trademark application (Serial No. 87227098) is scheduled to publish in the *Official Gazette* on Mar 28, 2017.  To preview the Notice of Publication, go to <u>http://tdr.uspto.gov/search.action?sn=87227098</u>.  If you have difficulty accessing the Notice of Publication, contact <u>TDR@uspto.gov</u>.

**PLEASE NOTE:**
1.  The Notice of Publication may not be immediately available but will be viewable within 24 hours of this e-mail notification.
2.  You will receive a second e-mail on the actual "Publication Date," which will include a link to the issue of the *Official Gazette* in which the mark has published.

Do NOT hit "Reply" to this e-mail notification.  If you have any questions about the content of the Notice of Publication, contact <u>TMPostPubQuery@uspto.gov</u>.

**VVIG(ALVAREZ)-001197**

## Trademark Snap Shot Publication Stylesheet
(Table presents the data on Publication Approval)

### OVERVIEW

| | | | |
|---|---|---|---|
| SERIAL NUMBER | 87227098 | FILING DATE | 11/04/2016 |
| REG NUMBER | 0000000 | REG DATE | N/A |
| REGISTER | PRINCIPAL | MARK TYPE | TRADEMARK |
| INTL REG # | N/A | INTL REG DATE | N/A |
| TM ATTORNEY | SALES, HEATHER ALISON | L.O. ASSIGNED | N40-NOT FOUND |

### PUB INFORMATION

| | |
|---|---|
| RUN DATE | 02/15/2017 |
| PUB DATE | N/A |
| STATUS | 680-APPROVED FOR PUBLICATON |
| STATUS DATE | 02/14/2017 |
| LITERAL MARK ELEMENT | THE RAGING DONUT |

| | | | |
|---|---|---|---|
| DATE ABANDONED | N/A | DATE CANCELLED | N/A |
| SECTION 2F | NO | SECTION 2F IN PART | NO |
| SECTION 8 | NO | SECTION 8 IN PART | NO |
| SECTION 15 | NO | REPUB 12C | N/A |
| RENEWAL FILED | NO | RENEWAL DATE | N/A |
| DATE AMEND REG | N/A | | |

### FILING BASIS

| FILED BASIS | | CURRENT BASIS | | AMENDED BASIS | |
|---|---|---|---|---|---|
| 1 (a) | YES | 1 (a) | YES | 1 (a) | NO |
| 1 (b) | NO | 1 (b) | NO | 1 (b) | NO |
| 44D | NO | 44D | NO | 44D | NO |
| 44E | NO | 44E | NO | 44E | NO |
| 66A | NO | 66A | NO | | |
| NO BASIS | NO | NO BASIS | NO | | |

### MARK DATA

| | |
|---|---|
| STANDARD CHARACTER MARK | YES |
| LITERAL MARK ELEMENT | THE RAGING DONUT |
| MARK DRAWING CODE | 4-STANDARD CHARACTER MARK |
| COLOR DRAWING FLAG | NO |

### CURRENT OWNER INFORMATION

| | |
|---|---|
| PARTY TYPE | 10-ORIGINAL APPLICANT |
| NAME | VVIG Inc |
| ADDRESS | 572 NW 23rd St<br>Miami, FL 33127 |
| ENTITY | 03-CORPORATION |

VVIG(ALVAREZ)-001198

| CITIZENSHIP | Florida |
|---|---|

### GOODS AND SERVICES

| INTERNATIONAL CLASS | 034 |
|---|---|
| DESCRIPTION TEXT | Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin |

### GOODS AND SERVICES CLASSIFICATION

| INTERNATIONAL CLASS | 034 | FIRST USE DATE | 04/06/2015 | FIRST USE IN COMMERCE DATE | 05/21/2015 | CLASS STATUS | 6-ACTIVE |
|---|---|---|---|---|---|---|---|

### MISCELLANEOUS INFORMATION/STATEMENTS

| CHANGE IN REGISTRATION | NO |
|---|---|
| DISCLAIMER W/PREDETER TXT | "DONUT" |

### PROSECUTION HISTORY

| DATE | ENT CD | ENT TYPE | DESCRIPTION | ENT NUM |
|---|---|---|---|---|
| 02/14/2017 | CNSA | O | APPROVED FOR PUB - PRINCIPAL REGISTER | 008 |
| 02/14/2017 | XAEC | I | EXAMINER'S AMENDMENT ENTERED | 007 |
| 02/14/2017 | GNEN | O | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | 006 |
| 02/14/2017 | GNEA | F | EXAMINERS AMENDMENT E-MAILED | 005 |
| 02/14/2017 | CNEA | R | EXAMINERS AMENDMENT -WRITTEN | 004 |
| 02/11/2017 | DOCK | D | ASSIGNED TO EXAMINER | 003 |
| 11/08/2016 | NWOS | I | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | 002 |
| 11/08/2016 | NWAP | I | NEW APPLICATION ENTERED IN TRAM | 001 |

### CURRENT CORRESPONDENCE INFORMATION

| ATTORNEY | NONE |
|---|---|
| CORRESPONDENCE ADDRESS | VVIG INC<br>VVIG INC<br>572 NW 23RD ST<br>MIAMI, FL 33127 |
| DOMESTIC REPRESENTATIVE | NONE |

VVIG(ALVAREZ)-001199

# United States of America

## United States Patent and Trademark Office

# Pound It

**Reg. No. 5,222,668**

**Registered Jun. 13, 2017**

**Int. Cl.: 34**

**Trademark**

**Principal Register**

VVIG Inc (FLORIDA CORPORATION)
572 NW 23rd St
Miami, FL 33127

CLASS 34: Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin

FIRST USE 8-11-2015; IN COMMERCE 8-11-2015

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 87-227,108, FILED 11-04-2016
HEATHER ALISON SALES, EXAMINING ATTORNEY



*Joseph Matal*

Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

VVIG(ALVAREZ)-001228

# REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten Years\***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

VVIG(ALVAREZ)-001229

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Tuesday, March 28, 2017 00:54 AM |
| **To:** | trademark@virtuevape.com |
| **Cc:** | paul@virtuevape.com |
| **Subject:** | Official USPTO Notice of Publication Confirmation: U.S. Trademark SN 87227108: POUND IT |

## *TRADEMARK OFFICIAL GAZETTE* PUBLICATION CONFIRMATION

**U.S. Serial Number:** 87227108
**Mark:** POUND IT
**International Class(es):** 034
**Owner:** VVIG Inc
**Docket/Reference Number:**

The mark identified above has been published in the Trademark Official Gazette (TMOG) on Mar 28, 2017.

**To Review the Mark in the TMOG:**

Click on the following link or paste the URL into an internet browser: https://tmog.uspto.gov/#issueDate=2017-03-28&serialNumber=87227108

On the publication date or shortly thereafter, the applicant should carefully review the information that appears in the TMOG for accuracy.  If any information is incorrect due to USPTO error, the applicant should immediately email the requested correction to TMPostPubQuery@uspto.gov.  For applicant corrections or amendments after publication, please file a post publication amendment using the form available at http://teasroa.uspto.gov/ppa/.  For general information about this notice, please contact the Trademark Assistance Center at 1-800-786-9199.

**Significance of Publication for Opposition:**

* Any party who believes it will be damaged by the registration of the mark may file a notice of opposition (or extension of time therefor) with the Trademark Trial and Appeal Board.  If no party files an opposition or extension request within thirty (30) days after the publication date, then eleven (11) weeks after the publication date a certificate of registration should issue.

To check the status of the application, go to http://tsdr.uspto.gov/#caseNumber=87227108&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.  Please check the status of the application at least every three (3) months after the application filing date.

To view this notice and other documents for this application on-line, go to http://tsdr.uspto.gov/#caseNumber=87227108&caseType=SERIAL_NO&searchType=documentSearch.  NOTE: This notice will only become available on-line the next business day after receipt of this e-mail.

**VVIG(ALVAREZ)-001230**

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA  22313-1451
www.uspto.gov

Mar 8, 2017

## NOTICE OF PUBLICATION

1.  Serial No.:
    87-227,108

2.  Mark:
    POUND IT
    (STANDARD CHARACTER MARK)

3.  International Class(es):
    34

4.  Publication Date:
    Mar 28, 2017

5.  Applicant:
    VVIG Inc

The mark of the application identified appears to be entitled to registration. The mark will, in accordance with Section 12(a) of the Trademark Act of 1946, as amended, be published in the *Official Gazette* on the date indicated above for the purpose of opposition by any person who believes he will be damaged by the registration of the mark. If no opposition is filed within the time specified by Section 13(a) of the Statute or by rules 2.101 or 2.102 of the Trademark Rules, the Commissioner of Patents and Trademarks may issue a certificate of registration.

Copies of the trademark portion of the *Official Gazette* containing the publication of the mark may be obtained from:

    The Superintendent of Documents
    U.S. Government Printing Office
    PO Box 371954
    Pittsburgh, PA 15250-7954
    Phone: 202-512-1800

By direction of the Commissioner.

**Email Address(es):**

    trademark@virtuevape.com
    paul@virtuevape.com

VVIG(ALVAREZ)-001231

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Wednesday, March 8, 2017 04:18 AM |
| **To:** | trademark@virtuevape.com |
| **Cc:** | paul@virtuevape.com |
| **Subject:** | Official USPTO Notification of Notice of Publication: U.S. Trademark SN 87227108: POUND IT |

<u>NOTIFICATION OF "NOTICE OF PUBLICATION"</u>

Your trademark application (Serial No. 87227108) is scheduled to publish in the *Official Gazette* on Mar 28, 2017.  To preview the Notice of Publication, go to <u>http://tdr.uspto.gov/search.action?sn=87227108</u>.  If you have difficulty accessing the Notice of Publication, contact <u>TDR@uspto.gov</u>.

**PLEASE NOTE:**
1.   The Notice of Publication may not be immediately available but will be viewable within 24 hours of this e-mail notification.
2.   You will receive a second e-mail on the actual "Publication Date," which will include a link to the issue of the *Official Gazette* in which the mark has published.

Do NOT hit "Reply" to this e-mail notification.  If you have any questions about the content of the Notice of Publication, contact <u>TMPostPubQuery@uspto.gov</u>.

VVIG(ALVAREZ)-001232

## Trademark Snap Shot Publication Stylesheet
(Table presents the data on Publication Approval)

### OVERVIEW

| | | | |
|---|---|---|---|
| SERIAL NUMBER | 87227108 | FILING DATE | 11/04/2016 |
| REG NUMBER | 0000000 | REG DATE | N/A |
| REGISTER | PRINCIPAL | MARK TYPE | TRADEMARK |
| INTL REG # | N/A | INTL REG DATE | N/A |
| TM ATTORNEY | SALES, HEATHER ALISON | L.O. ASSIGNED | N40-NOT FOUND |

### PUB INFORMATION

| | |
|---|---|
| RUN DATE | 02/14/2017 |
| PUB DATE | N/A |
| STATUS | 680-APPROVED FOR PUBLICATON |
| STATUS DATE | 02/13/2017 |
| LITERAL MARK ELEMENT | POUND IT |

| | | | |
|---|---|---|---|
| DATE ABANDONED | N/A | DATE CANCELLED | N/A |
| SECTION 2F | NO | SECTION 2F IN PART | NO |
| SECTION 8 | NO | SECTION 8 IN PART | NO |
| SECTION 15 | NO | REPUB 12C | N/A |
| RENEWAL FILED | NO | RENEWAL DATE | N/A |
| DATE AMEND REG | N/A | | |

### FILING BASIS

| FILED BASIS | | CURRENT BASIS | | AMENDED BASIS | |
|---|---|---|---|---|---|
| 1 (a) | YES | 1 (a) | YES | 1 (a) | NO |
| 1 (b) | NO | 1 (b) | NO | 1 (b) | NO |
| 44D | NO | 44D | NO | 44D | NO |
| 44E | NO | 44E | NO | 44E | NO |
| 66A | NO | 66A | NO | | |
| NO BASIS | NO | NO BASIS | NO | | |

### MARK DATA

| | |
|---|---|
| STANDARD CHARACTER MARK | YES |
| LITERAL MARK ELEMENT | POUND IT |
| MARK DRAWING CODE | 4-STANDARD CHARACTER MARK |
| COLOR DRAWING FLAG | NO |

### CURRENT OWNER INFORMATION

| | |
|---|---|
| PARTY TYPE | 10-ORIGINAL APPLICANT |
| NAME | VVIG Inc |
| ADDRESS | 572 NW 23rd St<br>Miami, FL 33127 |
| ENTITY | 03-CORPORATION |

VVIG(ALVAREZ)-001233

| CITIZENSHIP | Florida |
|---|---|

### GOODS AND SERVICES

| INTERNATIONAL CLASS | 034 |
|---|---|
| DESCRIPTION TEXT | Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin |

### GOODS AND SERVICES CLASSIFICATION

| INTERNATIONAL CLASS | 034 | FIRST USE DATE | 08/11/2015 | FIRST USE IN COMMERCE DATE | 08/11/2015 | CLASS STATUS | 6-ACTIVE |
|---|---|---|---|---|---|---|---|

### MISCELLANEOUS INFORMATION/STATEMENTS

| CHANGE IN REGISTRATION | NO |
|---|---|

### PROSECUTION HISTORY

| DATE | ENT CD | ENT TYPE | DESCRIPTION | ENT NUM |
|---|---|---|---|---|
| 02/13/2017 | CNSA | O | APPROVED FOR PUB - PRINCIPAL REGISTER | 004 |
| 02/11/2017 | DOCK | D | ASSIGNED TO EXAMINER | 003 |
| 11/08/2016 | NWOS | I | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | 002 |
| 11/08/2016 | NWAP | I | NEW APPLICATION ENTERED IN TRAM | 001 |

### CURRENT CORRESPONDENCE INFORMATION

| ATTORNEY | NONE |
|---|---|
| CORRESPONDENCE ADDRESS | VVIG INC<br>VVIG INC<br>572 NW 23RD ST<br>MIAMI, FL 33127 |
| DOMESTIC REPRESENTATIVE | NONE |

**VVIG(ALVAREZ)-001234**

# United States of America

## United States Patent and Trademark Office

# Crack Pie

**Reg. No. 5,222,671**

**Registered Jun. 13, 2017**

**Int. Cl.: 34**

**Trademark**

**Principal Register**

VVIG Inc (FLORIDA CORPORATION)
572 NW 23rd St
Miami, FL 33127

CLASS 34: Chemical flavorings in liquid form used to refill electronic cigarette cartridges;
Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than
essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid)
comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable
glycerin

FIRST USE 11-2-2015; IN COMMERCE 11-2-2015

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY
PARTICULAR FONT STYLE, SIZE OR COLOR

No claim is made to the exclusive right to use the following apart from the mark as shown:
"PIE"

SER. NO. 87-227,121, FILED 11-04-2016
HEATHER ALISON SALES, EXAMINING ATTORNEY



Joseph Matal

Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

VVIG(ALVAREZ)-001255

## REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

VVIG(ALVAREZ)-001256

| From: | TMOfficialNotices@USPTO.GOV |
|---|---|
| Sent: | Tuesday, March 28, 2017 00:54 AM |
| To: | trademark@virtuevape.com |
| Cc: | paul@virtuevape.com |
| Subject: | Official USPTO Notice of Publication Confirmation: U.S. Trademark SN 87227121: CRACK PIE |

## *TRADEMARK OFFICIAL GAZETTE* PUBLICATION CONFIRMATION

**U.S. Serial Number:** 87227121
**Mark:** CRACK PIE
**International Class(es):** 034
**Owner:** VVIG Inc
**Docket/Reference Number:**

The mark identified above has been published in the Trademark Official Gazette (TMOG) on Mar 28, 2017.

**To Review the Mark in the TMOG:**

  Click on the following link or paste the URL into an internet browser: https://tmog.uspto.gov/#issueDate=2017-03-28&serialNumber=87227121

On the publication date or shortly thereafter, the applicant should carefully review the information that appears in the TMOG for accuracy.  If any information is incorrect due to USPTO error, the applicant should immediately email the requested correction to TMPostPubQuery@uspto.gov.  For applicant corrections or amendments after publication, please file a post publication amendment using the form available at http://teasroa.uspto.gov/ppa/.  For general information about this notice, please contact the Trademark Assistance Center at 1-800-786-9199.

**Significance of Publication for Opposition:**

* Any party who believes it will be damaged by the registration of the mark may file a notice of opposition (or extension of time therefor) with the Trademark Trial and Appeal Board.  If no party files an opposition or extension request within thirty (30) days after the publication date, then eleven (11) weeks after the publication date a certificate of registration should issue.

To check the status of the application, go to http://tsdr.uspto.gov/#caseNumber=87227121&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.  Please check the status of the application at least every three (3) months after the application filing date.

To view this notice and other documents for this application on-line, go to http://tsdr.uspto.gov/#caseNumber=87227121&caseType=SERIAL_NO&searchType=documentSearch.  NOTE: This notice will only become available on-line the next business day after receipt of this e-mail.

VVIG(ALVAREZ)-001257

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA  22313-1451
www.uspto.gov

Mar 8, 2017

## NOTICE OF PUBLICATION

1.  Serial No.:
    87-227,121

2.  Mark:
    CRACK PIE
    (STANDARD CHARACTER MARK)

3.  International Class(es):
    34

4.  Publication Date:
    Mar 28, 2017

5.  Applicant:
    VVIG Inc

The mark of the application identified appears to be entitled to registration. The mark will, in accordance with Section 12(a) of the Trademark Act of 1946, as amended, be published in the *Official Gazette* on the date indicated above for the purpose of opposition by any person who believes he will be damaged by the registration of the mark. If no opposition is filed within the time specified by Section 13(a) of the Statute or by rules 2.101 or 2.102 of the Trademark Rules, the Commissioner of Patents and Trademarks may issue a certificate of registration.

Copies of the trademark portion of the *Official Gazette* containing the publication of the mark may be obtained from:

The Superintendent of Documents
U.S. Government Printing Office
PO Box 371954
Pittsburgh, PA 15250-7954
Phone: 202-512-1800

By direction of the Commissioner.

**Email Address(es):**

trademark@virtuevape.com
paul@virtuevape.com

VVIG(ALVAREZ)-001258

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Wednesday, March 8, 2017 04:18 AM |
| **To:** | trademark@virtuevape.com |
| **Cc:** | paul@virtuevape.com |
| **Subject:** | Official USPTO Notification of Notice of Publication: U.S. Trademark SN 87227121: CRACK PIE |

<u>NOTIFICATION OF "NOTICE OF PUBLICATION"</u>

Your trademark application (Serial No. 87227121) is scheduled to publish in the *Official Gazette* on Mar 28, 2017.  To preview the Notice of Publication, go to <u>http://tdr.uspto.gov/search.action?sn=87227121</u>.  If you have difficulty accessing the Notice of Publication, contact <u>TDR@uspto.gov</u>.

**PLEASE NOTE:**
1. The Notice of Publication may not be immediately available but will be viewable within 24 hours of this e-mail notification.
2. You will receive a second e-mail on the actual "Publication Date," which will include a link to the issue of the *Official Gazette* in which the mark has published.

Do NOT hit "Reply" to this e-mail notification.  If you have any questions about the content of the Notice of Publication, contact <u>TMPostPubQuery@uspto.gov</u>.

VVIG(ALVAREZ)-001259

## Trademark Snap Shot Publication Stylesheet
(Table presents the data on Publication Approval)

### OVERVIEW

| | | | |
|---|---|---|---|
| SERIAL NUMBER | 87227121 | FILING DATE | 11/04/2016 |
| REG NUMBER | 0000000 | REG DATE | N/A |
| REGISTER | PRINCIPAL | MARK TYPE | TRADEMARK |
| INTL REG # | N/A | INTL REG DATE | N/A |
| TM ATTORNEY | SALES, HEATHER ALISON | L.O. ASSIGNED | N40-NOT FOUND |

### PUB INFORMATION

| | |
|---|---|
| RUN DATE | 02/15/2017 |
| PUB DATE | N/A |
| STATUS | 680-APPROVED FOR PUBLICATON |
| STATUS DATE | 02/14/2017 |
| LITERAL MARK ELEMENT | CRACK PIE |

| | | | |
|---|---|---|---|
| DATE ABANDONED | N/A | DATE CANCELLED | N/A |
| SECTION 2F | NO | SECTION 2F IN PART | NO |
| SECTION 8 | NO | SECTION 8 IN PART | NO |
| SECTION 15 | NO | REPUB 12C | N/A |
| RENEWAL FILED | NO | RENEWAL DATE | N/A |
| DATE AMEND REG | N/A | | |

### FILING BASIS

| FILED BASIS | | CURRENT BASIS | | AMENDED BASIS | |
|---|---|---|---|---|---|
| 1 (a) | YES | 1 (a) | YES | 1 (a) | NO |
| 1 (b) | NO | 1 (b) | NO | 1 (b) | NO |
| 44D | NO | 44D | NO | 44D | NO |
| 44E | NO | 44E | NO | 44E | NO |
| 66A | NO | 66A | NO | | |
| NO BASIS | NO | NO BASIS | NO | | |

### MARK DATA

| | |
|---|---|
| STANDARD CHARACTER MARK | YES |
| LITERAL MARK ELEMENT | CRACK PIE |
| MARK DRAWING CODE | 4-STANDARD CHARACTER MARK |
| COLOR DRAWING FLAG | NO |

### CURRENT OWNER INFORMATION

| | |
|---|---|
| PARTY TYPE | 10-ORIGINAL APPLICANT |
| NAME | VVIG Inc |
| ADDRESS | 572 NW 23rd St<br>Miami, FL 33127 |
| ENTITY | 03-CORPORATION |

VVIG(ALVAREZ)-001260

| CITIZENSHIP | Florida |
|---|---|

## GOODS AND SERVICES

| INTERNATIONAL CLASS | 034 |
|---|---|
| DESCRIPTION TEXT | Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin |

## GOODS AND SERVICES CLASSIFICATION

| INTERNATIONAL CLASS | 034 | FIRST USE DATE | 11/02/2015 | FIRST USE IN COMMERCE DATE | 11/02/2015 | CLASS STATUS | 6-ACTIVE |
|---|---|---|---|---|---|---|---|

## MISCELLANEOUS INFORMATION/STATEMENTS

| CHANGE IN REGISTRATION | NO |
|---|---|
| DISCLAIMER W/PREDETER TXT | "PIE" |

## PROSECUTION HISTORY

| DATE | ENT CD | ENT TYPE | DESCRIPTION | ENT NUM |
|---|---|---|---|---|
| 02/14/2017 | CNSA | O | APPROVED FOR PUB - PRINCIPAL REGISTER | 008 |
| 02/14/2017 | XAEC | I | EXAMINER'S AMENDMENT ENTERED | 007 |
| 02/14/2017 | GNEN | O | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | 006 |
| 02/14/2017 | GNEA | F | EXAMINERS AMENDMENT E-MAILED | 005 |
| 02/14/2017 | CNEA | R | EXAMINERS AMENDMENT -WRITTEN | 004 |
| 02/11/2017 | DOCK | D | ASSIGNED TO EXAMINER | 003 |
| 11/08/2016 | NWOS | I | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | 002 |
| 11/08/2016 | NWAP | I | NEW APPLICATION ENTERED IN TRAM | 001 |

## CURRENT CORRESPONDENCE INFORMATION

| ATTORNEY | NONE |
|---|---|
| CORRESPONDENCE ADDRESS | VVIG INC<br>VVIG INC<br>572 NW 23RD ST<br>MIAMI, FL 33127 |
| DOMESTIC REPRESENTATIVE | NONE |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

## Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

**Serial Number: 87438799**
**Filing Date: 05/05/2017**

*NOTE: Data fields with the \* are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **TEAS Plus** | **YES** |
| **MARK INFORMATION** | |
| *MARK | Too Puft |
| *STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | Too Puft |
| *MARK STATEMENT | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| REGISTER | Principal |
| APPLICANT INFORMATION | |
| *OWNER OF MARK | VVIG Inc |
| *STREET | 572 NW 23rd St |
| *CITY | Miami |
| *STATE (Required for U.S. applicants) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants) | 33127 |
| PHONE | (786) 953-4139 |
| EMAIL ADDRESS | trademark@virtuevape.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| WEBSITE ADDRESS | www.virtuevape.com |
| LEGAL ENTITY INFORMATION | |
| *TYPE | CORPORATION |
| *STATE/COUNTRY OF INCORPORATION | Florida |
| GOODS AND/OR SERVICES AND BASIS INFORMATION | |
| *INTERNATIONAL CLASS | 034 |

**VVIG(ALVAREZ)-001290**

| | |
|---|---|
| *IDENTIFICATION | Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin; Cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes; Cartridges sold filled with propylene glycol for electronic cigarettes; Cartridges sold filled with vegetable glycerin for electronic cigarettes; Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Liquid nicotine solutions for use in electronic cigarettes |
| *FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 06/02/2016 |
| FIRST USE IN COMMERCE DATE | At least as early as 06/02/2016 |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT17\IMAGEOUT 17\874\387\87438799\xml1\ FTK0003.JPG |
| SPECIMEN DESCRIPTION | Physical product package and product label for the "Too Puft" Brand - required to be trademarked |
| **ADDITIONAL STATEMENTS INFORMATION** | |
| *TRANSLATION (if applicable) | |
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |
| **CORRESPONDENCE INFORMATION** | |
| *NAME | VVIG Inc |
| FIRM NAME | VVIG Inc |
| *STREET | 572 NW 23rd St |
| *CITY | Miami |
| *STATE (Required for U.S. addresses) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 33127 |
| PHONE | (786) 953-4139 |
| *EMAIL ADDRESS | trademark@virtuevape.com;paul@virtuevape.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| APPLICATION FILING OPTION | TEAS Plus |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 225 |
| *TOTAL FEE PAID | 225 |

VVIG(ALVAREZ)-001291

| SIGNATURE INFORMATION | |
|---|---|
| * **SIGNATURE** | /Catalina Jimenez/ |
| * **SIGNATORY'S NAME** | Catalina Jimenez |
| * **SIGNATORY'S POSITION** | Owner |
| **SIGNATORY'S PHONE NUMBER** | (786) 953-4139 |
| * **DATE SIGNED** | 05/05/2017 |

VVIG(ALVAREZ)-001292

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

# Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

**Serial Number: 87429389**
**Filing Date: 04/28/2017**

*NOTE: Data fields with the \* are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **TEAS Plus** | **YES** |
| **MARK INFORMATION** | |
| *MARK | 2PUFT |
| *STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | 2PUFT |
| *MARK STATEMENT | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | VVIG Inc |
| *STREET | 572 NW 23rd St |
| *CITY | Miami |
| *STATE (Required for U.S. applicants) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants) | 33127 |
| PHONE | (786) 953-4139 |
| EMAIL ADDRESS | trademark@virtuevape.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| WEBSITE ADDRESS | www.virtuevape.com |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| *STATE/COUNTRY OF INCORPORATION | Florida |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| *INTERNATIONAL CLASS | 034 |

VVIG(ALVAREZ)-001301

| | |
|---|---|
| *IDENTIFICATION | Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin; Cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes; Cartridges sold filled with propylene glycol for electronic cigarettes; Cartridges sold filled with vegetable glycerin for electronic cigarettes; Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Flavorings, other than essential oils, for use in electronic cigarettes; Flavourings, other than essential oils, for use in electronic cigarettes; Liquid nicotine solutions for use in electronic cigarettes |
| *FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 12/20/2016 |
| FIRST USE IN COMMERCE DATE | At least as early as 12/20/2016 |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT17\IMAGEOUT 17\874\293\87429389\xml1\ FTK0003.JPG |
| SPECIMEN DESCRIPTION | Product Promotional Shot - Showing - "2PUFT" - Brand name required to be trademarked |
| **ADDITIONAL STATEMENTS INFORMATION** | |
| *TRANSLATION (if applicable) | |
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |
| **CORRESPONDENCE INFORMATION** | |
| *NAME | VVIG Inc |
| FIRM NAME | VVIG Inc |
| *STREET | 572 NW 23rd St |
| *CITY | Miami |
| *STATE (Required for U.S. addresses) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 33127 |
| PHONE | (786) 953-4139 |
| *EMAIL ADDRESS | trademark@virtuevape.com;paul@virtuevape.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| APPLICATION FILING OPTION | TEAS Plus |
| NUMBER OF CLASSES | 1 |

VVIG(ALVAREZ)-001302

| FEE PER CLASS | 225 |
|---|---|
| *TOTAL FEE PAID | 225 |
| SIGNATURE INFORMATION | |
| * SIGNATURE | /Catalina Jimenez/ |
| * SIGNATORY'S NAME | Catalina Jimenez |
| * SIGNATORY'S POSITION | Owner |
| SIGNATORY'S PHONE NUMBER | (786) 953-4139 |
| * DATE SIGNED | 04/28/2017 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

## Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

**Serial Number: 87429394**
**Filing Date: 04/28/2017**

*NOTE: Data fields with the * are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **TEAS Plus** | **YES** |
| **MARK INFORMATION** | |
| *MARK | KRISPIE |
| *STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | KRISPIE |
| *MARK STATEMENT | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | VVIG Inc |
| *STREET | 572 NW 23rd St |
| *CITY | Miami |
| *STATE (Required for U.S. applicants) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants) | 33127 |
| PHONE | (786) 953-4139 |
| EMAIL ADDRESS | trademark@virtuevape.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| WEBSITE ADDRESS | www.virtuevape.com |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| * STATE/COUNTRY OF INCORPORATION | Florida |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| *INTERNATIONAL CLASS | 034 |

VVIG(ALVAREZ)-001340

| *IDENTIFICATION | Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin; Cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes; Cartridges sold filled with propylene glycol for electronic cigarettes; Cartridges sold filled with vegetable glycerin for electronic cigarettes; Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Flavorings, other than essential oils, for use in electronic cigarettes; Flavourings, other than essential oils, for use in electronic cigarettes; Liquid nicotine solutions for use in electronic cigarettes |
|---|---|
| *FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 12/20/2016 |
| FIRST USE IN COMMERCE DATE | At least as early as 12/20/2016 |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT17\IMAGEOUT 17\874\293\87429394\xml1\ FTK0003.JPG |
| SPECIMEN DESCRIPTION | Product Shot - Showing - "KRISPIE" - Brand name required to be trademarked |

## ADDITIONAL STATEMENTS INFORMATION

| *TRANSLATION (if applicable) | |
|---|---|
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |

## CORRESPONDENCE INFORMATION

| *NAME | VVIG Inc |
|---|---|
| FIRM NAME | VVIG Inc |
| *STREET | 572 NW 23rd St |
| *CITY | Miami |
| *STATE (Required for U.S. addresses) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 33127 |
| PHONE | (786) 953-4139 |
| *EMAIL ADDRESS | trademark@virtuevape.com;paul@virtuevape.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## FEE INFORMATION

| APPLICATION FILING OPTION | TEAS Plus |
|---|---|
| NUMBER OF CLASSES | 1 |

VVIG(ALVAREZ)-001341

| | |
|---|---|
| **FEE PER CLASS** | 225 |
| * **TOTAL FEE PAID** | 225 |
| **SIGNATURE INFORMATION** | |
| * **SIGNATURE** | /Catalina Jimenez/ |
| * **SIGNATORY'S NAME** | Catalina Jimenez |
| * **SIGNATORY'S POSITION** | Owner |
| **SIGNATORY'S PHONE NUMBER** | (786) 953-4139 |
| * **DATE SIGNED** | 04/28/2017 |

VVIG(ALVAREZ)-001342

## Trademark Snap Shot Publication Stylesheet
### (Table presents the data on Publication Approval)

### OVERVIEW

| | | | |
|---|---|---|---|
| SERIAL NUMBER | 87438764 | FILING DATE | 05/05/2017 |
| REG NUMBER | 0000000 | REG DATE | N/A |
| REGISTER | PRINCIPAL | MARK TYPE | TRADEMARK |
| INTL REG # | N/A | INTL REG DATE | N/A |
| TM ATTORNEY | BECHHOFER, YOCHEVED D | L.O. ASSIGNED | 114 |

### PUB INFORMATION

| | |
|---|---|
| RUN DATE | 08/05/2017 |
| PUB DATE | N/A |
| STATUS | 680-APPROVED FOR PUBLICATON |
| STATUS DATE | 08/04/2017 |
| LITERAL MARK ELEMENT | MONSTER KRISP |

| | | | |
|---|---|---|---|
| DATE ABANDONED | N/A | DATE CANCELLED | N/A |
| SECTION 2F | NO | SECTION 2F IN PART | NO |
| SECTION 8 | NO | SECTION 8 IN PART | NO |
| SECTION 15 | NO | REPUB 12C | N/A |
| RENEWAL FILED | NO | RENEWAL DATE | N/A |
| DATE AMEND REG | N/A | | |

### FILING BASIS

| FILED BASIS | | CURRENT BASIS | | AMENDED BASIS | |
|---|---|---|---|---|---|
| 1 (a) | YES | 1 (a) | YES | 1 (a) | NO |
| 1 (b) | NO | 1 (b) | NO | 1 (b) | NO |
| 44D | NO | 44D | NO | 44D | NO |
| 44E | NO | 44E | NO | 44E | NO |
| 66A | NO | 66A | NO | | |
| NO BASIS | NO | NO BASIS | NO | | |

### MARK DATA

| | |
|---|---|
| STANDARD CHARACTER MARK | YES |
| LITERAL MARK ELEMENT | MONSTER KRISP |
| MARK DRAWING CODE | 4-STANDARD CHARACTER MARK |
| COLOR DRAWING FLAG | NO |

### CURRENT OWNER INFORMATION

| | |
|---|---|
| PARTY TYPE | 10-ORIGINAL APPLICANT |
| NAME | VVIG Inc |
| ADDRESS | 572 NW 23rd St<br>Miami, FL 33127 |
| ENTITY | 03-CORPORATION |

VVIG(ALVAREZ)-001351

| CITIZENSHIP | Florida |
|---|---|

## GOODS AND SERVICES

| INTERNATIONAL CLASS | 034 |
|---|---|
| DESCRIPTION TEXT | Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin; Cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes; Cartridges sold filled with propylene glycol for electronic cigarettes; Cartridges sold filled with vegetable glycerin for electronic cigarettes; Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Liquid nicotine solutions for use in electronic cigarettes |

## GOODS AND SERVICES CLASSIFICATION

| INTERNATIONAL CLASS | 034 | FIRST USE DATE | 05/05/2017 | FIRST USE IN COMMERCE DATE | 05/05/2017 | CLASS STATUS | 6-ACTIVE |
|---|---|---|---|---|---|---|---|

## MISCELLANEOUS INFORMATION/STATEMENTS

| CHANGE IN REGISTRATION | NO |
|---|---|

## PROSECUTION HISTORY

| DATE | ENT CD | ENT TYPE | DESCRIPTION | ENT NUM |
|---|---|---|---|---|
| 08/04/2017 | CNSA | O | APPROVED FOR PUB - PRINCIPAL REGISTER | 004 |
| 08/02/2017 | DOCK | D | ASSIGNED TO EXAMINER | 003 |
| 05/11/2017 | NWOS | I | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | 002 |
| 05/09/2017 | NWAP | I | NEW APPLICATION ENTERED IN TRAM | 001 |

## CURRENT CORRESPONDENCE INFORMATION

| ATTORNEY | NONE |
|---|---|
| CORRESPONDENCE ADDRESS | VVIG INC<br>VVIG INC<br>572 NW 23RD ST<br>MIAMI, FL 33127 |
| DOMESTIC REPRESENTATIVE | NONE |

VVIG(ALVAREZ)-001352

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

## Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

**Serial Number: 87438764**
**Filing Date: 05/05/2017**

*NOTE: Data fields with the* *** are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.**

---

### The table below presents the data as entered.

| Input Field | Entered |
| --- | --- |
| **TEAS Plus** | **YES** |
| **MARK INFORMATION** | |
| *MARK | Monster Krisp |
| *STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | Monster Krisp |
| *MARK STATEMENT | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | VVIG Inc |
| *STREET | 572 NW 23rd St |
| *CITY | Miami |
| *STATE (Required for U.S. applicants) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants) | 33127 |
| PHONE | (786) 953-4139 |
| EMAIL ADDRESS | trademark@virtuevape.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| WEBSITE ADDRESS | www.virtuevape.com |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| *STATE/COUNTRY OF INCORPORATION | Florida |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| *INTERNATIONAL CLASS | 034 |

VVIG(ALVAREZ)-001357

| *IDENTIFICATION | Electronic cigarette liquid (e-liquid) comprised of flavorings in liquid form, other than essential oils, used to refill electronic cigarette cartridges; Electronic cigarette liquid (e-liquid) comprised of propylene glycol; Electronic cigarette liquid (e-liquid) comprised of vegetable glycerin; Cartridges sold filled with chemical flavorings in liquid form for electronic cigarettes; Cartridges sold filled with propylene glycol for electronic cigarettes; Cartridges sold filled with vegetable glycerin for electronic cigarettes; Chemical flavorings in liquid form used to refill electronic cigarette cartridges; Liquid nicotine solutions for use in electronic cigarettes |
|---|---|
| *FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 05/05/2017 |
| FIRST USE IN COMMERCE DATE | At least as early as 05/05/2017 |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT17\IMAGEOUT 17\874\387\87438764\xml1\ FTK0003.JPG |
| SPECIMEN DESCRIPTION | Physical product label for the "Monster Krisp" Brand - required to be trademarked |

## ADDITIONAL STATEMENTS INFORMATION

| *TRANSLATION (if applicable) | |
|---|---|
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |

## CORRESPONDENCE INFORMATION

| *NAME | VVIG Inc |
|---|---|
| FIRM NAME | VVIG Inc |
| *STREET | 572 NW 23rd St |
| *CITY | Miami |
| *STATE (Required for U.S. addresses) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 33127 |
| PHONE | (786) 953-4139 |
| *EMAIL ADDRESS | trademark@virtuevape.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## FEE INFORMATION

| APPLICATION FILING OPTION | TEAS Plus |
|---|---|
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 225 |
| *TOTAL FEE PAID | 225 |

VVIG(ALVAREZ)-001358

| SIGNATURE INFORMATION | |
|---|---|
| * SIGNATURE | /Catalina Jimenez/ |
| * SIGNATORY'S NAME | Catalina Jimenez |
| * SIGNATORY'S POSITION | Owner |
| SIGNATORY'S PHONE NUMBER | (786) 953-4139 |
| * DATE SIGNED | 05/05/2017 |

VVIG(ALVAREZ)-001359

EXHIBIT 4

T116000000671

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



700287776737

T116 -671

07/14/16--01037--022   **87.50



JUL 15 2016

N. CAUSSEAUX

# COVER LETTER

**TO:**   Registration Section
         Division of Corporations

**SUBJECT:**   Pound It
                              (Mark to be registered)

The enclosed Trademark/Service Mark Application, specimens and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

Victor K. Rones, Esq
                   (Name of Person)

Law Offices of Victor K. Rones, P.A.
                   (Firm/Company)

16105 NE 18 Avenue
                   (Address)

No. Miami Beach, Fl 33162
                   (City/State and Zip Code)

For further information concerning this matter, please call:

Victor K. Rones   at (305) 945-6522
         (Name of Person)              (Area Code & Daytime Telephone Number)

**MAILING ADDRESS:**                    **STREET/COURIER ADDRESS:**
Registration Section                    Registration Section
Division of Corporations                Division of Corporations
P.O. Box 6327                           Clifton Building
Tallahassee, FL 32314                   2661 Executive Center Circle
                                        Tallahassee, FL 32301

(**NOTE:** The information contained in this cover letter will be included in the permanent record and will be available to the general public.)

**APPLICATION FOR THE REGISTRATION OF A TRADEMARK OR SERVICE MARK**
PURSUANT TO CHAPTER 495, FLORIDA STATUTES

TO:    **Division of Corporations**
       **Post Office Box 6327**
       **Tallahassee, FL 32314**

**PART I**

1. OWNER/APPLICANT:  Enter the name and address of the individual or the business entity to be listed as the owner of the Trademark and/or Service Mark on the records of the Florida Department of State.

   (a) Owner's/Applicant's name:  _Henry Alvarez & Mariano Cuesta_

   (b) Owner's/Applicant's business address:  _2245 SW 10th Street_
       _Miami, FL 33135_
       City/State/Zip

If different, Owner's/Applicant's mailing address: _____

_____
City/State/Zip

   (c) Owner's/Applicant's telephone number: ( _____ ) _____

Check the appropriate box to indicate the Owner/Applicant is a(n):

☑ Individual   ☐ Corporation           ☐ Joint Venture   ☐ Limited Liability Company
☐ General Partnership  ☐ Limited Partnership   ☐ Union      ☑ Other: _Co-Ownership_

If the Owner/Applicant is a business entity, the business entity must have an active filing or registration on file with the Florida Department of State.  If the Owner/Applicant is <u>not</u> an individual, enter the business entity's Florida registration/document number in #1, the state or country under the laws of which the business entity is currently formed, organized or incorporated under in #2, and the entity's federal employer identification number (EIN) in #3.

   (1) Florida registration/document number:  _N/A_

   (2) Domicile State or Country:  _N/A_

   (3) Federal Employer Identification Number:  _N/A_

2. (a) <u>SERVICE MARK</u>:  If the owner/applicant is using the name, logo, design and/or slogan being registered in connection with a type of service, the mark is a service mark.  If the mark is a service mark, the applicant/owner must list the specific service(s) the mark is being used in connection with.  For example:  furniture moving services, diaper services, house painting services, wholesale and retail sales of tractor equipment, etc.  <u>If the owner/applicant is using the mark to identify services available in the market place, enter the specific service(s) being rendered here:</u>

(Note:  List only those services currently being rendered by the owner/applicant.  Do not include future services.)

_N/A_

_____

_____

**Page 1 of 4**

**2. (b)  TRADEMARK:**  If the owner/applicant is using the name, logo, design and/or slogan being registered in connection with an actual product manufactured by the owner/applicant or on the owner/applicant's behalf, the mark is a trademark.  If the mark is a trademark, the applicant/owner must list the specific product(s) the name, logo, design and/or slogan is being used to identify.  For example:  ladies sportswear, cat food, barbecue grills, shoe laces, etc.   If the owner/applicant is using the name, logo, design and/or slogan to identify goods available in the market place, enter the specific product(s) the name, logo, design and/or slogan is being used to identify:

(Note:  List only those product(s) currently available.  Do not include future products.)

eliquid for electronic cigarette use with name of
Pound It

**2. (c) HOW IS THE NAME, LOGO, DESIGN AND/OR SLOGAN CURRENTLY USED:**

**SERVICE MARKS:**  If the name, logo, design and/or slogan are/is being used in connection with a type of service, you must specify the form(s)/mean(s) of advertisement the applicant/owner is using to advertise the services to the general public.  For example:  newspaper advertisements, business cards, brochures, flyers, pamphlets, menus, etc.   If the mark is being used in connection with a type of service, state how the name, logo, design and/or slogan are/is being used in advertising here:

**TRADEMARKS:**  If the name, logo, design and/or slogan are/is being used to identify a product manufactured by or fore the applicant/owner, you must specify how the mark is applied or affixed to the actual product or its packaging.  For example:  a tag, label, imprinted or engraved on the actual product, etc.   If the mark is being used in connection with a specific product, state how the name, logo, design and/or slogan is applied or affixed to the actual product(s) or the packaging:

This is a label on the bottle which contains the
Pound It electronic liquid

**2. (d)  FEE(S) AND CLASS(ES):**  There are a total of 45 classes or categories in which all products or services must be categorized.  The fee to register a mark is $87.50 per class.  Make check payable to Florida Department of State.

List the class(es) which apply to the product(s) and/or service(s) listed in 2(a) and/or 2(b) above:

Class #34

**Page 2 of 4**

## PART II

1.  You must state the date the name, logo, design and/or slogan was first used in the state of Florida, and, if it was used in another state or country, the date you first used the name, logo, design and/or slogan in the other state or country. Enter the month, day, and year the name, logo, design and/or slogan was first used by the applicant/owner, the predecessor, or a related company in Florida. If the name, logo, design and/or slogan has been used in another state or country, then you must also enter the month, day, and year the name, logo, design and/or slogan was/were used in another state or country, when applicable.

**Note:  The Florida Statutes require a mark to be in use prior to registration.**

(a)  Date first used in other state or country, if applicable: _____

(b)  Date first used in Florida: August 2015

## PART III

**ENTER NAME, LOGO, DESIGN AND/OR SLOGAN BEING REGISTERED:**

1.  Enter the name, a brief description of the logo or design, and/or the slogan you are registering. The description of the logo and/or design must be 25 words or less. List the exact name, slogan, and/or description of the logo/design here: (NOTE: The name, logo, design and/or slogan listed in this section must match the exact name, logo, design and/or slogan listed on your specimens or examples.)

The word Pound It is spelled out in a bubbly font surrounding a cartoon pound cake with white icing. On the sides of the pound cake are two closed cartoon fists

Provide the English translation of any and all terms listed #1 above, when applicable: N/A

_____

_____

2.  DISCLAIMER STATEMENT (if applicable):
Your mark may include a word or design that is commonly used by others. Commonly used terms or designs must be disclaimed. When you disclaim a specific term or design, you are acknowledging this term is commonly used by others and that you do not claim the exclusive right to use the disclaimed term or design. All geographical terms and representations of cities, states or countries must be disclaimed (i.e., Miami, Orlando, Florida, the design of the state of Florida, the design of the United States of America, etc.). Corporate suffixes and terms readily associated with the specific product(s) and/or(s) service being provided must also be disclaimed.

Enter all terms listed in #1 above which require a disclaimer in the space provided below:

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE THE TERM(S)" _____

_____ "APART FROM THE MARK AS SHOWN.

**Page 3 of 4**

·3.  ATTACH OR INCLUDE THREE SPECIMENS OR EXAMPLES OF THE TRADEMARK OR SERVICE MARK BEING REGISTERED

Chapter 495, F.S., requires you to submit three specimens (samples or examples) of the mark in use.  <u>You must submit three specimens FOR EACH CLASS listed in Part I #2(d).  The name, logo, design and/or slogan on the specimens must be identical to the name, logo, design and/or slogan being registered.  You may provide three identical specimens or three different specimens.</u>  For each service mark class (classes 35-45), you may provide three newspaper advertisements, business cards, brochures, flyers, or any combination thereof.  For each trademark class (classes 1-34), you may provide three tags, labels, boxes, etc. or any combination thereof.  Photographs of bulky specimens are acceptable if the mark being registered and the good(s) or product(s) are clearly legible.

<u>SIGNATURE OF APPLICANT/OWNER AND NOTARIZATION:</u>

I, *Henry Alvarez*_____, being sworn, depose and say that I am the owner and the applicant herein, or that I am authorized to sign on behalf of the owner and applicant herein, and to the best of my knowledge no other person except a related company has registered this mark in this state or has the right to use such mark in Florida either in the identical form thereof or in such near resemblance as to be likely, when applied to the goods or services of such other person to cause confusion, to cause mistake or to deceive.  I make this affidavit and verification on my/the applicant's behalf.  I further acknowledge that I have read the application and know the contents thereof and that the facts stated herein are true and correct.

*Henry Alvarez*
_____
Typed or printed name of applicant

_____
Applicant's signature
(List name and title)

STATE OF ___*FL*_____

COUNTY OF ___*MIAMI DADE*_____

Sworn to and subscribed before me on this *08* day of ___*JULY*___ 20*16*  *HENRY D ALVAREZ*
(Name of Individual Signing)

☐ who is personally known to me  ☒ whose identity I proved on the basis of *FL Driver license.*

```
        LINDA FERREIRA
   Notary Public - State of Florida
     Commission # FF 924620
    My Comm. Expires Nov 2, 2018
```
(Seal)

_____
Notary Public Signature

*LINDA Ferreira*
Notary's Printed Name

My Commission Expires: ___*NOV 2, 2018*___

**FILING FEE: $87.50 per class**

**Page 4 of 4**

3.  ATTACH OR INCLUDE THREE SPECIMENS OR EXAMPLES OF THE TRADEMARK OR SERVICE MARK BEING REGISTERED

Chapter 495, F.S., requires you to submit three specimens (samples or examples) of the mark in use. You must submit three specimens FOR EACH CLASS listed in Part I #2(d).  The name, logo, design and/or slogan on the specimens must be identical to the name, logo, design and/or slogan being registered.  You may provide three identical specimens or three different specimens.  For each service mark class (classes 35-45), you may provide three newspaper advertisements, business cards, brochures, flyers, or any combination thereof.  For each trademark class (classes 1-34), you may provide three tags, labels, boxes, etc. or any combination thereof.  Photographs of bulky specimens are acceptable if the mark being registered and the good(s) or product(s) are clearly legible.

SIGNATURE OF APPLICANT/OWNER AND NOTARIZATION:

I, _Mariano    Cuesta_____, being sworn, depose and say that I am the owner and the applicant herein, or that I am authorized to sign on behalf of the owner and applicant herein, and to the best of my knowledge no other person except a related company has registered this mark in this state or has the right to use such mark in Florida either in the identical form thereof or in such near resemblance as to be likely, when applied to the goods or services of such other person to cause confusion, to cause mistake or to deceive.  I make this affidavit and verification on my/the applicant's behalf.  I further acknowledge that I have read the application and know the contents thereof and that the facts stated herein are true and correct.

_Mariano  Cuesta_____
Typed or printed name of applicant

_____  Owner
Applicant's signature
(List name and title)

STATE OF  _FL_____

COUNTY OF  _MIAMI DADE_____

Sworn to and subscribed before me on this _08_ day of _JULY_ _2016_ _Mariano CUESTA_
(Name of Individual Signing)

☐ who is personally known to me   ☑ whose identity I proved on the basis of _FL Driver license_

(Seal)   LINDA FERREIRA
Notary Public - State of Florida
Commission # FF 024820
My Comm. Expires Nov 2, 2018

_____
Notary Public Signature

_Linda Ferreira_
Notary's Printed Name

My Commission Expires: _Nov 2, 2018_

**FILING FEE: $87.50 per class**

Page 4 of 4

# OFFICIAL SPECIMEN



# OFFICIAL SPECIMEN



T16000000670

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP     ☐ WAIT     ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____   Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



600287776746

T16-670

07/14/16--01037--021   **87.50



JUL 15 2016

N. CAUSSEAUX

# COVER LETTER

**TO:**   Registration Section
Division of Corporations

**SUBJECT:**   <u>Crack Pie</u>
(Mark to be registered)

The enclosed Trademark/Service Mark Application, specimens and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

<u>Victor K. Rones, Esq</u>
(Name of Person)

<u>Law Offices of Victor K. Rones</u>
(Firm/Company)

<u>16105 NE 18th Ave</u>
(Address)

<u>No Miami Beach, FL 33162</u>
(City/State and Zip Code)

For further information concerning this matter, please call:

<u>Victor K. Rones</u> at (<u>305</u>) <u>945 - 6522</u>
(Name of Person)        (Area Code & Daytime Telephone Number)

**MAILING ADDRESS:**
Registration Section
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

**STREET/COURIER ADDRESS:**
Registration Section
Division of Corporations
Clifton Building
2661 Executive Center Circle
Tallahassee, FL 32301

(**NOTE:** The information contained in this cover letter will be included in the permanent record and will be available to the general public.)

**APPLICATION FOR THE REGISTRATION OF A TRADEMARK OR SERVICE MARK**
PURSUANT TO CHAPTER 495, FLORIDA STATUTES

TO:     **Division of Corporations**
        **Post Office Box 6327**
        **Tallahassee, FL  32314**

### PART I

1. OWNER/APPLICANT:  Enter the name and address of the individual or the business entity to be listed as the owner of the Trademark and/or Service Mark on the records of the Florida Department of State.

   (a)  Owner's/Applicant's name:  _Henry Alvarez & Mariano Cuesta_

   (b)  Owner's/Applicant's business address:  _2245 SW 10th Street_

   _Miami, Fl 33135_
   City/State/Zip

If different, Owner's/Applicant's mailing address:  _____

   _____
   City/State/Zip

   (c)  Owner's/Applicant's telephone number: ( _____ ) _____

Check the appropriate box to indicate the Owner/Applicant is a(n):

☒ Individual        ☐ Corporation        ☐ Joint Venture        ☐ Limited Liability Company
☐ General Partnership  ☐ Limited Partnership        ☐ Union        ☒ Other: _Co-Ownership_

If the Owner/Applicant is a business entity, the business entity must have an active filing or registration on file with the Florida Department of State.  If the Owner/Applicant is *not* an individual, enter the business entity's Florida registration/document number in #1, the state or country under the laws of which the business entity is currently formed, organized or incorporated under in #2, and the entity's federal employer identification number (EIN) in #3.

   (1)  Florida registration/document number:  _N/A_

   (2)  Domicile State or Country:  _N/A_

   (3)  Federal Employer Identification Number:  _N/A_

2. (a)  SERVICE MARK:  If the owner/applicant is using the name, logo, design and/or slogan being registered in connection with a type of service, the mark is a service mark.  If the mark is a service mark, the applicant/owner must list the specific service(s) the mark is being used in connection with.  For example:  furniture moving services, diaper services, house painting services, wholesale and retail sales of tractor equipment, etc.  If the owner/applicant is using the mark to identify services available in the market place, enter the specific service(s) being rendered here:

(Note:  List only those services currently being rendered by the owner/applicant.   Do not include future services.)

_N/A_

_____

_____

_____

**Page 1 of 4**

2. (b)  UNDERLINE TRADEMARK:  If the owner/applicant is using the name, logo, design and/or slogan being registered in connection with an actual product manufactured by the owner/applicant or on the owner/applicant's behalf, the mark is a trademark.  If the mark is a trademark, the applicant/owner must list the specific product(s) the name, logo, design and/or slogan is being used to identify.  For example:  ladies sportswear, cat food, barbecue grills, shoe laces, etc.   If the owner/applicant is using the name, logo, design and/or slogan to identify goods available in the market place, enter the specific product(s) the name, logo, design and/or slogan is being used to identify:

(Note:  List only those product(s) currently available.   Do not include future products.)

eliquid for electronic cigarette use with name of Crack Pie.

2. (c) HOW IS THE NAME, LOGO, DESIGN AND/OR SLOGAN CURRENTLY USED:

SERVICE MARKS:  If the name, logo, design and/or slogan are/is being used in connection with a type of service, you must specify the form(s)/mean(s) of advertisement the applicant/owner is using to advertise the services to the general public.  For example:  newspaper advertisements, business cards, brochures, flyers, pamphlets, menus, etc.  If the mark is being used in connection with a type of service, state how the name, logo, design and/or slogan are/is being used in advertising here:

TRADEMARKS:  If the name, logo, design and/or slogan are/is being used to identify a product manufactured by or fore the applicant/owner, you must specify how the mark is applied or affixed to the actual product or its packaging.  For example:  a tag, label, imprinted or engraved on the actual product, etc.  If the mark is being used in connection with a specific product, state how the name, logo, design and/or slogan is applied or affixed to the actual product(s) or the packaging:

This is a label on the bottle which contains the Crack Pie electronic liquid.

2. (d)  FEE(S) AND CLASS(ES):  There are a total of 45 classes or categories in which all products or services must be categorized.  The fee to register a mark is $87.50 per class.  Make check payable to Florida Department of State.

List the class(es) which apply to the product(s) and/or service(s) listed in 2(a) and/or 2(b) above:

Class #34

## PART II

1.  You must state the date the name, logo, design and/or slogan was first used in the state of Florida, and, if it was used in another state or country, the date you first used the name, logo, design and/or slogan in the other state or country. Enter the month, day, and year the name, logo, design and/or slogan was first used by the applicant/owner, the predecessor, or a related company in Florida. If the name, logo, design and/or slogan has been used in another state or country, then you must also enter the month, day, and year the name, logo, design and/or slogan was/were used in another state or country, when applicable.

**Note: The Florida Statutes require a mark to be in use prior to registration.**

(a)  Date first used in other state or country, if applicable: _____

(b)  Date first used in Florida: August 2015

## PART III

**ENTER NAME, LOGO, DESIGN AND/OR SLOGAN BEING REGISTERED:**

1.  Enter the name, a brief description of the logo or design, and/or the slogan you are registering. The description of the logo and/or design must be 25 words or less. List the exact name, slogan, and/or description of the logo/design here:  (NOTE:  The name, logo, design and/or slogan listed in this section must match the exact name, logo, design and/or slogan listed on your specimens or examples.)

The word Crack Pie surrounds the shape of a face made up of food. The eyes are in the shape of two pies. The mouth is in the shape of a smile and is made up of powdered Sugar

Provide the English translation of any and all terms listed #1 above, when applicable: N/A

_____

_____

2. DISCLAIMER STATEMENT (if applicable):
Your mark may include a word or design that is commonly used by others. Commonly used terms or designs must be disclaimed. When you disclaim a specific term or design, you are acknowledging this term is commonly used by others and that you do not claim the exclusive right to use the disclaimed term or design. All geographical terms and representations of cities, states or countries must be disclaimed (i.e., Miami, Orlando, Florida, the design of the state of Florida, the design of the United States of America, etc.). Corporate suffixes and terms readily associated with the specific product(s) and/or(s) service being provided must also be disclaimed.

Enter all terms listed in #1 above which require a disclaimer in the space provided below:

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE THE TERM(S)" _____

_____  "APART FROM THE MARK AS SHOWN.

**Page 3 of 4**

.3.   ATTACH OR INCLUDE THREE SPECIMENS OR EXAMPLES OF THE TRADEMARK OR SERVICE MARK BEING REGISTERED

.Chapter 495, F.S., requires you to submit three specimens (samples or examples) of the mark in use.  You must submit three specimens FOR EACH CLASS listed in Part I #2(d).  The name, logo, design and/or slogan on the specimens must be identical to the name, logo, design and/or slogan being registered.  You may provide three identical specimens or three different specimens.  For each service mark class (classes 35-45), you may provide three newspaper advertisements, business cards, brochures, flyers, or any combination thereof.  For each trademark class (classes 1-34), you may provide three tags, labels, boxes, etc. or any combination thereof.  Photographs of bulky specimens are acceptable if the mark being registered and the good(s) or product(s) are clearly legible.

### SIGNATURE OF APPLICANT/OWNER AND NOTARIZATION:

I, _Henry Alvarez_____, being sworn, depose and say that I am the owner and the applicant herein, or that I am authorized to sign on behalf of the owner and applicant herein, and to the best of my knowledge no other person except a related company has registered this mark in this state or has the right to use such mark in Florida either in the identical form thereof or in such near resemblance as to be likely, when applied to the goods or services of such other person to cause confusion, to cause mistake or to deceive.  I make this affidavit and verification on my/the applicant's behalf.  I further acknowledge that I have read the application and know the contents thereof and that the facts stated herein are true and correct.

_Henry Alvarez_____
Typed or printed name of applicant

_____  _owner_
Applicant's signature
(List name and title)

STATE OF _FL_____

COUNTY OF _MIAMI DADE_____

Sworn to and subscribed before me on this _08_ day of _JULY_ _2016_ _HENRY D ALVAREZ_
(Name of Individual Signing)

☐ who is personally known to me   ☒ whose identity I proved on the basis of _FL DRIVER LICENSE_

LINDA FERREIRA
Notary Public - State of Florida
Commission # FF 924620
My Comm. Expires Nov 2, 2018

(Seal)

_____
Notary Public Signature

_Linda Ferreira_
Notary's Printed Name

My Commission Expires: _NOV 2, 2018_

**FILING FEE: $87.50 per class**

**Page 4 of 4**

**3. ATTACH OR INCLUDE THREE SPECIMENS OR EXAMPLES OF THE TRADEMARK OR SERVICE MARK BEING REGISTERED**

Chapter 495, F.S., requires you to submit three specimens (samples or examples) of the mark in use. You must submit three specimens FOR EACH CLASS listed in Part I #2(d). The name, logo, design and/or slogan on the specimens must be identical to the name, logo, design and/or slogan being registered. You may provide three identical specimens or three different specimens. For each service mark class (classes 35-45), you may provide three newspaper advertisements, business cards, brochures, flyers, or any combination thereof. For each trademark class (classes 1-34), you may provide three tags, labels, boxes, etc. or any combination thereof. Photographs of bulky specimens are acceptable if the mark being registered and the good(s) or product(s) are clearly legible.

**SIGNATURE OF APPLICANT/OWNER AND NOTARIZATION:**

I, _Mariano Cuesta_ , being sworn, depose and say that I am the owner and the applicant herein, or that I am authorized to sign on behalf of the owner and applicant herein, and to the best of my knowledge no other person except a related company has registered this mark in this state or has the right to use such mark in Florida either in the identical form thereof or in such near resemblance as to be likely, when applied to the goods or services of such other person to cause confusion, to cause mistake or to deceive. I make this affidavit and verification on my/the applicant's behalf. I further acknowledge that I have read the application and know the contents thereof and that the facts stated herein are true and correct.

_Mariano Cuesta_
Typed or printed name of applicant

_(signature)_        owner
Applicant's signature
(List name and title)

STATE OF _FL_

COUNTY OF _MIAMI DADE_

Sworn to and subscribed before me on this _08_ day of _JULY_ , _2016_ , _MARIANO CUESTA_
(Name of Individual Signing)

☐ who is personally known to me   ☒ whose identity I proved on the basis of _FL DRIVER LICENSE_

(Seal)

LINDA FERREIRA
Notary Public - State of Florida
Commission # FF 924820
My Comm. Expires Nov 2, 2018

_(signature)_
Notary Public Signature

_LINDA FERREIRA_
Notary's Printed Name

My Commission Expires: _NOV 2, 2018_

**FILING FEE: $87.50 per class**

**Page 4 of 4**

My Comm. Expires Nov 2, 2018

# OFFICIAL SPECIMEN



# OFFICIAL SPECIMEN



T16 000000646

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

*W16 - 38938*
(Business Entity Name)

_____
(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



500285683065

*T16 - 646*

05/26/16--01012--006  **87.50



JUL 12 2016

N. CAUSSEAUX

## COVER LETTER

**TO:**    Registration Section
             Division of Corporations

**SUBJECT:** _The Raging Donut_
                                    (Mark to be registered)

The enclosed Trademark/Service Mark Application, specimens and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

_Victor K. Rones, Esq._
                 (Name of Person)

_Law Offices of Victor K. Rones, P.A._
                 (Firm/Company)

_16105 NE 18th Ave_
                 (Address)

_No. Miami Beach, Fl 33162_
                 (City/State and Zip Code)

For further information concerning this matter, please call:

_Victor K. Rones_ at (_305_), _945-6522_
        (Name of Person)              (Area Code & Daytime Telephone Number)

**MAILING ADDRESS:**
Registration Section
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

**STREET/COURIER ADDRESS:**
Registration Section
Division of Corporations
Clifton Building
2661 Executive Center Circle
Tallahassee, FL 32301

(**NOTE:** The information contained in this cover letter will be included in the permanent record and will be available to the general public.)



**FLORIDA DEPARTMENT OF STATE**
Division of Corporations

May 26, 2016

VICTOR K. RONES, ESQUIRE
LAW OFFICES OF VICTOR K. RONES, P.A.
16105 NE 18TH AVENUE
NORTH MIAMI BEACH, FL  33162

SUBJECT: THE RAGING DONUT
Ref. Number: W16000038938

We have received your document for THE RAGING DONUT and your check(s) totaling $87.50.  However, the document has not been filed and is being retained in this office for the following:

The specimens provided this office are not acceptable; we need three permanent specimens, **which may be the same or different**.  We do not accept camera ready copies. We do not accept specimens that have been altered or defaced in any manner.  We will accept labels, decals or tags that are affixed to the actual goods or products.  We will accept three LEGIBLE photographs of the goods or products with the specimens affixed.   If this is some kind of publication, newspaper, magazine, or column, we need three publications.   We need specimens for each class of registration.   We DO NOT accept letterhead, stationery, envelopes, invoices or mailing labels.

Please attach your specimens to a copy of this letter or to your corrected application, if it was returned to you for correction(s),and return it/them to this office for processing.

We do not accept specimens that have been created or altered by Photoshop or any other similar software.

Pursuant to s. 495.035(5), F.S., this application will be considered abandoned if the applicant fails to reply or resubmit the corrected/amended application within three months from date of this letter.

If you have any questions concerning the filing of your document, please call (850) 245-6051.

Nanette Causseaux
Regulatory Specialist II Supervisor                    Letter Number: 416A00011213

Division of Corporations  P.O. BOX 6327  Tallahassee, Florida 32314

**APPLICATION FOR THE REGISTRATION OF A TRADEMARK OR SERVICE MARK**
PURSUANT TO CHAPTER 495, FLORIDA STATUTES

TO:   **Division of Corporations**
      **Post Office Box 6327**
      **Tallahassee, FL 32314**

PART I

1. OWNER/APPLICANT:  Enter the name and address of the individual or the business entity to be listed as the owner of the Trademark and/or Service Mark on the records of the Florida Department of State.

   (a) Owner's/Applicant's name: _Henry Alvarez and Mariano Cuesta_

   (b) Owner's/Applicant's business address: _2245 SW 10th Street_

   _Miami, FL 33135_
   City/State/Zip

If different, Owner's/Applicant's mailing address: _____

_____
City/State/Zip

   (c)  Owner's/Applicant's telephone number: (_____)_____

Check the appropriate box to indicate the Owner/Applicant is a(n):

☑ Individual       ☐ Corporation            ☐ Joint Venture     ☐ Limited Liability Company
☐ General Partnership ☐ Limited Partnership   ☐ Union             ☑ Other: _Co-ownership_

If the Owner/Applicant is a business entity, the business entity must have an active filing or registration on file with the Florida Department of State.  If the Owner/Applicant is not an individual, enter the business entity's Florida registration/document number in #1, the state or country under the laws of which the business entity is currently formed, organized or incorporated under in #2, and the entity's federal employer identification number (EIN) in #3.

(1) Florida registration/document number: _N/A_

(2) Domicile State or Country: _N/A_

(3) Federal Employer Identification Number: _N/A_

2. (a)  SERVICE MARK:  If the owner/applicant is using the name, logo, design and/or slogan being registered in connection with a type of service, the mark is a service mark.  If the mark is a service mark, the applicant/owner must list the specific service(s) the mark is being used in connection with.  For example:  furniture moving services, diaper services, house painting services, wholesale and retail sales of tractor equipment, etc.  If the owner/applicant is using the mark to identify services available in the market place, enter the specific service(s) being rendered here:

(Note:  List only those services currently being rendered by the owner/applicant.  Do not include future services.)

_N/A_

_____

_____

**Page 1 of 4**

2. (b) <u>TRADEMARK:</u> If the owner/applicant is using the name, logo, design and/or slogan being registered in connection with an actual product manufactured by the owner/applicant or on the owner/applicant's behalf, the mark is a trademark. If the mark is a trademark, the applicant/owner must list the specific product(s) the name, logo, design and/or slogan is being used to identify. For example: ladies sportswear, cat food, barbecue grills, shoe laces, etc. <u>If the owner/applicant is using the name, logo, design and/or slogan to identify goods available in the market place, enter the specific product(s) the name, logo, design and/or slogan is being used to identify:</u>

(Note: List only those product(s) currently available. Do not include future products.)

Eliquid for electronic cigarette use with name of The Raging Donut.

2. (c) <u>HOW IS THE NAME, LOGO, DESIGN AND/OR SLOGAN CURRENTLY USED:</u>

<u>SERVICE MARKS:</u> If the name, logo, design and/or slogan are/is being used in connection with a type of service, you must specify the form(s)/mean(s) of advertisement the applicant/owner is using to advertise the services to the general public. For example: newspaper advertisements, business cards, brochures, flyers, pamphlets, menus, etc. <u>If the mark is being used in connection with a type of service, state how the name, logo, design and/or slogan are/is being used in advertising here:</u>

<u>TRADEMARKS:</u> If the name, logo, design and/or slogan are/is being used to identify a product manufactured by or fore the applicant/owner, you must specify how the mark is applied or affixed to the actual product or its packaging. For example: a tag, label, imprinted or engraved on the actual product, etc. <u>If the mark is being used in connection with a specific product, state how the name, logo, design and/or slogan is applied or affixed to the actual product(s) or the packaging:</u>

This is a label on the bottle which contains the Raging Donut electronic liquid

2. (d) <u>FEE(S) AND CLASS(ES):</u> There are a total of 45 classes or categories in which all products or services must be categorized. The fee to register a mark is $87.50 per class. Make check payable to Florida Department of State.

List the class(es) which apply to the product(s) and/or service(s) listed in 2(a) and/or 2(b) above:

Class #34

**Page 2 of 4**

**PART II**

1. You must state the date the name, logo, design and/or slogan was first used in the state of Florida, and, if it was used in another state or country, the date you first used the name, logo, design and/or slogan in the other state or country. Enter the month, day, and year the name, logo, design and/or slogan was first used by the applicant/owner, the predecessor, or a related company in Florida. If the name, logo, design and/or slogan has been used in another state or country, then you must also enter the month, day, and year the name, logo, design and/or slogan was/were used in another state or country, when applicable.

**Note: The Florida Statutes require a mark to be in use prior to registration.**

(a) Date first used in other state or country, if applicable: _____

(b) Date first used in Florida: August 2015

**PART III**

**ENTER NAME, LOGO, DESIGN AND/OR SLOGAN BEING REGISTERED:**

1. Enter the name, a brief description of the logo or design, and/or the slogan you are registering. The description of the logo and/or design must be 25 words or less. List the exact name, slogan, and/or description of the logo/design here: (NOTE: The name, logo, design and/or slogan listed in this section must match the exact name, logo, design and/or slogan listed on your specimens or examples.)

The Raging Donut is written in graffiti style font. The words "The Raging" are positioned above an image of a doughnut with pebble sprinkles and strawberry frosting on it. Below the doughnut is the word "Donut"

Provide the English translation of any and all terms listed #1 above, when applicable: N/A

_____

_____

2. DISCLAIMER STATEMENT (if applicable):
Your mark may include a word or design that is commonly used by others. Commonly used terms or designs must be disclaimed. When you disclaim a specific term or design, you are acknowledging this term is commonly used by others and that you do not claim the exclusive right to use the disclaimed term or design. All geographical terms and representations of cities, states or countries must be disclaimed (i.e., Miami, Orlando, Florida, the design of the state of Florida, the design of the United States of America, etc.). Corporate suffixes and terms readily associated with the specific product(s) and/or(s) service being provided must also be disclaimed.

Enter all terms listed in #1 above which require a disclaimer in the space provided below:

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE THE TERM(S)" _____

_____ "APART FROM THE MARK AS SHOWN.

Page 3 of 4

3. ATTACH OR INCLUDE THREE SPECIMENS OR EXAMPLES OF THE TRADEMARK OR SERVICE MARK BEING REGISTERED

Chapter 495, F.S., requires you to submit three specimens (samples or examples) of the mark in use. You must submit three specimens FOR EACH CLASS listed in Part I #2(d). The name, logo, design and/or slogan on the specimens must be identical to the name, logo, design and/or slogan being registered. You may provide three identical specimens or three different specimens. For each service mark class (classes 35-45), you may provide three newspaper advertisements, business cards, brochures, flyers, or any combination thereof. For each trademark class (classes 1-34), you may provide three tags, labels, boxes, etc. or any combination thereof. Photographs of bulky specimens are acceptable if the mark being registered and the good(s) or product(s) are clearly legible.

SIGNATURE OF APPLICANT/OWNER AND NOTARIZATION:

I, _Henry Alvarez_____, being sworn, depose and say that I am the owner and the applicant herein, or that I am authorized to sign on behalf of the owner and applicant herein, and to the best of my knowledge no other person except a related company has registered this mark in this state or has the right to use such mark in Florida either in the identical form thereof or in such near resemblance as to be likely, when applied to the goods or services of such other person to cause confusion, to cause mistake or to deceive. I make this affidavit and verification on mythe applicant's behalf. I further acknowledge that I have read the application and know the contents thereof and that the facts stated herein are true and correct.

_Henry Alvarez_
Typed or printed name of applicant

_____
Applicant's signature
(List name and title)

STATE OF _FL_

COUNTY OF _Dade_

Sworn to and subscribed before me on this _13_ day of _May_ 20_16_. _Henry Alvarez_
(Name of Individual Signing)

☐ who is personally known to me   ☒ whose identity I proved on the basis of _FL DL_

[Notary Seal]
FRANZINET SANTOS
Notary Public · State of Florida
My Comm. Expires Jun 22, 2018
Commission # FF 134521

_____
Notary Public Signature

_Franzinet Santos_
Notary's Printed Name

My Commission Expires: _June 22, 2018_

**FILING FEE: $87.50 per class**

Page 4 of 4

**3.  ATTACH OR INCLUDE THREE SPECIMENS OR EXAMPLES OF THE TRADEMARK OR SERVICE MARK BEING REGISTERED**

Chapter 495, F.S., requires you to submit three specimens (samples or examples) of the mark in use.  You must submit three specimens FOR EACH CLASS listed in Part I #2(d).  The name, logo, design and/or slogan on the specimens must be identical to the name, logo, design and/or slogan being registered.  You may provide three identical specimens or three different specimens.  For each service mark class (classes 35-45), you may provide three newspaper advertisements, business cards, brochures, flyers, or any combination thereof.  For each trademark class (classes 1-34), you may provide three tags, labels, boxes, etc. or any combination thereof.  Photographs of bulky specimens are acceptable if the mark being registered and the good(s) or product(s) are clearly legible.

<u>SIGNATURE OF APPLICANT/OWNER AND NOTARIZATION:</u>

I, _____Mariano Cuesta_____, being sworn, depose and say that I am the owner and the applicant herein, or that I am authorized to sign on behalf of the owner and applicant herein, and to the best of my knowledge no other person except a related company has registered this mark in this state or has the right to use such mark in Florida either in the identical form thereof or in such near resemblance as to be likely, when applied to the goods or services of such other person to cause confusion, to cause mistake or to deceive.  I make this affidavit and verification on my/the applicant's behalf.  I further acknowledge that I have read the application and know the contents thereof and that the facts stated herein are true and correct.

Mariano Cuesta
Typed or printed name of applicant

Applicant's signature
(List name and title)

STATE OF Fl

COUNTY OF Dade

Sworn to and subscribed before me on this 13 day of May 2016, Mariano Cuesta
(Name of Individual Signing)

☐ who is personally known to me   ☑ whose identity I proved on the basis of FL DL

FRANZINET SANTOS
Notary Public - State of Florida
My Comm. Expires Jun 22, 2018
Commission # FF 134521

Notary Public Signature

Notary's Printed Name

My Commission Expires: June 22, 2018

**FILING FEE: $87.50 per class**

**Page 4 of 4**

 



OFFICIAL SPECIMEN

EXHIBIT 5

From: **Paul Brandtastic** <paul@brandtasticdesign.com>
Date: Mon, Jul 25, 2016 at 12:58 PM
Subject: Labels - Invoiced - 01
To: Henry Alvarez <henry@mv-co.com>, mariano@mv-co.com, Henry Alvarez
<henryalvarez02@gmail.com>, mariano.cuesta1@gmail.com

Henry / Mariano

Here is the first invoice for the labels I have produced
for Vape Brands under your control - This invoice
equates to the written requests made to Paul Kettlewell
(Brandtastic Design LLC) for "emergency labels"

These are essentially the labels produced for you and
your brands when you had no pre-printed labels
available to use - in order to keep your product delivered
in a timely manner - and as agreed by Brandtastic
Design and yourselves to be charged at $0.08 cents per
label.





Please remit a cheque to Brandtastic Design LLC - by
return for the following amounts as outlined below:

**A total of: $2,136.48**

Please submit a reseller certificate so as not to incur
taxes on this invoice - I look forward to a prompt
response.

regards

1

Paul

Please call if you need anything explaining -  Supplied
spread sheet shows record of each hand written label
sheet requested and labels subsequently printed.

Empty vertical columns are where amounts were
relevant to other brands that do not concern you and I
have deleted those from this record.

For an overview below - These are all requests I have
on file for your brands that were printed and processed -
for various orders including new bespoke labels
for  international orders for China, Italy and France

See breakdown as follows:

PRODUCT - MG - QTY - TOTAL

| Product | Qty | Total |
|---|---|---|
| TOO PUFT 0mg | 10 | $0.80 |
| TOO PUFT 3mg | 65 | $5.20 |
| TOO PUFT 6mg | 40 | $3.20 |
| | | |
| CRACK PIE 0mg | 42 | $3.36 |
| CRACK PIE 1.5mg | 10 | $0.80 |
| CRACK PIE 3mg | 71 | $5.68 |
| CRACK PIE 6mg | 301 | $24.08 |
| CRACK PIE 12mg | 68 | $5.44 |
| | | |
| DONUT 0mg | 602 | $48.16 |
| DONUT 1.5mg | 491 | $39.28 |
| DONUT 3mg | 4261 | $340.88 |
| DONUT 6mg | 1386 | $110.88 |
| DONUT 12mg | 285 | $22.80 |
| | | |
| POUND IT 0mg | 30 | $2.40 |
| POUND IT 3mg | 30 | $2.40 |
| POUND IT 6mg | 31 | $2.48 |
| POUND IT 12mg | 9 | $0.72 |
| | | |
| DUNKS 0mg | 1 | $0.08 |
| DUNKS 3mg | 1600 | $128.00 |
| DUNKS 6mg | 0 | $0.00 |
| DUNKS 18mg | 5 | $0.40 |
| | | |
| ROLLY 0mg | 120 | $9.60 |
| ROLLY 1.5mg | 120 | $9.60 |
| ROLLY 3mg | 924 | $73.92 |
| ROLLY 6mg | 578 | $46.24 |
| ROLLY 12mg | 50 | $4.00 |
| ROLLY 18mg | 5 | $0.40 |
| | | |
| GUSH 0mg | 440 | $35.20 |
| GUSH 1.5mg | 570 | $45.60 |
| GUSH 3mg | 3451 | $276.08 |
| GUSH 6mg | 1777 | $142.16 |
| GUSH 18mg | 240 | $19.20 |

| | | |
|---|---|---|
| L/Q Blackbird 0mg | 200 | $16.00 |
| L/Q Blackbird 3mg | 203 | $16.24 |
| L/Q Blackbird 6mg | 200 | $16.00 |
| | | |
| L/Q Parfait 0mg | 1 | $0.08 |
| L/Q Parfait 3mg | 4 | $0.32 |
| L/Q Parfait 6mg | 4 | $0.32 |
| L/Q Parfait 12mg | 2 | $0.16 |
| | | |
| L/Q Dragons 0mg | 2 | $0.16 |
| L/Q Dragons 3mg | 9 | $0.72 |
| L/Q Dragons 6mg | 0 | $0.00 |
| | | |
| L/Q POC 0mg | 1 | $0.08 |
| L/Q POC 3mg | 102 | $8.16 |
| L/Q POC 6mg | 0 | $0.00 |
| | | |
| China DONUT 1.5mg | 300 | $24.00 |
| China DONUT 3mg | 300 | $24.00 |
| China DONUT 6mg | 600 | $48.00 |
| | | |
| China POUND IT 1.5mg | 400 | $32.00 |
| China POUND IT 3mg | 400 | $32.00 |
| China POUND IT 6mg | 700 | $56.00 |
| | | |
| China CRACK PIE 1.5mg | 400 | $32.00 |
| China CRACK PIE 3mg | 400 | $32.00 |
| China CRACK PIE 6mg | 700 | $56.00 |
| | | |
| French Crack pie 3mg | 15 | $1.20 |
| | | |
| French Too Puft 3mg | 15 | $1.20 |
| French Too Puft 6mg | 10 | $0.80 |
| | | |
| French DONUT 3mg | 15 | $1.20 |
| French DONUT 6mg | 20 | $1.60 |
| | | |
| Italy GUSH 0mg | 50 | $4.00 |
| Italy GUSH 1.5mg | 150 | $12.00 |
| Italy GUSH 3mg | 300 | $24.00 |
| Italy GUSH 6mg | 300 | $24.00 |
| | | |
| Italy ROLLY 0mg | 50 | $4.00 |
| Italy ROLLY 1.5mg | 150 | $12.00 |
| Italy ROLLY 3mg | 300 | $24.00 |
| Italy ROLLY 6mg | 300 | $24.00 |
| | | |
| Italy DUNKS 0mg | 100 | $8.00 |
| Italy DUNKS 1.5mg | 250 | $20.00 |
| Italy DUNKS 3mg | 500 | $40.00 |
| Italy DUNKS 6mg | 500 | $40.00 |
| | | |
| Italy DONUTS 0mg | 30 | $2.40 |
| Italy DONUTS 1.5mg | 50 | $4.00 |
| Italy DONUTS 3mg | 150 | $12.00 |
| Italy DONUTS 6mg | 150 | $12.00 |
| | | |
| Italy POUND IT 0mg | 30 | $2.40 |
| Italy POUND IT 1.5mg | 50 | $4.00 |
| Italy POUND IT 3mg | 150 | $12.00 |
| Italy POUND IT 6mg | 150 | $12.00 |

Italy CRACK PIE 0mg     30      $2.40
Italy CRACK PIE 1.5mg   50      $4.00
Italy CRACK PIE 3mg    150     $12.00
Italy CRACK PIE 6mg    150     $12.00

Regards

Paul Kettlewell
**Brandtastic Design**

Total Design Consultancy, Derby - UK - Miami - USA

UK Mob: +44 (0) 7972 648531
USA Mob: +1 (305) 713 0555

paul@brandtasticdesign.com
www.brandtasticdesign.com

This electronic message contains information from Brandtastic Design a trading name of TMOS Developmemt Limited which may be privileged, copyrighted and confidential. The information is intended to be for the use of the individual(s) or entity named above. If you are not the intended recipient. be aware that any disclosure. copying, distribution or use of the contents of this information is prohibited.

Internet communications are not secure and therefore TMOS Development Limited does not accept legal responsibility for the contents of this message.

Any views or opinions presented are only those of the author and not those of TMOS Development Limited. If you have received this message in error. please notify admin@brandtasticdesign.com immediately.

| Brands | Total Printed | Total Amount $ | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOO PUFF 0mg | 10 | $0.80 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOO PUFF 3mg | 65 | $5.20 | | | | | | | | | | | | | | | | | | | | | | | | | 5 | | | | | | | | | |
| TOO PUFF 6mg | 40 | $3.20 | | | | | | | | | | | | | | | | | | | | | | | | 10 | | | | | | | | | | 25 |
| CRACK PIE 0mg | 42 | $3.36 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CRACK PIE 1.5mg | 10 | $0.80 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CRACK PIE 3mg | 71 | $5.68 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CRACK PIE 6mg | 301 | $24.08 | | | | | | | | | | | 3 | | | | | | | | | | | | | 2 | 1 | | | | 80 | | | | |
| CRACK PIE 12mg | 68 | $5.44 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DONUT 0mg | 602 | $48.16 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DONUT 1.5mg | 491 | $39.28 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DONUT 3mg | 4261 | $340.88 | | | | | | | | | | | 3 | | | 2 | | | | | | | | | | 350 | 50 | | | 800 | | 320 | | | 5 | |
| DONUT 6mg | 1386 | $110.88 | | | | | | | | | | | 5 | | | | | | | | | | | | | | | | | | | | | | | |
| DONUT 12mg | 285 | $22.80 | | | | | | | | | | | 10 | 3 | | | | | | | | | | | | 2 | | | | | | | | | | |
| POUND IT 0mg | 30 | $2.40 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| POUND IT 3mg | 30 | $2.40 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| POUND IT 6mg | 31 | $2.48 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| POUND IT 12mg | 9 | $0.72 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4 | | | | | | | |
| DUNKS 0mg | 1 | $0.08 | | | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DUNKS 3mg | 1600 | $128.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DUNKS 6mg | 0 | $0.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DUNKS 18mg | 5 | $0.40 | | | | | | | 4 | | | | | | | | | 1 | | | | | | | | | | | | | | | | | | |
| ROLLY 0mg | 120 | $9.60 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ROLLY 1.5mg | 120 | $9.60 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ROLLY 3mg | 924 | $73.92 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 290 | | | |
| ROLLY 6mg | 578 | $46.24 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 290 | | | |
| ROLLY 12mg | 50 | $4.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ROLLY 18mg | 5 | $0.40 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GUSH 0mg | 440 | $35.20 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GUSH 1.5mg | 570 | $45.60 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GUSH 3mg | 3451 | $276.08 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GUSH 6mg | 1777 | $142.16 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 830 | | | | |
| GUSH 18mg | 240 | $19.20 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BURI 0mg | 0 | $0.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BURI 3mg | 0 | $0.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BURI 6mg | 0 | $0.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BURI 18mg | 0 | $0.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Blackbird Tobacco 0mg | 200 | $16.00 | | | | | | | | | | 200 | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Blackbird Tobacco 3mg | 203 | $16.24 | 3 | | | | | | | | | 200 | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Blackbird Tobacco 6mg | 200 | $16.00 | | | | | | | | | | 200 | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Parfait 0mg | 1 | $0.08 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Parfait 1.5mg | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Parfait 3mg | 4 | $0.32 | | | | | | | | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Parfait 6mg | 4 | $0.32 | | | | | | | | | | | | | 1 | | | | 2 | | | | | | | | | | | | | | | | | |
| L/Q Parfait 12mg | 2 | $0.16 | | | | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Dragons 0mg | 2 | $0.16 | | | | | | | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Dragons 3mg | 9 | $0.72 | | | | | | | | | | 1 | | 1 | | | | | | | | | | | | | | | | | | | | | | |
| L/Q Dragons 6mg | 0 | $0.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q POC 0mg | 1 | $0.08 | | | | | | | | | | | | | | | | | | | | | | | | 1 | | | | | | | | | | |
| L/Q POC 3mg | 102 | $8.16 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| L/Q POC 6mg | 0 | $0.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China DONUT 1.5mg | 300 | $24.00 | | | | | | 300 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China DONUT 3mg | 300 | $24.00 | | | | | | 300 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China DONUT 6mg | 600 | $48.00 | | | | | | 600 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China POUND IT 1.5mg | 400 | $32.00 | | | | | | 400 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China POUND IT 3mg | 400 | $32.00 | | | | | | 400 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China POUND IT 6mg | 700 | $56.00 | | | | | | 700 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China CRACK PIE 1.5mg | 400 | $32.00 | | | | | | 400 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China CRACK PIE 3mg | 400 | $32.00 | | | | | | 400 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| China CRACK PIE 6mg | 700 | $56.00 | | | | | | 700 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| French Crack pie 3mg | 15 | $1.20 | | | | | | | | | | | | | | | | | | | | | 15 | | | | | | | | | | | | | |
| French Too Puff 3mg | 15 | $1.20 | | | | | | | | | | | | | | | | | | | | | 15 | | | | | | | | | | | | | |
| French Too Puff 6mg | 10 | $0.80 | | | | | | | | | | | | | | | | | | | | | 10 | | | | | | | | | | | | | |
| French DONUT 3mg | 15 | $1.20 | | | | | | | | | | | | | | | | | | | | | 15 | | | | | | | | | | | | | |
| French DONUT 6mg | 20 | $1.60 | | | | | | | | | | | | | | | | | | | | | 20 | | | | | | | | | | | | | |
| Italy GUSH 0mg | 50 | $4.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 50 | | |
| Italy GUSH 1.5mg | 150 | $12.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 150 | | |
| Italy GUSH 3mg | 300 | $24.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 300 | | |
| Italy GUSH 6mg | 300 | $24.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 300 | | |
| Italy ROLLY 0mg | 50 | $4.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 50 | | |
| Italy ROLLY 1.5mg | 150 | $12.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 150 | | |
| Italy ROLLY 3mg | 300 | $24.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 300 | | |
| Italy ROLLY 6mg | 300 | $24.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 300 | | |
| Italy DUNKS 0mg | 100 | $8.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 100 | | |
| Italy DUNKS 1.5mg | 250 | $20.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 250 | | |
| Italy DUNKS 3mg | 500 | $40.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 500 | | |
| Italy DUNKS 6mg | 500 | $40.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 500 | | |
| Italy DONUTS 0mg | 30 | $2.40 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Italy DONUTS 1.5mg | 50 | $4.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Italy DONUTS 3mg | 150 | $12.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Italy DONUTS 6mg | 150 | $12.00 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| | | |
|---|---|---|
| Italy POUND IT 0mg | 30 | $2.40 |
| Italy POUND IT 1.5mg | 50 | $4.00 |
| Italy POUND IT 3mg | 150 | $12.00 |
| Italy POUND IT 6mg | 150 | $12.00 |
| | | |
| Italy CRACK PIE 0mg | 30 | $2.40 |
| Italy CRACK PIE 1.5mg | 50 | $4.00 |
| Italy CRACK PIE 3mg | 150 | $12.00 |
| Italy CRACK PIE 6mg | 150 | $12.00 |
| | | |
| **Total Printed** | **26706  0** | **$2,136.48** |

35  36  37  38  39  40  41   42  43  44  45   46   47   48   49  50   51   52   53   54   55   56   57   58   59   60  61   62  63  64   65  66   67   68  69  70  71   72  73   74  75  76  77  78  79  80



30
50
150
150

30
50
150
150

EXHIBIT 6

## AGREEMENT FOR PURCHASE AND SALE OF
## SHARES, MEMBERSHIP INTERESTS AND RIGHTS
## <u>IN VVIG INC AND VIRTUE VAPE LLC</u>

THIS AGREEMENT is made and entered into between ALL PARTIES AS DEFINED HEREIN, upon the terms and conditions herein set forth within the instant Agreement for the purposes set forth herein.

### <u>DEFINITIONS</u>

For purposes of the within Agreement for the Purchase and Sale of Shares, Membership Interests and Rights in VVIG Inc., and Virtue Vape LLC, the following terms are defined as follows:

1. ABBEY: The term "ABBEY" is defined as John Abbey.

2. ACO ENTITY: The term ACO ENTITY is defined as the Limited Liability Company to be formed as the recipient of the VVL INTERESTS and VVIG INTERESTS.

3. ACO ENTITY LOAN: the term ACO ENTITY LOAN is defined as a loan in an amount not to exceed 40,000.00 from JIMENEZ with zero interest for a term not to exceed six (6) months.

3. AGREEMENT: The term AGREEMENT is defined as the within Agreement for Purchase and Sale of Shares, Membership Interests and Rights in VVIG Inc. and Virtue Vape LLC.

4. ALVAREZ: The term ALVAREZ is defined as Henry Alvarez and assigns.

5. CUESTA: The term CUESTA is defined as Mariano Cuesta and assigns.

6. JIMENEZ: The term JIMENEZ is defined as Catalina Jimenez.

7. O'BRIEN: The term "O'BRIEN" is defined as David O'Brien.

8.    VVL: The term VVL is defined as Virtue Vape LLC, a Florida Limited Liability Company.

9.  VVL A/R is defined as accounts receivable which were created and accrued prior to December 15, 2015 but remained unpaid as of December 15, 2015.

10.  VVL CASH is defined as all funds held in any bank accounts by VVL as of December 15, 2015.

11.    VVL INTERESTS:  The term VVL INTERESTS is defined as any and all membership interests as well as any other form of ownership interest, options, pledges, warrant or any other form of interest or right to obtain any form of interest in VVL.

12.    VVIG: The term VVIG is defined as VVIG Inc., a Florida Corporation.

13.  VVIG A/R is defined as accounts receivable which were created and accrued prior to December 15, 2015 but remained unpaid as of December 15, 2015.

14.  VVIG A/R PERCENT is defined as 40% of the VVIG A/R.

15.  VVIG CASH is defined as all funds held in any bank accounts by VVIG as of December 15, 2015.

16.    The term VVIG INTERESTS is defined as any and all shares as well as any other form of ownership interest options, pledges, warrant or any other form of interest or right to obtain any form of interest in VVIG.

17.    ALL PARTIES: The term ALL PARTIES is defined as ABBEY, ACO ENTITY, ALVAREZ, CUESTA, JIMENEZ, O'BRIEN, VVL and VVIG.

## **RECITALS**

WHEREAS, VVL is a Florida Limited Liability Company which is in good standing solely owned by JIMENEZ (98% of the VVL INTERESTS) and O"BRIEN (2% of the VVL INTERESTS) with no other VVL INTERESTS owned by any other person; and

WHEREAS, VVIG is a Florida Corporation which is in good standing solely owned by JIMENEZ (40% of the VVIG INTERESTS), O"BRIEN (20% of the VVIG INTERESTS), ALVAREZ (20% of the VVIG INTERESTS) and CUESTA (20% of the VVIG INTERESTS)with no other VVL INTERESTS owned by any other person; and

WHEREAS, ABBEY has represented and warranted that he has no VVL INTERESTS nor VVIG INTERESTS but is executing this AGREEMENT to reflect the discharge and release of any potential claim or position which he may hold or have with regard to VVL and VVIG; and

WHEREAS, ALVAREZ, CUESTA and O'BRIEN desire that ACO ENTITY acquires and owns all VVL INTERESTS so that they acquire 100% of all VVL INTERESTS from the current holders of any and all VVL INTERESTS; and

WHEREAS, JIMENEZ and O'BRIEN desire to transfer all VVL INTERESTS unto ACO ENTITY and provide said ACO ENTITY with 100% of all VVL INTERESTS; and

WHEREAS, ALVAREZ, CUESTA and O'BRIEN desire that ACO ENTITY acquires and owns all VVIG INTERESTS so that ACO ENTITY acquires all VVL INTERESTS held by JIMENEZ as well as the VVL INTERESTS held by ALVAREZ, CUESTA and O'BRIEN; and

WHEREAS, JIMENEZ desires to transfer her VVIG INTERESTS unto ACO ENTITY to provide said ACO ENTITY with 100% of all VVIG INTERESTS; and

WHEREAS, ACO ENTITY will be thereafter owned by ALVAREZ, CUESTA and O'BRIEN equally; and

WHEREAS, ALL PARTIES have agreed to the terms and provisions set forth in the AGREEMENT and have agreed to be bound by all the terms hereof;

NOW THEREFORE, in consideration of the sum of ten dollars and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by ALL PARTIES, it is agreed as follows:

1.    ALL PARTIES represent and warrant that all items set forth in the Recitals of this AGREEMENT are true and correct.

2.    ALVAREZ, CUESTA and O'BRIEN shall form a create ACO ENTITY wherein each shall be a 1/3 member and vested with all membership rights.  Said ACO ENTITY shall be a member managed limited liability company as provided under Florida Law.  Said ALVAREZ, CUESTA and O'BRIEN will agree upon the name and terms for the articles of organization for said ACO ENTITY, as well as any terms to be adopted for any operating agreement.

3.    The ACO ENTITY shall acquire and purchase and ALVAREZ, CUESTA, JIMENEZ and O'BRIEN shall transfer any and all interests which they may have in VVL and VVIG unto the ACO ENTITY in consideration to be provided as follows:

A.    In consideration of any and all VVIG INTERESTS which ALVAREZ may hold and in consideration of the other obligations set forth herein, ALVAREZ shall receive 1/3 of the membership interest in the ACO ENTITY;

B.    In consideration of any and all VVIG INTERESTS which CUESTA may hold and in consideration of the other obligations set forth herein, CUESTA shall receive 1/3 of the membership interest in the ACO ENTITY;

C.    In consideration of any and all VVIG INTERESTS and VVL interests which O'BRIEN may hold and in consideration of the other obligations set forth herein, O'BRIEN shall receive 1/3 of the membership interest in the ACO ENTITY;

D.    In consideration of any and all VVIG INTERESTS and VVL interests which JIMENEZ may hold (as well as the representation and release of ABBEY), JIMENEZ shall receive the JIMENEZ PAYMENT.

The VVIG and VVL interests provided unto the ACO ENTITY shall not be subject to further transfer or pledge until such time as all payments described in paragraph 4 of this AGREEMENT are paid in full. Further, the books and records and certificates of such VVIG and VVL shall confirm and verify that the books and records and certificates of each have been so noted and that any such interests held in VVIG and VVL may not be transferred or pledged as set forth in this paragraph. Thus, ACO ENTITY shall remain as the sole owner of said interests, free and clear of any claim or lien, until such time as the full amounts described in paragraph 4 of this agreement are paid in full.

It is further hereby provided that any and all interests of ACO ENTITY shall be subject to a lien and UCC-1 filing with the Florida Secretary of State setting forth that any and all such ACO ENTITY INTERESTS are pledged as collateral for the obligations set forth in paragraph 4 of this AGREEMENT until said amounts are paid in full. A legend reflecting the foregoing shall be placed on any documentation evidencing any form of interest therein so as to insure that no ACO ENTITY interest may be transferred in any manner without such certificates being subject to the pledge described herein. No member or manager of ACO ENTITY shall take any action which may in any manner impair or effect the rights of JIMENEZ to the pledge agreement described herein. Further, ACO ENTITY shall confirm on its books and records the existence and application of the said pledge agreement.

4.    The JIMENEZ PAYMENT is defined as the payment by the ACO ENTITY as follows unto JIMENEZ at such address as may be designated by her:

A.    Commencing on December 15, 2015, the sum of $28, 125.00 (i.e. ¼ of 112,500.00) shall be paid unto JIMENEZ or such other person as JIMENEZ may in writing direct. A like payment of $28,125.00 shall be made on the 22nd day of December, 2015; A like payment of $28,125.00 shall be made on the 29th day of December, 2015; and A like payment of $28,125.00 shall be made

on the 8th day of January, 2016 (Thus, a total of $112,500.00 will be paid pursuant to this paragraph.)

B.     Commencing on January 15, 2016, the sum of $112,500.00 shall be paid unto JIMENEZ or such other person as JIMENEZ may in writing direct. A like payment of $112,500.00 shall be made on the fifteenth day of each month thereafter following until and through May 15, 2016. Such payments shall be subject to a grace period of ten days after written notice of default. (Thus, a total of $562,500.00 will be paid pursuant to this paragraph which when added to the sums described in subparagraph A hereof equals $675,000.00).

C.     Commencing on June 15, 2016, the sum of $56,250.00 shall be paid unto JIMENEZ or such other person as JIMENEZ may in writing direct. A like payment of $56,250.00 shall be made on the fifteenth day of each month thereafter following until and through May 15, 2017. Such payments shall be subject to a grace period of ten days after written notice of default. (Thus, a total of $675,000.00 will be paid pursuant to this paragraph).

D.     All amounts described as JIMENEZ PAYMENT within this paragraph 4 shall be reported on a Form 1099 unto JIMENEZ or such other person as JIMENEZ directed in writing.

E.     Additionally, JIMENEZ will enter into an employment agreement wherein she will perform such duties as are assigned by ACO ENTITY and be paid a gross salary (i.e. pre-tax) of $5,000.00 per month, (BEFORE TAXES) Such employment agreement shall be non-cancellable, commencing on December 15, 2015, and requiring her full and timely performance for payments. Said agreement will reflect a final termination date of November 15, 2017. Payments to JIMENEZ will be done on a W-2 basis with applicable withholding and similar required deductions.

F.     Notwithstanding any other provision to the contrary, it is provided that in the event that legislation or regulation render the business or business of VVL and VVIG economically unfeasible (i.e.the lawful sale of e-liquids in the United States of America), then and in that event, all payment

(provided under paragraphs 4 A through E hereof) , remaining due after the effective date of such legislation shall be cancelled, discharged and released.

G. In the event that any default or legislation change (as described in subparagraph F) should occur subsequent to June 15, 2016, it is hereby provided that ACO ENTITY shall nevertheless be deemed to be an owner of 50% of all ownership and other interests of VVIG and VVL.

5. All funds and assets which are held by VVL shall remain and be deemed to be assets of VVL; provided however, that it is acknowledged that all VVL CASH and VVL A/R is owed and shall be paid at closing unto JIMENEZ.

6. All funds and assets which are held by VVIG shall remain and be deemed to be assets of VVIG; provided however, that it is acknowledged that THE VVIG A/R PERCENT (but not VVIG CASH) shall be paid at closing unto JIMENEZ. Nevertheless, any and all distributions (to which JIMENEZ may be entitled and were accrued and due and owing as of December 15, 2015) shall still be paid unto JIMENEZ from VVIG.

7. The closing of the transaction provided for in this Agreement shall be at the offices of the VVL in Miami-Dade County, Florida or as such other place as may be agreed by the parties, on a date to be specified by the parties but in no event shall same be later than 30 days from the date hereof.

8. Each of the JIMENEZ, O'BRIEN and ABBEY (SELLING PARTIES) represents and warrants to all other parties herein, that:

A. Each of the Selling Parties, at the closing date, shall have full and valid title to the VVIG INTERESTS and VVL INTERETS to be delivered by them, and there will be no existing impediment to the sale and transfer of those shares. On delivery of the VVIG INTERESTS and VVL INTERESTS to be delivered under this Agreement, said interests shall be free and clear of all liens, charges and encumbrances and shall be legally issued, fully paid, and nonassessable interests of each Company. The VVIG INTERESTS and VVL INTERESTS delivered under this Agreement will constitute all of the issued and outstanding interests of the Companies existing as of the closing date.

B.      Each SELLING PARTY has the full right, power, legal capacity, and authority to enter into this Agreement and to sell and to deliver the VVIG INTERESTS and VVL INTERESTS to be sold and delivered under this Agreement.

C.      VVIG and VVL are business entities duly organized and validly existing and in good standing under the laws of Florida and have all of the powers necessary to engage in the business in which said entities are presently engaged.

D.      The VVIG INTERESTS and VVL INTERESTS have been duly authorized as represented in this AGREEMENT.  No outstanding interests are subject to any voting trust agreement, or any other agreement relating to the voting of the interests or restricting in any manner the sale or transfer of the interests.

E.      The balance sheet of VVIG and VVL as of _____ and related statements of income and expenses for the period ending on that date, copies of which have previously been delivered, comprise true and accurate statements as to the financial condition of both companies and the results of their prior operations, prepared in conformity with generally accepted accounting principles consistently applied.

F.      As of the date of this AGREEMENT and the Closing Date, the Companies have and will have no obligations or liabilities, contingent or otherwise, of a material nature, except as set forth in the above-described balance sheets.

G.      The Companies have good and marketable title to all of their property and assets, including the property and assets reflected in the above-described balance sheet, except property and assets disposed of since that date in the ordinary course of business.  In all instances, the remaining property and assets are subject to no mortgage, pledge, lien, conditional sales agreement, lease, encumbrances or charge that is not disclosed on the balance sheet.

H.      Since the date of the balance sheet, there have been no changes in the nature of the business of the Companies, or in their financial conditions, property, or assets other than changes in the ordinary course of business. Further,

the Companies haves has not incurred any obligations or liabilities or made any disbursements other than those in the ordinary course of business.

I.   The Companies are not a party to any employment contract with any person, or to any lease, contract, or agreement, not negotiated in the ordinary course of business.

J.   The Companies are not a Defendant, or a Plaintiff against whom a Counterclaim or Cross-Complaint has been asserted, in any litigation, pending or threatened neither has any material claim been made or asserted against either Company, nor are there any proceedings involving either Company threatened by or pending before any federal, state, or municipal government, or any department, board, body, or agency of the same.

K.   The Companies are not in violation of any provisions of its Articles of Incorporation/Organization or its Bylaws/Operating Agreement or any provision of law, and neither Company has defaulted under any Agreement or other instrument to which such Company is a party or by which such Company is bound, other than those of an immaterial insubstantial nature.

L.   The Companies are not in Default in payment of any of its obligations that are not revealed in the most receipt balance sheet furnished.

M.   Between the date of this Agreement and the closing date, the Companies will not pay or declare any distributions in respect of, nor issue, purchase, or redeem, any of its outstanding interests or any securities that evidence the right to purchase, or that are convertible into any form of interest.

9.   The ACO ENTITY represents and warrants that:

A.   It is a Limited Liability Company duly organized and validly existing and in good standing under the law of the State of Florida.

B.   The execution and delivery of this Agreement, by ACO ENTITY has been duly authorized by proper action and on the closing day ACO ENTITY will have all necessary power and authority to consummate the transaction contemplated by this Agreement.

10.     ACO ENTITY's obligation to perform and complete the transactions provided for in this Agreement shall be subject to SELLING PARTIES performing, on or before the closing date, all acts required of them, and shall be further subject to the material accuracy and correctness of the representations and warranties of SELLING PARTIES contained in this Agreement, and to the further conditions that:

    A.     On or before the closing date, SELLING PARTIES shall have caused the resignation of the mangers, officers and directors of Companies.

    B.     SELLING PARTIES shall deliver, on the closing date, a Certificate of SELLING PARTIES to the effect that the representations and warranties of SELLING PARTIES contained in this Agreement are substantially true as of the closing date.

    C.     SELLING PARTIES shall furnish, on the closing date, a Certificate of VVIG and VVL stating that as of the closing date, there has been no change in the capitalization of either Company or any change in its financial condition or asset other than changes resulting from the ordinary course of business and stating that no change has been materially adverse to either Company.

11.     SELLING PARTIES shall indemnify all other parties to this AGREEMENT against any and all loss, liability, and expenses, including attorney's fees, resulting from or arising out of taxes levied, imposed or assessed by any governmental authority, with respect to the income and operations of Company for all period prior to the closing date.

12.     All non-Selling Parties shall indemnify SELLING PARTIES against any and all loss, liability and expense, including attorney's fees, resulting from or arising out of taxes levied, imposed or assessed by any governmental authority with respect to the income of either Company for all periods commencing after the closing date.

13.     During the period from the date of this agreement to the closing date, SELLING PARTIES hall continue to conduct the business and operations of each Company in the same manner as they have been conducted previously, and shall maintain the books of account in accordance with generally accepted accounting principles consistently applied and in a manner that fairly and accurately reflects its income, expenses and liabilities.  During that period, unless the non-SELLING PARTIES shall have given their written consent, neither Company will and SELLING PARTIES will not cause either Company to, do any of the following:

A.     Incur any obligation or liability, absolute or contingent, other than current liabilities incurred in the ordinary and usual course of business.

B.     Incur any indebtedness for borrowed money, make any loans or advances to any individual, firm or corporation, or assume, guarantee, indorse, or otherwise become responsible for the obligations of any other individual, firm, or company.

C.     Declare or pay any distribution to any person;

D.     Subject any of its properties or assets to a mortgage, pledge, or lien, except encumbrances previously incurred in the ordinary and usual course of its business.

E.     Sell or transfer any of its properties.

F.     Make any investment of a capital nature.

G.     Enter into any long term contracts or commitments.

H.     Use any of its assets or properties, except for proper purposes.

I.     Modify, amend, cancel, or terminate any existing agreement, except; in the ordinary and usual course of its business.

J.     Issue, sell, or contract to sell any equity or debt securities.

14.     During the period from the date of this agreement to the closing date, SELLING PARTIES shall afford the non-SELLING PARTIES free access to BOTH Companies' offices, records, files, books of account, and tax returns, provided that such investigations and use of those item shall not unreasonably interfere with either Company's normal operation.

15.     ALL PARTIES shall bear their own counsel fees and other costs and expenses relating to the sale under this Agreement.

16.     ALL PARTIES each represent that none of them has employed any broker or entered into any agreement for the payment of any fees, compensation, or expenses to any person, firm, or corporation in connection with this transaction. Each shall indemnify the others against any such fees, compensation, or expense that may be incurred, particularly any claim for a finder's fee.

17.     Any notice, report, or demand required or permitted by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if it is sent by certified mail, postage and charges prepaid, to the addresses set forth in the Books and Records of VVIG.

18.     ABBEY represents and warrants that he holds no VVL INTERESTS nor VVIG INTERESTS and further waives and releases any claim or interest or position which he may have with regard to VVL and VVIG.

19.     ABBEY and JIMENEZ (herein defined as Employee/Contractor) agrees that during the term of JIMENEZ's employment agreement and for a period of two (2) years thereafter, said Employee/Contractor  shall not (within the area defined as the "Restricted Zone") directly or indirectly own any interest in, manage, operate, join, control, participate in, invest in, or otherwise be connected in any manner with, whether as an officer, director, member, manager, contractor, consultant, employee, partner, investor or otherwise any business entity which is engaged in any business similar to the business of either VVIG or VVL.  During the two (2) year period commencing on the date after termination of this agreement, Employee/Contractor may not for him/herself or on behalf of any other person, partnership, corporation or business entity be in contact in any way with any customer or supplier of the corporation for the purpose of soliciting, diverting or taking away any customer of VVL or VVIG.  A customer shall mean any person (including any form of entity) who has had any contact with either VVIG or VVL within the two (2) years prior to the date that the Employee/Contractor's relationship ceases.  A supplier of VVIG or VVL shall mean any person (including any form of entity) who has had any contact with VVIG or VVL (whether providing any service, product or both or acting as a vendor, supplier, distributor, manufacturer, contractor or any other relationship) within the two (2) years prior to the date that the Employee/Contractor's relationship ceases. Furthermore, Employee/Contractor covenants and agrees that

Employee/Contractor will fully and completely advise and inform any new persons with whom Employee/Contractor becomes involved of the existence and terms of this covenant. Furthermore, Employee/Contractor shall upon termination return to VVIG and VVL and shall not take nor maintain any client lists, supplier lists, nor any other information or supplies pertaining to either VVIG or VVL's business which shall be deemed to be trade secrets of both VVIG and VVL.

This non-compete provision is severable and independent of any and all other provisions hereof. Notwithstanding any other provision, neither VVIG nor VVL shall be liable nor responsible in any manner for workmen's compensation, withholding, social security, unemployment compensation, etc. In said regard, Employee/Contractor shall have no authority to bind either VVL or VVIG or act on behalf of them.

Employee/Contractor further has been provided with information regarding the marketing, advertisement, formulation, and operation regarding VVIG and VVL's business. Any and all such information shall be kept strictly confidential and may not be disclosed during the term of this agreement and for a period of five years after termination of this agreement.

The provisions hereof shall be enforceable by injunctive relief, with the requirement of bond being waived and further waiving proof of irreparable injury or harm. Consequential damages and attorneys fees pertaining to such violation will be awarded to VVL and/or VVIG in such event (Employee/Contractor waives any claim for attorney fees including the waiver of attorney fees pursuant to Florida Statute 57.105). Furthermore, for purposes of this agreement, the parties have agreed upon a liquidated damage amount of $250,000.00 for each such violation since it is agreed that in such event damages to VVIG and VVL shall be presumed. The parties to this agreement submit themselves to binding arbitration under the American Arbitration Association in Miami- Dade County, Florida. Trial by jury is waived by all parties.

The term VVIG and VVL's business is defined as any business carried on or engaged in by VVIG or VVL during the time of Employee/Contractor's term of retention, including but not limited to the manufacture, sale, distribution, as well as servicing of any and all matters pertaining to e-liquids and electronic smoking (e.g. electric products, hardware and any other product or service which may be made a part of the business).

The term Restricted Zone is defined as any area in which Employee/Contractor has engaged in business on behalf of or for VVIG or VVL including but not limited the addresses listed below of Employee/Contractor.

20. Notwithstanding any other provision set forth in this agreement, after substantial negotiation, the parties have agreed to modify their agreement as follows;

A. Transfer of management and control (but not ownership) of VVIG or VVL shall occur on December 20, 2015. At such time, the management and control of both VVIG and VVL shall be provided unto Alvarez and Cuesta; however, the ownership of any and all interests of said companies shall be held in escrow by ESCROW AGENTS.

B. Furthermore, all consideration to be paid unto JIMENEZ shall be also kept and paid in escrow with said ESCROW AGENTS.

C. The foregoing management and control is thus done in order to effectuate a smooth transition and understanding of the business operations between the parties.

D. Such transition shall not be deemed completed nor the escrow terminated until April 20, 2015 so that a full four month period is provided to ease such transition.

E. During the time of such transition, the ownership of the interests of VVIG and VVL shall remain with JIMENEZ; however, the obligations to pay any and all taxes attributable to income earned during such time period, shall be due and payable from ACO ENTITY. JIMENEZ shall calculate and review such amounts with all parties to confirm the amounts which are due and payable.

F. In the event that the amounts paid into escrow during this time period are not paid in accordance with this agreement, then and in that event the parties shall each receive from escrow the amounts or interest which they provided to escrow agent; provided that in the event, it is determined that a decrease in value of VVL and VVIG occurred due to the mismanagement or improper operations, then and in that event, the parties stipulate that the ACO ENTITY shall pay from the funds which it holds in escrow an amount of a penalty equal to the decrease in value caused by such mismanagement or improper operations as may be determined by the cpa chosen to do the books and records for VVL and VVIG in accordance with generally accepted accounting principles.

G. Prior to any such claim being asserted as to mismanagement or improper operations, written notice thereof shall be served upon ACO ENTITY from JIMENEZ specifying the specific points so alleged with a ten day right to cure and correct said items.

21. It is hereby further provided that if the ACO ENTITY in its sole discretion requests the providing of the ACO ENTITY LOAN from JIMENEZ. The funds set forth and constituting the ACO ENTITY LOAN shall be made available within ten days of written request.

22. This Agreement may not be modified, terminated or impaired except by written agreement signed by ALL PARTIES.

IN WITNESS WHEREOF, ALL PARTIES have executed this AGREEMENT for the purposes and upon the terms and provisions hereof intending to be bound thereby.

(The Remainder of this page has been intentionally left blank)

Witnesses:

_____          _____
Signature of Witness                         John Abbey

_____
Printed Name of Witness


_____
Signature of Witness

_____
Printed Name of Witness




State of Florida            )
                            ) s.s.
County of Miami-Dade        )

      Before me the undersigned authority personally appeared John Abbey who acknowledged before me that he executed the within AGREEMENT for the purposes therein expressed.  As proof of identification, he _____ is personally known to me; or _____ exhibited his Florida Driver's License.

Dated: December _____, 2015


_____
Notary Public
State of Florida
My commission expires:

Witnesses:

_____          _____
Signature of Witness                                          Henry Alvarez

_____
Printed Name of Witness

_____
Signature of Witness

_____
Printed Name of Witness

State of Florida          )
                                 ) s.s.
County of Miami-Dade   )

      Before me the undersigned authority personally appeared Henry Alvarez who acknowledged before me that he executed the within AGREEMENT for the purposes therein expressed.  As proof of identification, he _____is personally known to me; or _____exhibited his Florida Driver's License.

Dated: December ____, 2015

_____
Notary Public
State of Florida
My commission expires:

Witnesses:

_____
Signature of Witness

_____
Printed Name of Witness

_____
Signature of Witness

_____
Printed Name of Witness

_____
Mariano Cuesta


State of Florida            )
                            ) s.s.
County of Miami-Dade   )

      Before me the undersigned authority personally appeared Mariano Cuesta who acknowledged before me that he executed the within AGREEMENT for the purposes therein expressed. As proof of identification, he _____ is personally known to me; or _____ exhibited his Florida Driver's License.

Dated: December _____, 2015


_____
Notary Public
State of Florida
My commission expires:

Witnesses:

_____
Signature of Witness

_____
Printed Name of Witness

Catalina Jimenez, Individually and
as President on behalf of VVIG, Inc.
and as Manager and Member of
Virtue Vape, LLC

_____
Signature of Witness

_____
Printed Name of Witness

State of Florida      )
                     ) s.s.
County of Miami-Dade   )

      Before me the undersigned authority personally appeared Catalina Jimenez,
individually and as President of VVIG Inc. and as Manager and Member of Virtue
Vape LLC who acknowledged before me that she was authorized and empowered
to execute the within AGREEMENT on behalf of said companies and herself
individually and that she executed the within AGREEMENT for the purposes
therein expressed.  As proof of identification, she _____ is personally known to me;
or _____ exhibited her Florida Driver's License.

Dated: December _____, 2015

_____
Notary Public
State of Florida
My commission expires:

Witnesses:

_____

Signature of Witness

_____

Printed Name of Witness

David O'Brien, Individually and
on behalf of VVIG, Inc.
and as Manager and Member of
Virtue Vape, LLC

_____

Signature of Witness

_____

Printed Name of Witness


State of Florida          )
                          ) s.s.
County of Miami-Dade   )

      Before me the undersigned authority personally appeared David O'Brien, individually and on behalf of VVIG Inc. and as Member of Virtue Vape LLC who acknowledged before me that he was authorized and empowered to execute the within AGREEMENT on behalf of said companies and himself individually and that he executed the within AGREEMENT for the purposes therein expressed. As proof of identification, he _____is personally known to me; or _____exhibited his Florida Driver's License.

Dated: December ____, 2015


_____

Notary Public
State of Florida
My commission expires:

Exhibit "7"

Reply          Forward          Delete

## Fwd: Draft Shareholder Agreement

**Date:** 01/29/2016 (11:07:28 AM EDT)
**From:** John Abbey
**To:** Mariano Cuesta   henry@mv-co.com

**Attachments:**   Virtue Vape Shareholders Agreement (January 28 2016).doc (145 KB)

   Text (5 KB)

John Abbey

Begin forwarded message:

> **From:** Steve Rosenthal <steve@marxrosenthal.com>
> **Date:** January 29, 2016 at 9:09:07 AM EST
> **To:** Catalina Velasquez <catalina@virtuevape.com>
> **Cc:** John Abbey <john@virtuevape.com>
> **Subject: Draft Shareholder Agreement**

Catalina:
Attached is the initial draft of the VVIG Inc. Shareholder Agreement.  Please review and then we discuss and revise as necessary before circulating to the entire group.  I am out of town the remainder of today but will be in the office all of next week.  Thank you.
Steve

## Steve Rosenthal, Esq.

### *Marx Rosenthal PLLC*
SunTrust International Center
Suite 2900
One Southeast Third Avenue
Miami, Florida 33131

Ph:      (305) 577-0276
Direct:  (786) 378-8121
Fax:     (305) 577-9917
Steve@Marxrosenthal.com

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL. OR PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY

DRAFT 1/29/16

## VVIG INC.
## SHAREHOLDERS AGREEMENT

THIS SHAREHOLDERS AGREEMENT (this "Agreement") of VVIG Inc., a Florida corporation (the "Corporation"), is entered into effective as of the ___ day of _____, 2016 by and between Henry Alvarez ("Alvarez"), Mariano Cuesta ("Cuesta"), Catalina Jimenez ("Jimenez"), and Dave O'Brian ("Obrien" and together with Alvarez, Cuesta and Jimenez, the "Shareholders" and each a "Shareholder").

RECITALS

WHEREAS, the Corporation was formed on the 14th day of May, 2015 (the "Formation Date") upon the filing of Articles of Incorporation with the State of Florida; and

WHEREAS, the Shareholders signing below desire to provide herein for the management and the conduct of the business and affairs of the Corporation as well as the Shareholders' relative rights and obligations with respect thereto; and

WHEREAS, the Shareholders agree that this Agreement shall supersede any other agreement, oral or written, relating to the matters set forth herein and any such agreements shall be void in their entirety and of no further force or effect.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged by the Shareholders, the Shareholders intending to be bound by the terms of this Agreement hereby agree as follows:

## ARTICLE 1
## RECITALS

The above recitals are true and correct in all respects and are incorporated herein by reference.

## ARTICLE 2
## DEFINITIONS

The following capitalized terms used in this Agreement have the meanings provided below:

      a.    "Board" means the group composed of all of the Directors of the Corporation.

      b.    "Business Activities" or "Business" means the production and sale of e-juice and related products as well as any other legal business as determined with the Consent of the Board.

    c.      "Class A Shareholder" means any Shareholder owning Class A Shares.

    d.      "Class A Shares" means that specific class of Shares with respect to the Class A Members as set forth on Schedule A attached hereto and which are voting shares of the Corporation.

    e.      "Class B Shareholder" means any Shareholder owning Class B Shares.

    f.      "Class B Shares" means that specific class of Shares with respect to the Class B Members as set forth on Schedule A attached hereto and which are non-voting Shares of the Corporation.

    g.      "Code" means the Internal Revenue Code of 1986, as amended, as well as all Treasury Regulations promulgated under the Code.

    h.      "Consent" means, (i) with respect to a vote of the Shareholders, the approval, authorization, consent or ratification of Members (or the proxies of such Members) holding more than fifty percent (50%) of the Class A Shares at a meeting duly held pursuant to this Agreement or given by such Shareholders in an instrument duly executed and delivered in the manner provided herein and (ii) with respect to a vote of the Directors, the majority vote of the Directors with each Director entitled to one (1) vote.

    i.      "Corporation" means VVIG Inc., a Florida corporation, or any successor thereto by merger or consolidation.

    j.      "Corporation's Clients" means any individuals, partnerships, corporations, professional associations or other business organizations for whom the Corporation or its subsidiaries perform Business Activities.

    k.      "Documents" means all original written, recorded, or graphic matters whatsoever, and any and all copies thereof, including, but not limited to:  papers; books; records; tangible things; correspondences; communications; messages; memoranda; work-papers; reports; affidavits; statements; summaries; analyses; evaluations; client records and information; agreements; agendas; advertisements; instructions; charges; manuals; brochures; publications; directories; industry lists; schedules; price lists; client lists; statistical records;  training manuals; computer printouts; books of account; records and invoices reflecting business operations; and all things similar to any of the foregoing however denominated.  In all cases where originals are not available, the term "Documents" shall also mean identical copies of original documents or non-identical copies thereof.

    l.      "Fair Market Value Per Share" means the price per Share determined in accordance with the provisions of Article 7 of this Agreement.

m.     "Percentage Ownership" means, with respect to each Shareholder, the percentage determined by dividing the number of issued and outstanding Shares owned by such Shareholder by the aggregate issued and outstanding Shares owned by all Shareholders (and initially as set forth opposite each Shareholders name on Schedule A attached hereto).

n.     "Person" includes an individual, partnership, corporation, association, joint-stock company, limited liability company, trust, joint venture, unincorporated organization, any governmental entity, department, agency or political subdivision, or any other entity.

o.     "Personal Representative" and "PR" each means the executor (for purposes hereof, the term executor has the meaning provided therefore under Section 2203 of the Code, executrix, administrator, or administratrix of any deceased Shareholder, the trustee of any trust which holds Shares, or the representative of a deceased person.

p.     "Proprietary Information" means trade secrets or confidential proprietary information of the Corporation which are material to the conduct of the Business of the Corporation.

q.     "Shareholder" means any holder of Shares from time to time. "Shareholders" means all of the holders of Shares from time to time, unless the context expressly indicates to the contrary.

r.     "Shares" means any and all of the shares of stock of the Corporation including both Class A Shares and Class B Shares.

s.     "Transfer" means any direct or indirect, voluntary or involuntary, sale, assignment, transfer, mortgage, encumbrance, pledge, hypothecation, or other disposition of Shares or any interest in Shares.

t.     "Transferee" means any Person to whom Shares are Transferred.

3

## ARTICLE 3
### FORMATION/CORPORATE INFORMATION

**3.01**   **Formation**.   The Corporation was formed as a corporation under the Florida Business Corporation Act (the "Act"), upon the filing of Articles of Incorporation with the Office of the Secretary of State of the State of Florida

**3.02**   **Admission of Shareholders**.   By executing this Agreement, the Shareholders are all being admitted as the sole Shareholders of the Corporation, all upon the terms and subject to the conditions set forth in this Agreement.

**3.03**   **Name of the Corporation**.   The name of the Corporation is VVIG Inc.   The Corporation shall conduct its business under such name, or under any assumed, fictitious or other name as may be determined by the Board and permitted by law.

**3.04**   **Places of Business**.   The principal place of business of the Corporation shall be located at 572 NW 23rd Street, Miami, FL 33127 or at such other place as the Directors may determine with Consent.   The Corporation shall qualify to do business in such places as the Directors may determine with Consent.

**3.05**   **Registered Agent**.   The Registered Agent of the Corporation shall be _____.   The address of the Registered Agent shall be _____.

**3.06**   **Ownership.**   By executing this Agreement each Shareholder agrees and acknowledges that their Percentage Ownership and ownership of a specific class of Shares shall be as set forth opposite their name on Schedule A attached hereto and that there are no other shareholders in the Corporation.

**3.07**   **Prior Agreements.**   All prior agreements, whether written or verbal, between the Corporation and the Shareholders as well as among the Shareholders or any other Persons as a group relating to the management of the Corporation, Transfer and restrictions on Transfers of Shares owned by the Shareholders and any other matters discussed herein are, upon execution of this Agreement, hereby terminated, revoked, made null and void and of no further force or effect.

## ARTICLE 4
### RESTRICTIONS ON TRANSFER OF SHARES

**4.01**   **Restrictions on Transfer.**   As long as this Agreement remains in effect, no Shareholder may at any time Transfer any Shares or any interest in any Shares now owned or hereafter acquired by the Shareholder, unless they first comply with the terms and conditions of this Agreement.   Any attempted Transfer of any Shares or interest in any Shares in violation of this Agreement is void and ineffectual, does not operate to Transfer any interest to the purported

Transferee.  In the event of any Shareholder that is an entity, the Transfer or proposed Transfer of the equity interests in such entity shall be treated as an attempted Transfer of the Shares held by such entity which shall be subject to the terms of this Agreement.

**4.02**     **Permitted Transfers by Shareholders.**  Notwithstanding the terms of Section 4.01, a Shareholder may Transfer its Shares in any manner as long as the Shareholder obtains the prior written consent of all Class A Shareholders prior to effecting the Transfer and the proposed Transferee, as a condition precedent to such Transfer, executes a writing acceptable to counsel for the Corporation whereby the proposed Transferee agrees to become a party to this Agreement and obtains a written opinion (at the Transferee's expense) that such Transferee is a permissible Shareholder of an "S" corporation under the Code.

**4.03**     **Right of First Refusal.**  Notwithstanding any other terms of this Agreement, and after complying with, the terms of Section 4.02, any Shareholder (the "Offering Person") who wishes to Transfer part or all of its Shares (the "Offered Shares") to a third party may do so only in accordance with the following procedures:

(a)     Offering Notice. The Offering Person shall give written notice thereof (the "Offering Notice") to the Corporation and each other Shareholder. The Offering Notice shall state (A) the number of the Offered Shares, (B) the name of the prospective Person (the "Prospective Assign") to whom the Offering Person desires to transfer the Offered Shares, (C) the price of the Offered Shares to be paid by the Prospective Assign, (the "Proposed Purchase Price"), (D) that the proposed purchase of the Offered Shares shall be consummated no later than thirty (30) calendar days after the expiration of the options referred to in Subsections below, (E) such information as required as a result of the proposed Transfer, and (F) that the offer of the Prospective Assign has been accepted by the Offering Person subject to the rights of the Corporation and each Offeree (as defined below) contained in this Section 4.03.

(b)     Certificate of Prospective Assign. The Offering Notice shall be accompanied by a certificate of the Prospective Assign stating that (A) its offer to purchase the Offered Shares is a valid, binding and enforceable against the Prospective Assign, (B) the description of its offer contained in the Offering Notice is complete and accurate, (C) it is aware of the rights of the Corporation and each Offeree contained in this Section 4.03 and (D) prior to the purchase of any Offered Shares by the Prospective Assign, it will become a party to this Agreement and agree to be bound by the terms and conditions hereof (including the terms of Section 4.02). In addition, the certificate of the Prospective Assign shall be accompanied by evidence reasonably satisfactory to the Board as to the Prospective Assign's financial ability to consummate the proposed purchase; provided that the delivery to the Corporation of financial statements of the Prospective Assign showing a net worth in excess of two times the Proposed Purchase Price shall satisfy this requirement.

(c)     Option to Purchase by Each Offeree. Upon receipt of an Offering Notice, the other Shareholders (each, an "Offeree" or collectively, "Offerees"), each Offeree shall have the opportunity to purchase all or part of the Offered Shares based on such Offeree's Proportionate Share, on the same terms and conditions as those in the Offering Notice. An Offeree may exercise its option by delivering to the Offering Person and the Corporation written

notice of its desire to exercise its option within thirty (30) calendar days following the date that the Offering Notice was delivered.  For purposes of this Section 4.03(c) the term "Proportionate Share" means such number of Offered Shares multiplied by a fraction, the numerator of which is the number of Shares of the subject Offeree who exercises his, her or its option to purchase the Offered Shares, and the denominator of which is the total number of Shares of all of the Offerees who exercise their options to purchase the Offered Shares.  In the event not all Offered Shares are purchased by the Offerees pursuant to this Section 4.03(c) the Offerees purchasing their full Proportionate Share of the Offered Shares shall be permitted to purchase any remaining Offered Shares in such amounts as mutually agreed by all of such Offerees.  Subject to the provisions below, any Shareholder who exercises his, her or its option under this Subsection 4.03(c) and pays the required consideration shall automatically be deemed to be a substitute member under the Act with respect to the Shares so Transferred in place of the Offering Person. If the Offerees elect to purchase any of the Offered Shares hereunder, they shall have thirty (30) days to close on such purchase upon acceptance of such offer.  Notwithstanding the foregoing, in the event of a sale of Class A Shares, any such Shares purchased by any Person other than an existing Class A Shareholder shall automatically convert to Class B Shares.

(d)     Option to Purchase to Corporation. If the other Members do not purchase all of the Offered Shares pursuant to (c) immediately above, the Corporation shall have the option for a period of twenty (20) calendar days to purchase some or all of the remaining Offered Shares on the same terms and conditions as those in the Offering Notice. The Corporation's option to purchase the Offered Shares hereunder shall be exercisable, with the Consent of the Board, by delivering written notice to such effect, prior to the expiration of such twenty (20) day period, to the Offering Person and each other Shareholder. The failure of the Corporation to exercise its option to purchase some or all of the remaining Offered Shares within such twenty (20) day period shall be deemed to be a waiver of its right to purchase the Offered Shares.

(e)     Sale by Offering Person. Subject to the provisions below, if the Corporation and the Offerees fail to exercise the options set forth in Sections 4.03(c) and (d)  with respect to all of the Offered Shares, then the Offering Person may proceed to sell the Offered Shares with respect to which none of said options were exercised to the Prospective Assign on the same terms as set forth in the Offering Notice; provided (i) such sale is closed within sixty (60) calendar days after the expiration of the option granted to the Offerees in Section 4.03(c) and (ii) the Prospective Assign agrees to be bound by all of the terms and conditions of this Agreement and executes such documents as are deemed reasonably necessary by the attorneys for the Corporation to bind the Prospective Assign to the provisions of this Agreement. If such sale is not consummated within said sixty (60) day period, no Transfer of such Offered Shares may be made thereafter by the Offering Person to the Prospective Assign without again complying with all other relevant terms of this Agreement. Upon satisfaction of the conditions set forth herein, the Prospective Assign shall automatically be deemed to be a Substitute Shareholder with respect to the Interest Transferred pursuant to this Section 4.03 in place of the Offering Person without the consent of the Members, and the Offering Person shall provide written notice of such Transfer to the Board and the Secretary immediately after the consummation of such Transfer. Notwithstanding the foregoing, in the event of a sale of Class A Shares to an Offering Person, any Shares purchased by such Person shall automatically convert to Class B Shares.

6

(f)      Closing. The closing of any purchase of the Offered Shares pursuant to this Section 4.03 shall be held at the principal office of the Corporation at 10:00 a.m. local time no later than thirty (30) calendar days after the date of expiration of the Offeree's option referred to in Section 4.03(c) and (d) or at such other time and place as the parties to the transaction may agree. At such closing, the Offering Person shall sell and assign the Offered Shares to the purchaser thereof free and clear of any liens, claims and encumbrances (other than restrictions imposed by this Agreement and pursuant to applicable federal and state securities laws) and the Offering Person shall so represent and warrant, and further represent and warrant that it is the record and beneficial owner of such Offered Shares. The purchaser(s) of the Offered Shares shall deliver at such closing, in cash by wire transfer of immediately available funds, payment in full for such Offered Shares.

### 4.04    Bring-Along/Tag-Along Rights.

(a)      Subject to the Right of First Refusal in Section 4.03, if any Class A Shareholder or group of Class A Shareholders (the "Selling Shareholder") propose to sell more than seventy five percent (75%) of the Class A Shares, in the aggregate, to a third party purchaser pursuant to a bona fide offer made by such third party, such Selling Shareholder shall have the right to cause all of the other Shareholders (the "Bring-Along Shareholders") to transfer such percentage of the Bring-Along Shareholders Shares to such third-party purchaser equal the percentage determined by dividing the number of Shares to be transferred by the Selling Shareholder by the total number of Shares held by the Selling Shareholder prior to such transfer.  Such right shall be exercised by the Selling Shareholder pursuant to a written demand (the "Joint-Sale Demand") which sets forth the terms and conditions of the proposed sale which shall be delivered to the Bring-Along Shareholders.  The closing of any sale of the Interests pursuant to this Section 4.04(a) shall be no sooner than thirty (30) days after the Bring-Along Partners receive the Joint-Sale Demand and the Bring-Along Shareholders agree to cooperate with the Selling Shareholder in taking any and all actions and signing such documents as may be required to consummate a sale pursuant to the terms of this Section 4.04(a).

(b)      Subject to the Right of First Refusal of Section 4.03, if any Shareholder or group of Shareholders (the "Selling Shareholder") proposes to sell any of their Shares to any Person (whether as the result of an Offer or otherwise), the other Shareholders (the "Tag-along Shareholders") may elect to participate in the sale on the same terms as the Selling Shareholder and forego their rights under Section 4.03 by giving notice of such intention to the Selling Shareholder within ten (10) days of receiving the Offer Notice (as defined in Section 4.03(a)) from the Selling Shareholder. Each Tag-along Shareholder shall be permitted to sell a number of Shares to such Person equal to the product of (i) the number of Shares which may be sold to such Person by the Selling Shareholder (taking into account any purchases by the other Shareholders pursuant to Section 4.04(b)) and (ii) a fraction, the numerator of which is the number of Shares held by the Tag-along Shareholder and the denominator of which is the aggregate number of Shares held by the Selling Shareholder (not taking into account any purchases pursuant to Section 4.03) and all Tag-Along Shareholders electing under this Section 4.04b). In the event Section 4.03 of this Agreement applies to the proposed sale and all Shares are purchased by

Other Shareholders pursuant to such Section, each Tag-along Shareholder electing under this Section 4.04(b) will have no right to sell any Shares to the Person wishing to purchase Shares and must abide by the terms of Section 4.04(b).

**4.05** **Effect of Involuntary Transfers.** Upon the happening of an Involuntary Withdrawal (as defined below) with respect to any Shareholder, such Shareholder (or such Shareholder's Successor), within five (5) days of such Involuntary Withdrawal, shall notify the Corporation and the other Shareholder of such event at which time such Shareholder (or the Shareholder's Successor) (the "Withdrawn Shareholder") shall be deemed to offer for sale (the "Withdrawal Offer") to the Corporation all of the Shareholder's Shares owned of record and beneficially by the Withdrawn Shareholder (or the Shareholder's Successor) (the "Withdrawal Interest").

The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 P.M., local time at the Corporation's principal office on the sixtieth (60th) day following the date the Corporation is notified of the Involuntary Withdrawal. At any time during the Withdrawal Offer Period, the Corporation, with the Consent of the Directors, may accept the Withdrawal Offer by notifying the Withdrawn Shareholder (or the Shareholder's Successor) (via the "Withdrawal Notice") of its acceptance.

If the Corporation accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase, which shall be not earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Period. If the Corporation accepts the Withdrawal Offer, the Corporation shall purchase the Withdrawal Interest for the Purchase Price Per Share multiplied by the Number of Shares being purchased, less any costs incurred with respect to such purchase. If the Corporation does not desire to purchase the Withdrawal Interest, the Corporation shall notify all other Shareholders, at any time prior to the expiration of the Withdrawal Offer Period, of its decision not to accept the Withdrawal Offer. In such event, each other Shareholder shall be permitted to purchase such percentage of the Withdrawal Interest equal to the percentage determined by dividing the number of Shares held by such Shareholder by the number of Shares held by all other Shareholders (excluding all Shares held by the Withdrawn Shareholder or such Shareholder's Successor).

If any other Shareholder decides to purchase their permitted portion of the Withdrawal Interest, the closing for such purchase shall be not earlier than ten (10) or later than sixty (60) days after the date they received Notice from the Corporation that the Corporation will not purchase the Withdrawal Interest. The price for the portion of the Withdrawal Interest being purchased will be the Purchase Price Purchase Price multiplied by the number of Shares being purchased.

If the Corporation and the other Shareholders fail to fully accept the Withdrawal Offer, then the Withdrawn Shareholder or the Withdrawn Shareholder's Successor, as the case may be, upon the expiration of the Withdrawal Offer Period, shall thereafter be treated as the un-admitted assignee of a Shareholder with respect to any un-purchased Shares who shall be entitled to distributions from the Corporation but shall not be permitted to participate in any capacity with

8

respect to the operations or management of the Corporation and any Class A Shares held by such Person shall automatically be converted to Class B Shares. The term Involuntary Withdrawal means, with respect to any Shareholder (or their Successor), the occurrence of any of the following events:

   a.  the Shareholder makes an assignment of their Shares for the benefit of creditors;

   b.  the Shareholder files a voluntary petition of bankruptcy;

   c.  the Shareholder is adjudged bankrupt or insolvent or there is entered against the Shareholder an order for relief in any bankruptcy or insolvency proceeding;

   d.  the Shareholder files a petition seeking for the Shareholder any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

   e.  the Shareholder seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Shareholder or of all or any substantial part of the Shareholder's properties;

   f.  the Shareholder files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Shareholder in any proceeding described in (a) through (e) immediately above;

   g.  in the case of a Shareholder that is an individual, the death of such individual; or

   h.  in the case of a Shareholder that is an entity, the death of the majority owner of such entity.

## ARTICLE 5
## RESTRICTIONS ON GRANTING ENCUMBRANCES

No Shareholder may directly or indirectly, grant a security interest in, mortgage, encumber, pledge, assign or Transfer for financing purposes or as collateral for performance of any obligation any of that Shareholder's Shares without in each case first obtaining the consent in writing of the holders of all of the outstanding Shares of the Corporation. That consent, if obtained, does not operate to release any of that Shareholder's Shares from the restrictions of this Agreement, but rather, all those restrictions merely become subject to the encumbrance to which the consent expressly applies, for the duration and amount of that encumbrance only. If the holder of the encumbrance at any time forecloses upon those Shares or otherwise causes the Transfer of those Shares, that holder, and any Person acquiring the Shares, takes them subject to all of the restrictions contained in this Agreement, and shall be subject to all of the restrictions of this Agreement the same as if that holder or Person had been an original party to this Agreement.

In addition, any such foreclosed Shares shall automatically convert to Class B Shares if they were previously Class A Shares.

## ARTICLE 6
## TAXES

6.01 **"S" Corporation Status.** The Shareholders intend that the Corporation be treated as an "S" corporation for U.S. federal income tax purposes. No Shareholder, Officer or Director shall make any election otherwise or take any action that would disqualify the Corporation as an "S" corporation.

6.02 **Allocations and Distributions**. All allocations of taxable profit or loss of the Corporation as well as distributions of cash or other property to the Shareholders shall be in accordance with each Shareholder's relative Percentage Ownership of the Shares.

6.03 **Tax Distribution**. Notwithstanding anything to the contrary in this Agreement, if the Corporation has not distributed to one or more Shareholders during any fiscal year an amount of cash at least equal to such Shareholder's Tax Distribution (as defined below) for such fiscal year, within sixty (60) days after the close of such fiscal year, the Directors will use their best efforts to cause the Corporation to distribute to each such Shareholder an amount of cash sufficient so that each Shareholder has received a Tax Distribution for such fiscal year. If there is insufficient cash to make a Tax Distribution to all Shareholders, then the available Cash will be divided amongst such Shareholders pro-rata in accordance with their relative short-falls.

"Tax Distribution" with respect to any Shareholder for any fiscal year of the Corporation means an amount of cash equal to the product of (i) the profit allocated to such Shareholder pursuant to Section 6.02 for such fiscal year and (ii) thirty-five percent (35%); provided, however, that with the unanimous vote of the Shareholders, the percentage in sub-clause (ii) may be increased or decreased from time to time to reflect changes in the maximum federal marginal income tax rate and applicable state income tax rates.

**6.03** **Amounts Withheld and Other Tax Payments**. Any amount withheld with respect to a Shareholder pursuant to any federal, state, local or foreign tax law from a distribution by the Corporation to a Shareholder shall be treated as distributed to such Shareholder. Any other amount required to be deposited or paid with respect to or on behalf of a Shareholder pursuant to any federal, state, local or foreign tax law in connection with any tax liability or obligation (estimated or otherwise) of the Shareholder shall be treated as a loan from the Corporation to such Shareholder. If such loan is not repaid within thirty (30) days from the date the Corporation notifies the Shareholder of such payment, the loan shall bear interest from the time such deposit or payment is made (and adjusted thereafter at intervals of one (1) year) at the prevailing prime rate then in effect plus two hundred (200) basis points. In addition to all other remedies the Corporation may have, the Corporation may withhold distributions that would otherwise be payable to such Shareholder and apply such amounts toward repayment of the loan.

## ARTICLE 7
## PURCHASE PRICE

**7.01    Determination of Purchase Price by Parties.**  The Purchase Price Per Share under this Agreement shall be its "Fair Market Value" (determined in the manner set forth below in Section 7.02) as of the end of the calendar month immediately preceding the calendar month in which the applicable event occurs requiring the determination of the Purchase Price Per Share.

**7.02    Fair Market Value of Shares.**

    **a.**    In the event it is necessary to determine the "Fair Market Value" per Share, said amount shall be determined jointly by  the selling Shareholder (or its PR, as the case may be) and the Corporation or other Shareholder, as the case may be.

    **b.**    **Joint Selection of Appraiser.**  In the event the relevant parties cannot agree on the "Fair Market Value" per Share pursuant to (a) immediately above, said amount shall be determined by an appraisal made by an appraiser jointly selected by (i) the selling Shareholder (or its PR, as the case may be) and (ii) the Corporation or other Shareholder, as the case may be.

    **c.**    **Individual Selection of Appraisers.**  If the foregoing parties fail or refuse to agree upon a mutually acceptable appraiser, then each such party may select his/her/its own appraiser (with all of the remaining Shareholders selecting one appraiser to act on their behalf); each appraiser must be a valuation expert certified by the American Institute of Certified Public Accountants (AICPA), the National Association of Certified Valuation Analysts  (NACVA), the Institute of Business Appraisers (IBA) or the American Society of Appraisers (ASA).  If all such appraisals vary by no more than 10%, the Fair Market Value shall be the average of all such appraisals.  In the event the appraisals vary by more than 10%, each of the appraisers shall select another appraiser to appraise the Fair Market Value of the Shares and the parties must share the cost of such appraisal equally.  The highest and lowest appraised Fair Market Values shall then be discarded, and the remaining appraised Fair Market Values shall be averaged.

    **d.**    **Fair Market Value is Binding.**  The Fair Market Value as determined pursuant to this Article 7 shall be final and binding upon the parties hereto and their respective PRs.

## ARTICLE 8
## LEGEND ON SHARE CERTIFICATES

**8.01**   **Legend.**   Simultaneously with the execution of this Agreement, the Shareholders must surrender to the Corporation all of their respective Share certificates (if issued) and the following endorsement will be placed on the face or back of each certificate:

> "These Shares may not be sold, Transferred, assigned, mortgaged, pledged, hypothecated or otherwise disposed of in any manner whatsoever except in accordance with a Shareholders Agreement between the holder of this certificate, the Corporation and others, a copy of which will be provided upon request."

AND

> "These Shares have not been registered under the securities act of 1933 or under any applicable state law.  They may not be offered for sale, sold, Transferred or pledged without (1) registration under the securities act of 1933 and any applicable state law, or (2) an opinion of counsel satisfactory to the corporation and its counsel that such registration is not required."

After that endorsement, the certificates will be returned to their respective owners.  All Share certificates hereinafter issued must bear the same endorsements.  Upon termination of this Agreement, such certificates must be surrendered to the Corporation and new certificates without the foregoing endorsements will be issued in lieu thereof.

**8.02**   **New Shareholder Requirements.**   Under no circumstance is a sale or other Transfer of any Shares valid until the proposed Transferee has executed and become a party to this Agreement and subject to all provisions of this Agreement (unless the requirement is waived by express written consent of all parties hereto) and has provided an opinion of counsel that such Transferee is a qualified shareholder of an "S" corporation.   Notwithstanding any other provisions of this Agreement, no Transfer of any Shares may in any event result in the non-applicability of the provisions of this Agreement to those Shares.

## ARTICLE 9
## BOARD OF DIRECTORS, OFFICERS & MANAGEMENT

**9.01**   **Composition of Board.**   The number of Directors comprising the Board at the time of the execution of this Agreement shall be four (4) consisting of Alvarez, Cuesta, Jimenez and O'Brien.  At a meeting of the Shareholders to be held in January of each year beginning in 2017, the Class A Shareholders, with Consent, shall elect three (4) Directors to serve until the subsequent January meeting unless the number of Directors of the Corporation has been increased.  With respect to the foregoing, the Class A Shareholders, with unanimous consent, may increase the number of Directors to an amount no greater than five (5) with the Class A

Shareholders appointing any such new Directors.  The Directors intend to hold monthly meetings at the offices of the Corporation.

Notwithstanding the foregoing, a Person shall immediately terminate as and cease to be a Director upon the happening of any of the following events:

      a.     the Person delivers to Corporation a written resignation as a Director; or

      b.     the Person ceases to be a Member (or the entity owned by a Director ceases to be a Shareholder) or dies;

The termination of a Person as a Director shall be deemed to occur (1) immediately upon the occurrence of an event described in b. immediately above with respect to the Person or (2) in the case of a written resignation as described in a. immediately above, upon the earlier of (i) the expiration of the thirty (30) day period after the date on which the written resignation was given to the Corporation or (ii) the date on which a new Director is appointed as set forth immediately below.  In the event a Director, or their successor (if any), ceases to be a Director pursuant to the terms above, a new Director may, but shall not be required to, be appointed with the unanimous vote of the remaining Directors who shall serve as a Director until the next January when Board elections shall take place.  In no event shall any Director be removed as a Director for so long as they are a Shareholder of the Corporation unless they are removed for Cause (as defined below).

    **9.02**    **Officers of the Corporation.**  The Directors, by executing this Agreement, agree to appoint O'Brien as the president of the Corporation (the "President") as well as Alvarez, Cuesta and Jimenez as the "Vice Presidents" of the Corporation.  The Directors, in their capacity as such, agree to only remove the President and Vice Presidents from their positions as such with the Consent of all disinterested Directors (i) for "Cause" or (ii) if such Office ceases to be a Shareholder or Director of the Corporation pursuant to this Agreement or otherwise.   For purposes of this section, for "Cause" shall mean: (A) committing or participating in an injurious act of fraud, gross neglect or embezzlement against the Corporation; (B) committing or participating in any other injurious act or omission in a manner which was materially negligent against the Corporation, monetarily or otherwise; (C) engaging in a criminal enterprise involving moral turpitude; (D) conviction of an act or acts constituting a felony under the laws of the United States or any state thereof; or (E) failure by the President to satisfy its fiduciary duties as set forth in this Agreement.  No actions, events or circumstances occurring or taking place at any time prior to the date of this Agreement shall in any event constitute or provide any basis for a determination of "Cause" hereunder.

    **9.03**    **Deadlock.**  In the event the Directors of the Corporation are deadlocked in the management of the Corporation's affairs with respect to a Major Decision (as defined below) for a period of at least fifteen (15) days, the Shareholders of the Corporation are unable to break the deadlock, and irreparable injury to the Corporation is threatened or being suffered, the Class A Shareholders with Consent shall select an individual who the Directors shall nominate to the Board.  All Class A Shareholders agree to vote to elect the nominated individual to the Board.  The newly nominated Director shall serve to break the deadlock in question, and shall continue

to serve as a Director of the Corporation until the next annual meeting of the Shareholders, at which point the number of Directors shall be reduced with elections to proceed pursuant to the provisions of Section 9.01. In the event a Director is not so elected within five (5) days after the fifteen (15) day deadlock period, all parties hereto agree that the matters resulting in the deadlock shall be immediately submitted to mandatory arbitration in Dade County, Florida, pursuant to the rules of the American Arbitration Association, and the rulings in such arbitration shall be adopted and complied with by the parties hereto.

**9.04 <u>Management of the Corporation</u>.** The management and control of the day-to-day business and affairs of the Corporation shall be vested in the President and Vice Presidents of the Corporation. The President and Vice Presidents shall report directly to the Board of the Corporation. The President shall be responsible for the implementation of the decisions of the Board and for conducting the ordinary and usual business and affairs of the Corporation as more fully set forth in Section 9.05 hereof, and as limited by this Agreement. Notwithstanding the foregoing, no Shareholder, Officer or Director shall take any of the following actions without the written Consent of the Directors (each, a "Major Decision"):

a. Changing the Business of the Corporation;

b. Assigning, pledging, mortgaging, granting security interests in or otherwise encumbering any of the assets of the Corporation, or causing the Corporation to guarantee the debts or other obligations of any other party, except in the ordinary course of business of the Corporation;

c. Except as otherwise set forth herein, borrowing any money or property or otherwise obtaining financing for the Corporation, other than credit purchases of goods and services on a current basis and in the normal course of business;

d. Making, executing or delivering any general assignment for the benefit of creditors or any bond, guaranty, indemnity bond, or surety bond;

e. Assigning, transferring, pledging, compromising, or releasing any claim of the Corporation except for full payment, or arbitrating, or consenting to the arbitration of any of its disputes or controversies;

f. Initiating, terminating or settling any legal proceedings to which the Corporation is a party;

g. Causing the Business of the Corporation to be conducted other than in the ordinary course;

h. Entering into any contract or agreement requiring a payment of funds in excess of $10,000.00 in one or a series of related payments;

i. Except as set forth herein, paying a salary to any Shareholder;

   j.   Setting up any subsidiary or affiliated entities; or

   k.   Hiring any employees of the Corporation.

In addition to the above, no Shareholder, Officer or Director shall take any of the following actions without the unanimous vote of the Board:

   a.   Selling or otherwise disposing of all or substantially all of the assets of the Corporation; or

   b.   Increasing the capital of the Corporation or admitting any new shareholder into the Corporation.

**9.05 <u>Duties of the President.</u>** The President, at the expense of and on behalf of the Corporation, shall in good faith use his best efforts to implement or cause to be implemented all decisions approved by the Board and to conduct or cause to be conducted the ordinary and usual business and affairs of the Corporation in accordance with and as limited by this Agreement, including, but not limited to, the items set forth below,  The Vice-Presidents, in their capacity as such, shall assist the President in implementing the following as well as such other appropriate actions as the President and Vice-Presidents shall determine from time-to-time:

   a.   Implement or continue to implement any business plan and/or Budget approved by the Board;

   b.   Coordinate the services of all employees, supervisors and other persons necessary or appropriate to carry out the business of the Corporation;

   c.   Cause to be kept all books of account and other records of the Corporation;

   d.   Negotiate, enter into and supervise the performance of contracts covering the acquisition of assets or the rendering of services to the Corporation;

   e.   At all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of the Corporation's property used or useful in the conduct of its business and keep the same in good repair, working order and conditions, and from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto so that the business carried on in connection therewith may be properly and advantageously conducted at all times;

   f.   To the extent that funds of the Corporation are available therefore, pay all debts and other obligations of the Corporation when due;

   g.   Maintain all funds of the Corporation in one or more accounts in a bank or banks selected by the Board;

h.  Create or cause to be created and supervise all systems, procedures and controls for the proper conduct of the business and affairs of the Corporation;

i.  Do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence, rights, franchises, licenses and privileges in the jurisdictions of its incorporation and qualify and remain qualified in each jurisdiction where qualification is necessary or desirable in view of its business operations or the ownership of its properties;

j.  Keep at all times the Corporation's properties adequately insured and maintained to the extent such insurance against such risks as maybe required by law, this Agreement or the Board;

k.  Cause the Corporation and all of its employees to observe and conform to all laws, regulations or other valid requirements of all governmental authorities relative to the conduct of the Corporation's business or to its properties and assets and maintain and keep in full force and effect all licenses and permits necessary to the proper conduct of the business of the Corporation; and

l.  Perform other normal business functions and otherwise operate and manage the business and affairs of the Corporation in accordance with and as limited by this Agreement.

**9.06 Monthly Compensation.**  For so long a Shareholder is a party to this Agreement, such Shareholder shall be entitled to a monthly salary (the "Salary") of five percent (5%) of the gross sales proceeds of the Corporation for the most recently ended month. Such amount shall be determined within five (5) business days of the end of each month and paid within fifteen (15) days of the end of each month. Notwithstanding the foregoing, the Salary may be increase, decreased or eliminated in its entirety with the Consent of the Board but any Salary must be identical for all Shareholders.

### ARTICLE 10
### ADDITIONAL CAPITAL/ISSUANCES OF NEW SHARES

If, at any time, the Directors, with Consent, determine that additional funds are necessary to further the Business, the Directors may, on behalf of the Corporation, either (i) obtain a loan from one or more Shareholders or an independent third party on commercially reasonable terms as determined in the sole discretion of the Directors or (ii) raise additional capital through the issuance of new Shares from the Corporation (the "New Shares"). In the event the Directors elect to issue New Shares, the Directors shall give each then existing Shareholder written notice of such election (which shall include the price per New Share) (a "New Share Notice") and each such Shareholder shall have fifteen (15) days to elect, in writing, to purchase their pro-rata portion of the New Shares based on the relative Percentage Ownership

of the Shareholders at the time of the planned issuance. In the event the Shareholders, in the aggregate, do not elect to purchase all of the New Shares by the expiration of the fifteen (15) day period, the Directors shall notify the Shareholders of the number of New Shares for which no election to purchase was made and the Shareholders that did elect to purchase their pro-rata share of the New Shares shall be permitted to elect, within fifteen (15) days of such notice, to purchase any remaining New Shares in such amounts as such Shareholders shall mutually agree. Shareholders making an election pursuant to this Article 10 must close on the purchase of the New Shares they have elected to purchase within forty five (45) days of the New Share Notice and any election made by any Shareholder pursuant to this Article 10 shall be deemed a binding commitment to purchase which will be specifically enforceable by the Corporation. Any New Shares not purchased by existing Shareholders may be sold to third parties for a period up to six (6) months from the date of the New Share Notice for a price no less than that offered in the New Share Notice. Following the issuance of New Shares pursuant to this Article 10 each Shareholder's Percentage Ownership shall be adjusted in accordance with the new number of Shares outstanding after such issuance this Agreement shall be amended accordingly to reflect the new issuance of Shares. Notwithstanding the foregoing, the number of total Shares that may be issued by the Corporation shall be limited to the extent set forth in the Corporation's Articles of Incorporation. In addition, any New Shares issued to a Class A Shareholder pursuant to this Article 10 shall be Class A Shares and any New Shares issued to a Class B Shareholder shall be Class B Shares.

## ARTICLE 11
## CORPORATE FINANCES & BANK ACCOUNTS

**11.01** The Officers of the Corporation may, at their discretion, annually prepare and submit to the Shareholders an annual budget with general categories of expenditures (the "Budget") no later than thirty (30) days prior to the end of each fiscal year. Any individual expenditure during any fiscal year in an amount greater than ten percent (10%) of a budgeted amount must, prior to expenditure, be submitted to the Board and approved with the Consent of the Directors.

**11.02** Accounting

       **a.**    **Fiscal Year.** The Fiscal Year of the Corporation shall end on the last day of December of each year.

       **b.**    **Location of Records.** The books of account of the Corporation shall be kept and maintained at the principal office of the Corporation. In addition, all other records necessary, convenient or incidental to recording the Corporation's business and affairs shall also be maintained at the principal office of the Corporation. For accounting purposes only, said books of account shall be maintained on an accrual basis in accordance with GAAP, consistently applied, and shall show all assets, liabilities, and capital accounts and all items of income, cost and expense.

    c.  **Accounting Decisions**. All decisions as to accounting principles and elections, whether for book or tax purpose (and such decisions may be different for each purpose), as well as the choice of the accountant for the Corporation shall be made by the President; provided, however, all decisions with respect to accounting principles shall be in accordance with consistent application of GAAP in effect at the time of such decisions.

    d.  **Right of Inspection**. Each Shareholder shall have the right at all reasonable times during usual business hours to audit, examine and make copies of or extracts from the books of account or other records of the Corporation. Such right may be exercised through any agent or employee of such Shareholder designated by him or her. Each Shareholder shall bear all expenses incurred in any examination for such Shareholder's account. No Shareholder shall do anything under this paragraph which would unreasonably interfere with the operations of the Corporation.

    **11.03**  **Bank Accounts.** Funds of the Corporation shall be deposited in an account or accounts in the bank or banks approved by the Board. Withdrawals from bank accounts shall be made only in the regular course of the Corporation's business on signatures only of _____. Furthermore, there shall be no commingling of the monies and funds of the Corporation with the monies and funds of any other Person.

## ARTICLE 12
## NON-COMPETE/CORPORATE OPPORTUNITIES

    Each Shareholder hereby agrees that for so long as they are a Shareholder of the Corporation they will not, directly or indirectly (including, but not limited to, as an equity or debt holder, partner, shareholder, employee, independent contractor, manager, director or officer) through any affiliate or other related entity or person, in the United States or any other jurisdiction, compete with any business of the Corporation (including, but not limited to the Business) or appropriate any business opportunity, involving any business activity in which the Corporation has or may have an interest for any corporate purpose (a "Business Opportunity"), without first (i) presenting the Business Opportunity to all of the Shareholders in writing and (ii) receiving unanimous written consent of the Directors waiving the Corporation's right to the Business Opportunity. Each Shareholder hereby agrees to be expressly bound by this provision and acknowledges that the other Shareholders would not have entered into this Agreement without the inclusion of this provision. Notwithstanding the above, the Shareholders shall be permitted to pursue such other non-competing business ventures that they so desire without any other Shareholder or Director having any rights with respect to any profits or gains derived from such businesses and may continue any existing businesses that they operate as of the date of this Agreement.

## ARTICLE 13
## LIFE INSURANCE

The Corporation may maintain a life insurance and/or a disability policy on the life of any of the Shareholders. Such insurance may be maintained for the purpose of replacing a "key" Shareholder upon such Shareholder's death or for purchasing such Shareholder's Shares upon such events. Any insurance purchased by the Corporation will be at the discretion of the Board and the proceeds of such policy shall belong solely to the Corporation.

## ARTICLE 14
## TERMINATION OF AGREEMENT & CORPORATION

**14.01  Termination of Agreement as to All Parties.**  This Agreement will terminate upon the occurrence of any one of the following events:

      a.     the express written agreement of all of the parties hereto, or their respective successors in interest, to that effect;

      b.     the bankruptcy, receivership or dissolution of the Corporation; or

      c.     the acquisition of all of the outstanding securities of the corporation by one Shareholder or a third party Transferree;

**14.02  Termination of Agreement as to a Particular Shareholder.**  This Agreement will terminate with respect to an individual Shareholder when, through compliance with this Agreement, the Shareholder no longer owns any interest in the Shares.

**14.03  Termination of Corporation.**  The Corporation's existence shall terminate upon the Consent of the Board.

## ARTICLE 15
## MISCELLANEOUS

**15.01  Choice of Law/Venue.**  This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Agreement shall be governed by, the internal laws of the State of Florida, without giving effect to provisions thereof regarding conflict of laws. Except for disputes governed by arbitration, the parties hereby submit to the exclusive jurisdiction of the United States District Court of in and for the Southern District of Florida or the Circuit Courts and in for Miami-Dade County located within Miami-Dade County, Florida over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby, and further agree that venue for all such matters shall lie exclusively in those courts and that process for any such action or proceeding may be served on any party anywhere in the world. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they

may now or hereafter have, including, but not limited to, any claim of forum non conveniens, to venue in such courts.

**15.02   Successors.**  Subject to and without intending to waive the restrictions relating to transfer or assignment in this Agreement, this Agreement inures to the benefit of and is binding upon the parties, their respective estates, heirs, executors, administrators, legal representatives, successors and assigns, as applicable and appropriate.

**15.03   Severability.**  If any provision of this Agreement is, for any reason, declared by a court of competent jurisdiction to be invalid or unenforceable then (i) the validity and enforceability of all provisions of this Agreement not ruled to be invalid or unenforceable will be unaffected, (ii) the effect of the ruling will be limited to the jurisdiction of the court making the ruling, (iii) the provisions(s) held to be wholly or partly invalid or unenforceable will be deemed amended, and the court is authorized to reform the provision(s) to the minimum extent necessary to render them valid and enforceable in conformity with the parties' intent as manifested herein, and (iv) if the ruling, or the controlling principle of law or equity leading to the ruling is subsequently overruled, modified, or amended by legislative, judicial or administrative action, then the provision(s) in question as originally set forth in this Agreement will be deemed valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity.

**15.04   Counterparts.**  This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all counterparts shall together constitute one and the same instrument.

**15.05   Waivers.**  Each of the parties to this Agreement reserves the right to waive any of the conditions precedent to their respective obligations hereunder.  No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.  All remedies afforded in this Agreement shall be taken and construed as cumulative, that is, in addition to every other remedy provided therein or by law or in equity.  The failure of any party to enforce at any time any of the provisions of this Agreement, or to require at any time performance by any other party of any of the provisions hereof, shall in no way be construed to be a waiver or create an estoppel from enforcement of such provisions, nor in any way to affect the validity of this Agreement or any part thereof, or the right of any party to thereafter enforce each and every such provision, or to seek relief as a result of the prior breach.

**15.06   Notices.**  All notices and other communications required or permitted to be given pursuant to this Agreement shall be in writing signed by the sender, and shall be considered given by the sender and received by the recipient as follows:  (a) on the date delivered, if personally delivered; (b) on the date sent by telecopy, if sent on a business day by 6:00 p.m. (EST) with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error; or if sent after that time, on the next succeeding business day; (c) on the next business day after being sent by recognized overnight mail service in time for and specifying next day or next business day delivery; or (d) five (5) business days after mailing, if mailed by United States postage-paid, certified or registered mail, return receipt requested, in

each case addressed to the parties at their respective addresses or telecopier numbers as set forth on the books and records of the Corporation.

**15.07   Amendments.**  Except as provided herein, this Agreement may be amended or modified only by a writing signed by all of the Shareholders at the time of the amendment.

**15.08   Further Assurances.**   Consistent with the terms and conditions of this Agreement, each party hereto shall do and perform or cause to be done and performed all such further acts and things, and shall execute and deliver all such other instruments, certificates, and other documents as any other party hereto may reasonably require in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

**15.09   Attorney/Attorneys' Fees.**  In connection with any litigation, including appellate proceedings, arising out of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs including all costs incurred to recover attorney's fees.  In addition, each Shareholder acknowledges that this Agreement has been drafted by counsel for the Corporation and that he has been afforded the opportunity, and encouraged, to seek independent legal counsel with respect to the terms contained herein and has been afforded the opportunity to ask questions regarding the terms contained herein.   Notwithstanding the above, each Shareholder fully understands all terms of this Agreement and is satisfied with such terms.

IN WITNESS WHEREOF, the parties have set their hands and seals with respect to this Shareholders Agreement of VVIG Inc. consisting of twenty one (21) pages plus Schedules and Exhibits effective as of the day and year first above written.


_____
Henry Alvarez, Shareholder & Director


_____
Mariano Cuesta, Shareholder & Director


_____
Catalina Jimenez, Shareholder & Director


_____
Dave O'Brien, Shareholder & Director

21

## SCHEDULE A

| Name and Address | Shares & Class | Percentage Ownership |
|---|---|---|
| Henry Alvarez<br>4151 Segovia Drive<br>Coral Gables, FL 33146 | 2,000 Class A | 20% |
| Mariano Cuesta<br>2245 SW 10th Street<br>Miami, FL 33135 | 2,000 Class A | 40% |
| Catalina Jimenez<br>2775 Collins Avenue, PH9<br>Miami Beach, FL 33140 | 4,000 Class A | 20% |
| Dave O'Brien<br>8307 Cazavini Court<br>Miami, Raleigh, NC 27613 | 2,000 Class A | 20% |
| **TOTAL** | **10,000** | **100%** |

Exhibit "8"

Too Püft

$4.25 /bottle 60 mL for Manufacturing of Too Püft

Henry and Mariano purchase boxes

Henry and Mariano psrchase inventory

Paul sends Henry and Mariano art work

Give us recei.pe

Foodfighter Juice

- $4.60 /bottle 60 mL for manufacturing of The Raging Donut, Pound It

and Crack Pie. Exclusively to manufacter flavors previously mentioned

- $2.80 /bottle 30mL for manufacturing of The Raging Donut, Pound It

and Crack Pie. Exclusively to manufactor flavors previously mentioned

- Henry & Mariano receive $2 per 60mL and $1 per 30mL sold

by Virtue Vape LLC    VVIG Inc.

Henry and Mariano pay ▓▓▓▓ For their marketing

- Mariano and Henry recieve possesion of ejuicedepo.com and all

passwords

*Henry Alvarez not allowed to come Virtue Vape

- Henry and Mariano distribute brands made by Virtue Vape

- Virtue Vape LLC and VVIG are only allowed to sell to

distributers.

HENRY & MARIANO Purchase Quiche Inventory at $16[

Lease for 164 NW 20ᵗʰ St will be determined in the

future

- Virtue Vape and VVIG relinquish any right of ownership of Food Fighter

Juice or Too Püft

- Effective as of 2/17/16 pending Cashier's check for the following:



Contract
be final

**Too Poff**
- $4.25/bottle 60mL for Manufacturing of Too Poff
  D° M.C.
- Henry and Mariano purchase boxes
- Henry and Mariano purchase inventory
- Paul sends Henry and Mariano art work
- Give us receipe

exclusivity until the Brand Dies

**Foodfighter Juice**
- $4.60/bottle 60mL for manufacturing of The Raging Donut, Pound It and Crack Pie. Exclusively to manufacture flavors previously mentioned
- $2.80/bottle 30mL for manufacturing of The Raging Donut, Pound It and Crack Pie. Exclusivity to manufacture flavors previously mentioned
  D° M.C.
- Henry & Mariano receive $2 per 60mL and $1 per 30mL sold by Virtue Vape LLC / VVIG Inc.
- Henry and Mariano pay $4,200 for marketing expense!
- Mariano and Henry recieve posession of ejuicedepo.com and all passwords
  D° M.C.
- ✗ Henry Alvarez not allowed to come Virtue Vape
- Henry and Mariano distribute brands made by Virtue Vape
- Virtue Vape LLC and VVIG are only allowed to sell to distributors.

- HENRY & MARIANO Purchase Quiche Inventory at $1.61
- Lease for 161 NW 20th St will be determined in the future
  D° M.C.
- Virtue Vape and VVIG relinquish any right of ownership of Food Fighter Juice or Too Poff
- Effective as of 2/17/16 pending Cashier's check for the following:

M C 1) $4,200 for marketing

D 2) All of Too Puft inventory and boxes

3) Quickie inventory

C) 4) An order of The Raging Donut, Pound It, and Crack Pie

60 ços

Non factor !!!

No Sale !

VVIG-0362

M (1) $4,200 for marketing

2) All of Too Puft inventory and boxes

3) Quickie inventory

C) 4) An order of The Raging Donut, Pound It, and Crack Pie

60 days

Non refu !!
No Surv !